1  MARC A. PILOTIN
   Regional Solicitor
2  LAURA C. BREMER (Cal. Bar No. 162900)
   Counsel for ERISA
3  ADRIANA AHUMADA (Cal. Bar No. 274295)
   Senior Trial Attorney
4  ANDREW M. KATZ (Cal Bar No. 350024)
   Senior Trial Attorney
   UNITED STATES DEPARTMENT OF LABOR
5  90 7th Street, Suite 3-700
   San Francisco, CA 94103-1516
6  Telephone: 415-625-7742
   Ahumada.Adriana.E@dol.gov
7  *Attorneys for Plaintiff Julie A. Su,*
   *Acting United States Secretary of Labor*

8                **UNITED STATES DISTRICT COURT**

9                    **DISTRICT OF OREGON**

10                   **PORTLAND DIVISION**

11

12  JULIE A. SU,
         Acting Secretary of Labor, U.S.          Case No. 3:24-cv-01548-YY
13       Department of Labor,

14                              Plaintiff,         **[PROPOSED] CONSENT
                                                   JUDGMENT AND PERMANENT
         v.                                        INJUNCTION**
15

16  DR. ROBERT B. PAMPLIN, JR., an
    individual; R.B. PAMPLIN CORPORATION,
17  an Oregon Corporation; and R.B. PAMPLIN
    CORPORATION & SUBSIDIARIES
    PENSION PLAN, an employee benefit plan,
18
                                Defendants.
19

20

21

22

23

24

25
    _____
    CONSENT JUDGMENT AS TO R.B. PAMPLIN CORPORATION AND ROBERT B. PAMPLIN, JR.
    Case No. 3:24-cv-01548-YY                                        Page 1

**INTRODUCTION**

A.      Plaintiff Acting United States Secretary of Labor Julie A. Su ("Acting Secretary") of the U.S. Department of Labor ("Department") and Defendants R.B. Pamplin Corporation ("Pamplin Corporation") and Dr. Robert B. Pamplin, Jr. ("Dr. Pamplin") (collectively, the "Defendants") have agreed to resolve the matters in controversy in this civil action and agree to the entry of this Consent Judgment and Permanent Injunction ("Consent Judgment") as provided below. Marilyn Pamplin, Amy Pamplin North, and Anne Pamplin Evenson ("Pamplin Family Fiduciaries") are also signatories to this Consent Judgment and agree to be bound to its terms as provided below.

**STATEMENTS BY AND AGREEMENTS BETWEEN THE PARTIES**

B.      The Acting Secretary, pursuant to her authority under section 502(a)(2) and (5) of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), filed a Complaint against Defendants and the R.B. Pamplin Corporation and Subsidiaries Pension Plan (the "Pension Plan")[1] pleading violations of ERISA sections 404, 405, 406, and 407, 29 U.S.C. §§ 1104, 1105, 1106, and 1107.

C.      The Acting Secretary and Defendants (collectively, "the Parties") admit that this Court has jurisdiction over this action under ERISA section 502(e)(1), 29 U.S.C. § 1132(e)(1), and that venue lies in the District of Oregon pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2).

D.      Dr. Pamplin and Pamplin Corporation admit that they are fiduciaries to the Pension Plan, which is an ERISA-covered plan, and that they have been fiduciaries to the

---

[1] The Pension Plan is named in the Complaint as a party necessary for complete relief pursuant to Fed. R. Civ. P. 19(a).

Pension Plan since at least April 2004. Dr. Pamplin and Pamplin Corporation further admit that they are parties in interest to the Pension Plan within the meaning of ERISA section 3(14), 29 U.S.C. § 1002(14).

E.    The Parties agree to the entry of this Consent Judgment. The Parties further agree that this Consent Judgment fully settles all claims that the Acting Secretary asserted in the Complaint filed in this matter against Defendants covering the period from April 13, 2018 through September 6, 2023.

F.    Dr. Pamplin and Pamplin Corporation admit that the following companies are their affiliates or subsidiaries: Columbia Empire Farms, Inc.; Ross Island Sand & Gravel, Co.; Mount Vernon Mills, Inc.; Oregon Publication Corporation, Inc.; Smith and Waters, Inc.; Anne Amie Vineyards; LeCep II, Inc.; Pamplin Vineyards LLC; and R2 Land LLC (collectively, "Pamplin Affiliates"). Defendants further represent and admit that Dr. Pamplin has full control and authority over the Pamplin Affiliates and that the Pamplin Affiliates are parties in interest to the Pension Plan under ERISA section 3(14), 29 U.S.C. § 1002(14). Defendants agree that the Pamplin Affiliates are bound by this Consent Judgment. Defendants also agree that this Consent Judgment shall bind Defendants' affiliates, successors, assigns, heirs, agents, and representatives. This Consent Judgment will not apply to any current Pamplin Affiliate that is no longer owned or controlled in whole or in part by: (i) Defendants, (ii) any other Pamplin Affiliate, or (iii) any individual(s) related to Dr. Pamplin by blood or marriage.

G.    Dr. Pamplin and Pamplin Corporation admit that they violated ERISA section 406(a)(1)(E), 29 U.S.C. § 1106(a)(1)(E), by causing the Pension Plan to acquire employer real property that they knew or should have known was not qualifying employer real property as required by ERISA section 407(a), 29 U.S.C. § 1107(a).

H.      Dr. Pamplin and Pamplin Corporation admit that they violated ERISA sections 406(a)(1)(E) and 407(a), 29 U.S.C. §§ 1106(a)(1)(E) and 1107(a), by causing the Pension Plan to acquire non-qualifying employer real property and to hold more than 10 percent of the fair market value of its assets as employer real property. Dr. Pamplin and Pamplin Corporation admit that they caused the Pension Plan to acquire 27 non-qualifying employer real properties, in whole or in part, worth over 50 percent of fair market value of its assets. Defendants admit that they continued to cause the Pension Plan to acquire non-qualifying employer real properties after the Acting Secretary informed Defendants that doing so violated ERISA.

I.      Dr. Pamplin and Pamplin Corporation admit that they caused the Pension Plan to engage in numerous transactions that they knew constituted the sale, exchange, or leasing of property between the Pension Plan and Pamplin Corporation or one of the Pamplin Affiliates, all of which are parties in interest to the Pension Plan, in violation of ERISA section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A).

J.      Dr. Pamplin and Pamplin Corporation admit that they violated ERISA section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), by causing the Pension Plan to enter into leaseback agreements with Pamplin Corporation and the Pamplin Affiliates that contained highly unfavorable terms to the Pension Plan and that failed to contain terms protecting the Pension Plan's interests, thereby benefiting Defendants and the Pamplin Affiliates.

K.      Dr. Pamplin and Pamplin Corporation admit that they violated ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), by causing the Pension Plan to engage in transactions that they knew constituted direct or indirect transfers of the Pension Plan's assets to, or use of the Pension Plan's assets by, or for the benefit of, parties in interest. For example, Pamplin Corporation and the Pamplin Affiliates used many of the employer real properties acquired by

1    the Pension Plan either without paying rent or by paying rent late without incurring any penalties

2    for doing so.

3        L.    Dr. Pamplin and Pamplin Corporation admit that they violated ERISA section

4    406(b)(2), 29 U.S.C. § 1106(b)(2), by selling and contributing to the Pension Plan certain

5    employer real property saddled with unpaid property taxes or other encumbrances that Pamplin

6    Corporation and the Pamplin Affiliates had failed to pay or clear, thereby reducing their value.

7        M.    Dr. Pamplin and Pamplin Corporation admit that they breached their fiduciary

8    duty of loyalty in violation of ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), by failing

9    to act solely in the interest of Pension Plan participants and beneficiaries and for the exclusive

10   purpose of providing benefits to participants and defraying reasonable Pension Plan expenses.

11   For example, Dr. Pamplin and Pamplin Corporation sold employer real property to the Pension

12   Plan for the purpose of and with the intent to obtain cash for Pamplin Corporation and the

13   Pamplin Affiliates to the detriment of the best interests of the Pension Plan's participants and

14   beneficiaries.

15       N.    Dr. Pamplin and Pamplin Corporation admit that they breached their duty of

16   prudence in violation of ERISA section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(b), by imprudently

17   causing the Pension Plan to invest heavily in non-qualifying employer real properties and to

18   lease the employer real properties back to Pamplin Corporation and the Pamplin Affiliates,

19   resulting in poor investment returns on at least three properties compared to what the Pension

20   Plan would have earned had its assets been prudently invested.

21       O.    Dr. Pamplin and Pamplin Corporation admit that they breached their duty of

22   prudence in violation of ERISA section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(b), by causing the

23   Pension Plan to purchase or acquire the employer real properties identified on Exhibit 1 for over

24

25

fair market value using an imprudent process. For example, Dr. Pamplin and Pamplin Corporation caused the Pension Plan to acquire Ross Island Property (appraised value of $10,600,000) and Tait Property (appraised value of $4,800,000) using appraisals that did not account for significant environmental issues that reduced their fair market values below the appraised values. Defendants also failed to read the appraisal reports to confirm that the appraisers had accounted for these environmental issues and to ensure the information that the appraisers used was accurate. Defendants then caused the Pension Plan to acquire the Tait and Ross Island Properties.

P.      Dr. Pamplin and Pamplin Corporation admit that they breached their duty of diversification in violation of ERISA section 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C), by causing the Pension Plan to invest in an undiversified portfolio consisting of over 50 percent of employer real property.

Q.      Dr. Pamplin and Pamplin Corporation admit that they violated ERISA section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), by failing to comply with the Pension Plan's governing documents, which forbid transactions in violation of ERISA sections 406(a) and (b) and 407, 29 U.S.C. §§ 1106(a) and (b), 1107.

R.      Dr. Pamplin and Pamplin Corporation admit that because of their ERISA violations, the Pension Plan suffered losses, with such losses to be determined upon the Pension Plan's sale or disposition of its non-qualifying and imprudent employer real properties as set forth in this Consent Judgment.

S.      Defendants admit that their conduct as alleged in the Complaint and set forth in Paragraphs D through R above constitutes defalcation while acting in a fiduciary capacity for purposes of 11 U.S.C. § 523(a)(4).

T.      Dr. Pamplin and Pamplin Corporation waive filing an Answer and further waive entering any affirmative defense, counterclaim, or third-party complaint, or any other defenses that they may have in this case.

U.      Defendants waive service of the Consent Judgment and agree that entry of the Consent Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendants of its terms and conditions.

V.      Unless specifically provided below, Defendants waive any right to contest or appeal, including before this Court, any provision of this Consent Judgment or any action taken thereunder. Defendants agree that the Acting Secretary has full and final authority to determine losses based on the methodology described in this Consent Judgment.

W.      Defendants acknowledge that the Acting Secretary has received and relied upon their sworn declarations of financial status and other supporting financial documentation in entering into this Consent Judgment. If the Acting Secretary determines that their declarations of financial status and supporting financial documentation are false, misleading, and/or untrue, including by omission, Defendants acknowledge that they may be subject to civil contempt, criminal prosecution, other monetary penalties, and/or equitable relief.

X.      By signing their names to this Consent Judgment, Defendants represent that they are informed and understand the effect and purpose of this Consent Judgment, that they are signing this Consent Judgment freely and voluntarily, and that they have been given the opportunity to speak with an attorney regarding this Consent Judgment.

Y.      Defendants expressly waive Findings of Fact and Conclusions of Law.

## STATEMENTS AND AGREEMENTS BY ADDITIONAL PERSONS BOUND BY THIS CONSENT JUDGMENT

Z.      The Pamplin Family Fiduciaries agree that this Consent Judgment can be

1    enforced against them pursuant to Rule 71 of the Federal Rules of Civil Procedure as it could

2    against Defendants. The Pamplin Family Fiduciaries agree to the entry of this Consent Judgment

3    and to the Court's jurisdiction over them.

4    AA.    The Pamplin Family Fiduciaries admit that they were fiduciaries to the Pension

5    Plan during periods when Dr. Pamplin and Pamplin Corporation committed the ERISA

6    violations specified in Paragraphs G through Q above.

7    BB.    The Pamplin Family Fiduciaries admit that they violated ERISA sections

8    404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B), (D) because they had a fiduciary duty

9    to monitor the Pension Plan's Trustee Dr. Pamplin and failed to do so.

10    CC.    The Pamplin Family Fiduciaries agree that they are jointly and severally liable for

11    Dr. Pamplin's ERISA violations under ERISA section 405(a)(2), 29 U.S.C. § 1105(a)(2).

12    However, as provided below, collection against the Pamplin Family Fiduciaries for the amounts

13    due under this Consent Judgment will not proceed unless and until the Acting Secretary deems

14    Dr. Pamplin and/or Pamplin Corporation to be in default of their obligations under this Consent

15    Judgment. The Pamplin Family Fiduciaries consent to the entry of the permanent injunction and

16    judgment against them as provided in this Consent Judgment.

17    DD.    The Pamplin Family Fiduciaries waive service of the Consent Judgment and

18    Findings of Fact and Conclusions of Law. The Pamplin Family Fiduciaries agree that entry of the

19    Consent Judgment by the Court and filing with the Clerk of the Court will constitute notice to the

20    Pamplin Family Fiduciaries of its terms and conditions.

21    EE.    Unless specifically provided below, the Pamplin Family Fiduciaries waive any

22    right to contest or appeal, including before this Court, any provision of this Consent Judgment or

23    any action taken thereunder. The Pamplin Family Fiduciaries agree that the Acting Secretary has

24

25

full and final authority to determine losses due under this Consent Judgment based on the methodology described in this Consent Judgment.

FF.     By signing their names to this Consent Judgment, the Pamplin Family Fiduciaries represent that they have received actual notice of this Consent Judgment, that they are informed and understand the effect and purpose of this Consent Judgment, that they are signing this Consent Judgment freely and voluntarily, and that they have been given the opportunity to speak with an attorney regarding this Consent Judgment.

GG.     Marilyn Pamplin acknowledges that the Acting Secretary has received and relied upon her sworn declaration of financial status and other supporting financial documentation in entering into this Consent Judgment. If the Acting Secretary determines that her declaration of financial status and supporting financial documentation are false, misleading, and/or untrue, including by omission, Marilyn Pamplin acknowledges that she may be subject to civil contempt, criminal prosecution, other monetary penalties, and/or equitable relief.

## **PERMANENT INJUNCTION**

Pursuant to the statements and agreements above, upon joint motion of the Parties and the Pamplin Family Fiduciaries, and for cause shown,

**IT IS HEREBY ORDERED, ADJUDGED, and DECREED** that Defendants, the Pamplin Affiliates, their officers, agents, servants, employees, successor companies, parties in interest, and all persons and entities acting at their direction or in concert or participation with them, and the Pamplin Family Fiduciaries are permanently enjoined and restrained as provided below.

**IT IS ALSO HEREBY ORDERED, ADJUDGED, and DECREED** that additional equitable relief is provided below to redress the ERISA violations set forth above.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## I.   PROHIBITION ON FURTHER VIOLATIONS OF ERISA AND SERVICE AS ERISA-COVERED FIDUCIARIES

1.     Dr. Pamplin is hereby permanently enjoined and restrained from future service as a fiduciary of, or service provider to, any ERISA-covered employee benefit plan. The Pamplin Family Fiduciaries are likewise permanently enjoined and restrained from future service as a fiduciary of, or service provider to, any ERISA-covered employee benefit plan.

2.     Defendants and the Pamplin Family Fiduciaries are permanently enjoined and restrained from violating the provisions of Title I of ERISA, 29 U.S.C. §§ 1001, *et seq*.

## II.   PROHIBITION ON DISSIPATING ASSETS

3.     To ensure that Defendants will not sell, transfer, or otherwise dissipate assets that may be used to satisfy all amounts due under this Consent Judgment, Defendants are hereby enjoined from selling or transferring any items of real or personal property worth $50,000 or more in fair market value that they own or in which they have an interest, unless otherwise approved by the Acting Secretary. Defendants shall notify the Acting Secretary of any anticipated sales or transfers in writing. If the Acting Secretary does not object within 5 business days of receiving such notification, Defendants may proceed with the transaction. If a dispute concerning the fair market value of any real or personal property arises, the Acting Secretary's assessment of fair market value shall govern. This provision shall apply to the sale or transfer of both partial and whole interests in real or personal property where the total of all such interests exceeds $50,000 in fair market value.

4.     Defendants shall notify the Acting Secretary of any anticipated sales or transfers of art, antiquities, other personal property, or real property with a fair market value of more than $1,000 but less than $50,000, and the Acting Secretary shall have the right to object to such sales within 5 business days of receiving such notification. If the Acting Secretary objects, Defendants

shall not proceed with the sale or transfer.

5.      Nothing in Paragraphs 3 and 4 shall prohibit Defendants from transferring assets to the Pension Plan to satisfy the amounts due under this Consent Judgment.

6.      Nothing in Paragraphs 3 and 4 shall prohibit Pamplin Corporation or the Pamplin Affiliates from selling their products, machinery, equipment, or assets (other than real property) in the normal course of business and for the sole purpose of furthering business operations, including (a) covering loan repayments due to *bona fide* third-party financial institution lenders; (b) covering Defendants' payroll expenses, including payroll taxes; (c) paying employee benefits; (d) making required contributions to the Pension Plan or the R.B. Pamplin Corporation 401(k) Plan. Except as otherwise stated above, in no event shall the proceeds of such sales permitted under this paragraph flow directly or indirectly to Defendants, their family members (including the Pamplin Family Fiduciaries), affiliates (including the Pamplin Affiliates), successors, assigns, heirs, and representatives.

7.      Nothing in Paragraphs 3 and 4 shall prohibit Mount Vernon Mills, Inc. from transferring dividends to Pamplin Corporation to be used to make mandatory contributions to the Pension Plan. Within 60 days of any such transfers, Defendants shall provide to the Acting Secretary documentation showing the dividend transfer to Pamplin Corporation and the subsequent transfer of those dividends from Pamplin Corporation to the Pension Plan.

8.      Nothing in Paragraphs 3 and 4 shall prohibit Dr. Pamplin from selling his primary residence in Lake Oswego, Oregon, if Defendants have satisfied Sections VII or VIII below as confirmed by the Acting Secretary.

9.      Paragraphs 3 to 4 shall not apply if Defendants have satisfied Sections VII or VIII below or if Defendants satisfy all amounts due under this Consent Judgment as confirmed by the

Acting Secretary.

10.    Nothing in Paragraphs 3 to 4 shall prohibit Defendants from selling up to $750,000 in art, antiquities, or other personal property for the sole purpose of (a) covering loan repayments due to *bona fide* third-party financial institution lenders; (b) covering Defendants' payroll expenses, including payroll taxes; (c) paying employee benefits; (d) making required contributions to the Pension Plan or the R.B. Pamplin Corporation 401(k) Plan; or (e) satisfying the indemnification provision under Section 1 of the October 23, 2020 *Third Amendment to Purchase and Sale Agreement and Buyer Contingency Waiver* between the R.B. Pamplin Corporation and Subsidiaries Pension Plan & Trust and Moore Excavation, Inc. dba MEI Group and WCP, Inc., attached hereto as Exhibit 2, if Defendants secure a release on behalf of the Pension Plan of any liability it may face under the *Third Amendment to Purchase and Sale Agreement and Buyer Contingency Waiver* and provide proof thereof to the Acting Secretary within 30 days thereafter. Except as otherwise stated above, in no event shall the proceeds of such sales permitted under this paragraph flow directly or indirectly to Dr. Pamplin or his family members, affiliates (including the Pamplin Affiliates), successors, assigns, heirs, and representatives.

11.    Nothing in this Section shall prohibit Defendants from paying their legal fees.

### III.    APPROVAL OF INDEPENDENT FIDUCIARY FOR PENSION PLAN

12.    Gallagher Fiduciary Advisors, LLC ("Independent Fiduciary") is hereby recognized and approved as the Independent Fiduciary to the Pension Plan with full authority and discretion to administer, manage, and control the Pension Plan, including serving as its Investment Manager, except that it shall not perform the duties exclusively reserved for the Plan Administrator and the Corporation as set forth in the Amendment No. 3 to the Pension Plan Document, Exhibit 3, and in the Pension Plan's Document, Exhibit 4.

13.     The Independent Fiduciary is charged with bringing the Pension Plan into compliance with ERISA in a time and manner subject to ERISA's prudence requirement.

14.     The Independent Fiduciary shall be entitled to reasonable compensation, fees and expenses to correct the violations detailed in the Complaint and otherwise carry out its duties under this Consent Judgment, which the Pension Plan shall pay as outlined in Exhibits 5, 6, and 7. The Independent Fiduciary shall comply with all other terms in Exhibits 5, 6, and 7. The Independent Fiduciary may also hire service providers to assist it. Defendants are jointly and severally liable for all the aforementioned costs associated with the Independent Fiduciary ("IF Costs"), including past and future IF Costs. The Independent Fiduciary shall be responsible for reviewing, approving, and monitoring all expenses and shall do so in accordance with its ERISA fiduciary obligations and solely in the best interests of the Pension Plan participants and beneficiaries.

15.     Defendants shall pay or reimburse the Pension Plan for all future costs and fees incurred by any successor independent fiduciary.

16.     To the extent that the Independent Fiduciary performs services for the Pension Plan in accordance with this Consent Judgment but outside of its contractual obligations under Exhibits 5, 6, and 7, the Independent Fiduciary shall be entitled to reasonable fees and expenses of $650 per hour of work performed.

17.     The Independent Fiduciary may continue to serve as the independent fiduciary to the Pension Plan after bringing the Pension Plan into compliance with ERISA and after discharging its required duties under this Consent Judgment, subject to the terms of a new engagement agreement.

18.     The Independent Fiduciary shall not be discharged, terminated, or permitted to resign, except by Court order upon application of either the Acting Secretary or the Independent Fiduciary. If the Independent Fiduciary is terminated or discharged during the term of this Consent Judgment, the Acting Secretary shall recommend a successor independent fiduciary for appointment by the Court. Recommendations for a successor independent fiduciary shall be made by the Acting Secretary within such periods as the Court, by further order, may require.

19.     The Independent Fiduciary shall be subject to such orders as the Court may direct.

20.     The Independent Fiduciary has reviewed and agrees to the terms of this Consent Judgment.

## IV.    CREATION OF INDEPENDENT PLAN COMMITTEE TO ACT AS PLAN ADMINISTRATOR FOR PENSION PLAN

21.     Pamplin Corporation is enjoined from appointing the Plan Administrator, the Trustee, the investment manager, or any fiduciary to the Pension Plan.

22.     To ensure proper administration of the Pension Plan, within 15 days of entry of this Consent Judgment, Pamplin Corporation shall adopt Exhibit 3 as Amendment No. 3 to the Pension Plan's governing document. The Plan Committee is hereby established to administer the Pension Plan and to serve as the Pension Plan's "Plan Administrator" with all powers and responsibilities assigned to the "Plan Administrator" under Section 8.03 of the Pension Plan's Document, Exhibit 4. In addition, the Plan Committee shall be given any powers that Pamplin Corporation previously had under the Pension Plan's Document, Exhibit 4. The Plan Committee's members shall be Gary R. Williams and William Rogers. Members of the Plan Committee are fiduciaries to the Pension Plan under ERISA and therefore must comply with ERISA.

23.     The Plan Committee may only replace the Independent Fiduciary after the Independent Fiduciary has brought the Pension Plan into compliance with ERISA. Any replacement of the Independent Fiduciary must be done in accordance with ERISA and must be in the best interests of the Pension Plan. The Plan Committee may not appoint any trustee or additional investment manager until Defendants satisfy the IF Costs as defined in Section III and Loss Amount as defined in Section V, and all other amounts due to the Pension Plan under this Consent Judgment.

24.     Dr. Pamplin, the Pamplin Family Fiduciaries, and their affiliates, successors, assigns, heirs, agents, and representatives are prohibited from serving on the Plan Committee or from influencing or attempting to influence the Plan Committee in any way.

## V.     DEFENDANTS' OBLIGATION TO RESTORE LOSSES

25.     Defendants shall restore all losses incurred by the Pension Plan (the "Loss Amount") resulting from Defendants' fiduciary breaches, pursuant to ERISA section 409(a), 29 U.S.C. § 1109(a). Defendants are jointly and severally liable for the Loss Amount, which is at least $20,642,905. The final Loss Amount will be calculated as provided in Paragraphs 26 to 33 below.

26.     The Acting Secretary, in consultation with the Independent Fiduciary, shall calculate the Loss Amount as the sum of the losses incurred by the Pension Plan resulting from its acquisition or holding of each employer real property ("Employer Real Property") listed in Exhibit 1. Losses shall be calculated on a property-by-property basis, meaning that any gain from one Employer Real Property may not be used to offset any losses from other Employer Real Property. The Acting Secretary will aggregate the losses resulting from each Employer Real Property to determine the Loss Amount.

27.     The losses for each Employer Real Property shall be calculated as the sum of the

Lost Income Amount, the Property Expenses and Liabilities Amount, the Sales Loss Amount, and Interest as defined below:

A. **Lost Income Amount:** The "Lost Income Amount" is the amount that the Pension Plan would have earned had it invested in a "hypothetical" prudent investment vehicle rather than acquired a particular Employer Real Property. The Acting Secretary calculated the Lost Income Amount using the applicable quarterly interest rate in Section 6621(c)(1) of the Internal Revenue Code, 26 U.S.C. § 6621(c)(1), as the "hypothetical" prudent investment vehicle for each Employer Real Property from the date the Pension Plan acquired the Employer Real Property through December 31, 2024. Those amounts have been set forth in Exhibit 1.

B. **Property Expenses and Liabilities Amount:** The "Property Expenses and Liabilities Amount" for each Employer Real Property equals all expenses and liabilities incurred, or which may be incurred in the future, by the Pension Plan in connection with owning each Employer Real Property, including: property taxes; costs associated with extinguishing any liens; costs associated with title corrections; environmental remediation costs; maintenance costs; utilities; property and liability insurance; and any other costs associated with holding the Employer Real Property.

C. **Sales Loss Amount:** The "Sales Loss Amount" for each Employer Real Property equals the difference between the recorded amount at which the Employer Real Property was transferred to the Pension Plan, as listed in Exhibit 1, and the net sale price of such property. If Pension Plan gains money from the sale of an Employer Real Property, the gain may be used to offset the Lost Income Amount, Property Expenses and Liability Amount, and Interest for that Employer Real Property only.

This subparagraph applies to Employer Real Property that the Pension Plan previously sold as well as Employer Real Property that the Pension Plan currently owns and sells in the future.

D. **Interest:** Defendants shall pay interest at an annual rate of 5.8% ("Interest") on:

    i.    the Lost Income Amount, which shall accrue from the date the Consent Judgment is entered until the date that the Pension Plan receives cash either from Defendants or from the sale of Settlement Assets, as discussed in Section VIII, to compensate it for the Lost Income Amount for each Employer Real Property;

    ii.    the Property Expenses and Liabilities Amount, which shall accrue from the date that the Pension Plan incurred an expense or liability falling under the Property Expenses and Liabilities Amount until the date the Pension Plan receives cash either from Defendants or from the sale of Settlement Assets, as discussed in Section VIII, to compensate it for the Property Expenses and Liabilities Amount for each Employer Real Property;

    iii.    the Sales Loss Amount for each Employer Real Property, which shall accrue from the date that the Pension Plan incurs a loss from a sale of Employer Real Property until the date the Pension Plan receives cash either from Defendants or from the sale of Settlement Assets, as discussed in Section VIII, to compensate it for the Sales Loss Amount for each Employer Real Property; and

    iv.    IF Costs paid by the Pension Plan, which shall accrue from the date that the Pension Plan paid the IF Costs until the date that the Pension Plan receives

cash from Defendants or from the sale of Settlement Assets, as discussed in Section VIII, to compensate it for such IF Costs.

28.    The Acting Secretary shall calculate the losses for each Employer Real Property as described above after each Employer Real Property is sold and shall notify Defendants in writing of the losses for each Employer Real Property, including the bases for it.

29.    The Loss Amount shall be reduced by $5,499,227.97 to account for lease payments that the Pension Plan received in connection with its ownership of the Employer Real Property.

30.    Once all Employer Real Property has been sold from the Pension Plan, the Acting Secretary shall calculate the amount owed to date under Section V, including Interest calculated pursuant to Paragraph 27 accrued to date ("Interim Loss Amount"). The Acting Secretary will inform Defendants of the Interim Loss Amount calculation. No later than 60 days after being notified of the Interim Loss Amount, Defendants may comment on the Acting Secretary's Interim Loss Amount calculation. The Acting Secretary may file an exhibit with the Interim Loss Amount due under this Consent Judgment, which shall be the new enforceable amount Defendants owe under this Consent Judgment.

31.    The Acting Secretary will calculate the final Loss Amount after all amounts attributable to the Loss Amount, including amounts due under other sections of this Consent Judgment, can be calculated.

32.    No later than 60 days after being notified of the final Loss Amount, Defendants may comment on the Acting Secretary's final Loss Amount calculation.

33.    No later than 30 days after Defendants have provided comments on the final Loss Amount, the Acting Secretary shall file an exhibit containing the final Loss Amount and IF Costs

due under this Consent Judgment. The Acting Secretary's exhibit shall be deemed as the definitive amount due under this Consent Judgment, except for Interest calculated pursuant to Paragraph 27, which will continue to accumulate until the Pension Plan has been paid in full.

## VI.    EXCHANGE OF PAMPLIN RANCHLAND FOR ROSS ISLAND AND TAIT PROPERTIES

34.    Defendants represent that they directly or indirectly own, control and have full authority over the real property listed in the attached Exhibit 8 (collectively referred to hereinafter as the "Pamplin Ranchland"). Within 30 days following entry of this Consent Judgment, Defendants shall transfer title and ownership of the Pamplin Ranchland as listed in Exhibit 8[2] to the Pension Plan in exchange for the Pension Plan transferring title and ownership of the Ross Island[3] and Tait[4] properties to Defendant Pamplin Corporation.

35.    Defendants will receive a credit against the Loss Amount for any positive net value of the Pamplin Ranchland less $15,400,000, the amount at which the Pension Plan acquired the Ross Island and Tait properties. The net value of the Pamplin Ranchland shall be

---

[2] Defendants may have previously attempted to transfer to the Pension Plan, in whole or in part, the parcels listed in Exhibit 8 under Wasco County, Oregon tax account ID numbers 11711, 11714, 12902, 11723, 11726, 12898, 12899, 12886. Defendants shall ensure that all such properties have been properly transferred to the Pension Plan or otherwise transfer such properties to the Pension Plan.

[3] The addresses for the Ross Island property are 4129 SE McLoughlin Boulevard and 4315 SE McLoughlin Boulevard Portland, OR 97202. The Ross Island property has the following two tax account ID numbers in Multnomah County: R328459 and R328484; and the following parcel identification numbers: R991141110 and R991150370.

[4] The address for the Tait property is 2611 SE 4th Avenue Portland, OR 97202. The tax account ID number in Multnomah County for the Tait property is R197256, and its parcel identification number is R448700650.

1  calculated as the net sale amount[5] of all ranchland properties sold by the Pension Plan (i.e., the

2  Pamplin Ranchland as well as Employer Real Property ranchland (hereinafter "Plan

3  Ranchland")[6]) minus any taxes owed on the Pamplin Ranchland and Plan Ranchland and minus

4  $32,334,325, the amount at which the Pension Plan acquired the Plan Ranchland. If the net value

5  of the Pamplin Ranchland is less than $15,400,000, then Defendants shall be liable for the

6  difference, which shall be added to the Loss Amount.

7      36.    Defendants shall pay or reimburse the Pension Plan for all expenses and liabilities

8  incurred, or which may be incurred in the future, by the Pension Plan in connection with owning

9  the Pamplin Ranchland as well as the Tait and Ross Island Properties, including: property taxes,

10  including outstanding property taxes which the Pension Plan assumed upon acquisition of the

11  property; costs associated with extinguishing any liens; costs associated with title corrections;

12  environmental remediation costs; maintenance costs; utilities; property and liability insurance;

13  and any other costs associated with holding these properties.

14  **VII.    TRUST DEEDS**

15      37.    Within 45 days of entry of this Consent Judgment, Defendants shall execute trust

---

[5] "Net sales amount" means the proceeds the Pension Plan receives for all the ranchland properties after accounting for the costs of selling the ranchland, such as the brokerage fees and closing costs.

[6] The Plan Ranchland, which is a portion of the Employer Real Property, includes the following parcels located in Wasco County, Oregon as identified by tax account ID number: 11711, 11688, 12644, 12674, 12675, 12684, 12687, 12742, 12793, 12794, 12797, 12798, 12799, 12800, 12802, 12810, 12814, 12816, 12817, 12871, 12887, 12888, 12889, 12890, 12891, 12892, 12893, 12682, 15182, 15311, 16412, 12648, 12792, 11715,12875, 12876, 12903. The Plan Ranchland, which is a portion of the Employer Real Property, also includes the following parcels located in Jefferson County, as identified by tax account ID number: 122, 270, 268, 216, 291, 217, 297, 226, 227, 228, 229, 225, 583, 351, 352, 11225, 397,8777, 8650, 8614, 8753, 551, 549, 395, 399, 241, 588, 8608, 622, 642, 8610, 51, 66. To the extent that any of the Plan Ranchland parcels may still be owned in whole or in part by Defendants, Defendants shall transfer all such interests to the Pension Plan as required under Section VI.

deeds, naming the Pension Plan as the beneficiary, on real property owned by them, either in whole or in part, to serve as security for the performance of Defendants' obligation to pay the IF Costs and Loss Amount. Defendants shall execute such trust deeds on real property totaling $23,100,000.

38.    Defendants shall utilize $23,100,000 on the trust deeds as the amount that the trust deeds are intended to secure, notwithstanding that the ultimate amount owed and to be paid by Defendants may differ. To satisfy the requirements of this paragraph, Defendants shall utilize the Trust Deed form attached hereto as Exhibit 9, along with a recording cover sheet suitable for the county in which the deeded property is located.

39.    Defendants represent that they own the property, in whole or in part, listed on the trust deeds, that Defendants have authority to execute the trust deeds on the interests they own, and that the properties are not encumbered except for unpaid property taxes. If any property is encumbered with unpaid property taxes, that property's value towards the $23,100,000 shall be discounted by the amount owed in unpaid property taxes. If the property is co-owned, all owners must sign the trust deed.

40.    Within three days of being notified of any defect in a trust deed, Defendants shall take any and all necessary action to cure such defect.

41.    The Independent Fiduciary shall record the trust deeds once signed, and Defendants agree not to further encumber the property following the recording of the trust deeds and before any reconveyance.

**VIII.    <u>TRANSFERRING ASSETS TO THE PENSION PLAN TO RESTORE LOSSES AND PAY INDEPENDENT FIDUCIARY COSTS</u>**

42.    To secure and satisfy Defendants' obligation to restore the Loss Amount and pay IF Costs, Defendants shall transfer assets unencumbered except for unpaid property taxes (the

"Settlement Assets") totaling at least $23,100,000 in fair market value to the Pension Plan. If any property is encumbered with unpaid property taxes, that property's value shall be discounted by the amount of unpaid property taxes. The Independent Fiduciary will sell the Settlement Assets and use the sales proceeds to satisfy the amounts owed under this Consent Judgment. When determining the credit that Defendants will receive against the Loss Amount, the value of any Settlement Asset will be determined when it is sold. This Section shall govern how Settlement Assets are selected and transferred to the Pension Plan.

43.     Within 14 days of entry of this Consent Judgment, Defendants shall provide a list to the Acting Secretary and the Independent Fiduciary of assets that Defendants propose to satisfy Paragraph 42. Such list shall include a description of each proposed property, including address and parcel number, if real property, or where the property is located, if not real property. In furtherance of this paragraph, Defendants hereby propose the real properties listed on Exhibit 10 for the Independent Fiduciary's consideration.

44.     Within 45 days of proposing each asset, Defendants shall provide the Acting Secretary and the Independent Fiduciary with a written appraisal for each proposed asset. The written appraisal shall be performed by a professional appraiser previously approved by the Acting Secretary and in compliance with Uniform Standards of Professional Appraisal Practice. Defendants shall bear all costs associated with obtaining an appraisal.

45.     If the proposed asset is not real property, Defendants will also provide documentation showing anticipated costs to sell it. Defendants will only be credited for the asset's value after subtracting the anticipated costs to sell it from its estimated fair market value.

46.     If the Pension Plan pays for the appraisal of any proposed Settlement Asset on behalf of Defendants, including any additional costs and expenses associated with such an

appraisal, Defendants shall be liable for all such costs and expenses, which shall be included in the Loss Amount and subject to Interest at the rate set forth in Paragraph 27. Defendants' liability under this paragraph shall include the costs and expenses incurred by the Pension Plan associated with the Pension Plan's appraisal of Anne Amie Vineyards, plus Interest calculated at the rate set forth in Paragraph 27.

47.    For each proposed real property asset, Defendants shall provide the following documents, and any other relevant information, that are in their possession, custody or control to the Acting Secretary and the Independent Fiduciary within 30 days of proposing the asset:

    A.  Property surveys;

    B.  All documents concerning title;

    C.  All documents concerning zoning;

    D.  All leases, rental agreements or other agreements that are binding on the property;

    E.  Inspection reports for any inspection of the property conducted in the prior 3 years;

    F.  Environmental reports and soil reports;

    G.  All documents for the past five (5) years concerning maintenance and capital expenditures;

    H.  All documents concerning any liens on the property;

    I.  All Phase 1 reports;

    J.  Certificate(s) of occupancy;

    K.  Permits and site plans;

    L.  All property condition reports;

M.  Licenses to operate on property;

N.  Insurance policies on the property;

O.  Violation and litigation history concerning the property for the past 5 years;

P.  All encumbrances on the property;

Q.  All appraisals conducted on the property within the past 3 years; and

R.  Tenant information, including name, contact information, and nature of tenant's business and use of the property.

48.     For each proposed asset that is not real property, Defendants shall provide the following documents, and any relevant information, that are in their possession, custody, or control to the Acting Secretary and the Independent Fiduciary within 30 days of proposing the asset:

A.  All documents associated with the provenance for the piece;

B.  Sales documents;

C.  Certificates of authenticity;

D.  Curatorial records;

E.  Conservation files;

F.  Registrarial records;

G.  Auction records;

H.  Documents concerning purchase history;

I.  Documents concerning ownership history;

J.  Documents showing insurance coverage of the piece, if any; and

K.  Documents appraising the property.

49.    The Acting Secretary and the Independent Fiduciary may also request from Defendants additional documents and information concerning the proposed assets, which Defendants shall provide within 7 days of any such request.

50.    Within 30 days after receipt of the proposed list, written appraisal, and accompanying documents and information required under Paragraphs 42 through 49, the Independent Fiduciary shall either approve or reject, in whole or in part, the proposed assets to be transferred to the Pension Plan. The Independent Fiduciary's approval of a proposed asset is not an agreement or admission that any valuation or appraisal of that asset is correct. The Acting Secretary may provide input to the Independent Fiduciary about whether to approve or reject a proposed asset. If the Independent Fiduciary rejects any of the proposed assets, Defendants shall have 14 days thereafter to propose alternative assets of at least equivalent value to the rejected assets. Defendants must provide all documents and information listed in Paragraphs 42 through 49 within the same timeframes provided for in those paragraphs. Then, the Independent Fiduciary shall have an additional 30 days after receiving such documents and information to approve or reject the alternative proposed assets.

51.    Within 30 days following the Independent Fiduciary's approval of any proposed asset, Defendants shall transfer ownership of that asset to the Pension Plan according to the terms of the transfer agreement(s) governing such transfer. Defendants' obligation to transfer approved assets to the Pension Plan shall be without regard to whether the Independent Fiduciary has rejected other proposed assets.

52.    Defendants shall be liable for all costs, expenses, and liabilities associated with the Pension Plan's acquisition and holding of the Settlement Assets, including transfer costs, property taxes, insurance, maintenance, preservation, storage, assigned leases, and restoration.

1   Such costs and expenses shall be added to the Loss Amount and subject to Interest at the rate set

2   forth in Paragraph 27.

3       53.    Within 30 days of being notified of any title defect for any Settlement Asset,

4   Defendants shall cure such defect.

5       54.    The Independent Fiduciary will manage and sell all Settlement Assets and use the

6   sales proceeds to satisfy the Loss Amount and IF Costs. The Independent Fiduciary will sell the

7   Settlement Assets in a manner consistent with its independent judgment, fiduciary obligations,

8   and this Consent Judgment, and shall have full authority to do so. Defendants shall also be liable

9   for all IF Costs and other costs associated with maintaining and selling the Settlement Assets

10   with Interest at the rate set forth in Paragraph 27 accruing on those costs.

11       55.    Defendants and the Pamplin Family Fiduciaries cannot contest the Independent

12   Fiduciary's management or sales of the Settlement Assets.

13       56.    As the Independent Fiduciary sells the Settlement Assets, it shall allocate and

14   apply sales proceeds as follows:

15   **First Priority:** Defendants' liability for IF Costs

16   **Second Priority:** Defendants' liability for the Loss Amount

17   Upon full satisfaction of the IF Costs and the Loss Amount, the Pension Plan's claim to the

18   Settlement Assets or Settlement Asset proceeds shall be extinguished, and the Independent

19   Fiduciary shall return any Settlement Asset or Settlement Asset proceeds remaining in the

20   Pension Plan to the transferor of the Settlement Asset as reflected in the applicable transfer

21   agreement governing the transfer of the Settlement Asset.

22       57.    If the proceeds from the sale of the Settlement Assets are insufficient to cover the

23   Loss Amount and IF Costs, Defendants shall contribute additional assets to the Pension Plan as

24

25

follows:

A.    At least every 365 days, the Acting Secretary will calculate the total remaining amount due under this Consent Judgment and determine whether the value of the Settlement Assets or Settlement Asset proceeds is sufficient to cover the anticipated estimated total amount due under this Consent Judgment. The Acting Secretary's determination of a shortfall shall be final, and Defendants and the Pamplin Family Fiduciaries agree not to contest this determination.

B.    If the Acting Secretary notifies Defendants that the Settlement Assets or Settlement Asset proceeds are insufficient to cover the estimated total amount due under this Consent Judgment, Defendants shall transfer additional assets that are unencumbered except for unpaid property taxes to the Pension Plan to satisfy the anticipated shortfall. If any additional asset contributed is encumbered with unpaid property taxes, that property's value shall be discounted by the amount of unpaid property taxes. The procedures set forth in Paragraphs 42 through 56 above shall govern, except that Defendants must propose a list of assets within 30 days after being notified by the Acting Secretary of the shortfall. The Acting Secretary shall share with the Defendants in writing the basis for determining the insufficiency.

58.    Until Defendants contribute sufficient assets to satisfy the additional amount necessary to cover the anticipated shortfall, Defendants must comply with Section II. Defendants' obligation to comply with Section II shall be suspended upon Defendants' contribution of sufficient additional assets to satisfy the anticipated shortfall.

59.    Pursuant to Class Exemption 1979-15, 44 Fed. Reg. 26979 (1979), sections 406 and 407(a) of ERISA and section 4975(a) and (b) of the Internal Revenue Code, shall not apply

to any transactions or activities required under this Consent Judgment, including the transfer of Settlement Assets to the Pension Plan.

## IX.    INDEPENDENT FIDUCIARY DUTIES AND RESPONSIBILITIES

60.    The Independent Fiduciary shall have the following duties and responsibilities:

A.    The Independent Fiduciary has the authority to exercise all duties and authorities assigned to it under this Consent Judgment;

B.    The Independent Fiduciary shall exercise all of its rights, duties, discretion, and responsibilities as a fiduciary in accordance with ERISA;

C.    The Independent Fiduciary shall have the powers and duties of a trustee as set forth in Article VII of the Pension Plan's Document, attached as Exhibit 4, except that the Independent Fiduciary shall not serve as the custodian of the Pension Plan's assets;

D.    The Independent Fiduciary shall have the power and authority to appoint one or more directed trustees to hold and maintain the assets of the Pension Plan; however, the Independent Fiduciary shall be responsible for overseeing its appointee, who shall be subject to the Independent Fiduciary's lawful instructions;

E.    The Independent Fiduciary has the authority to identify and pursue recovery of the Pension Plan's assets as well as any monies to which the Pension Plan has a right of recovery;

F.    The Independent Fiduciary has the authority to identify and pursue claims on the Pension Plan's behalf;

G.    Except as provided herein, the Independent Fiduciary shall have the authority to delegate or direct to such trustees, attorneys, employees, agents, assigns, and service providers such fiduciary responsibilities as the Independent Fiduciary shall determine is appropriate. The Independent Fiduciary may not, however, delegate the authority to

appoint, replace and remove such trustees, attorneys, employees, agents, assigns, and service providers or the responsibility to monitor the activities of the trustees, attorneys, employees, agents, assigns, and service providers of the Pension Plan;

H.     The Independent Fiduciary is empowered to require Defendants to deliver and otherwise make available to the Independent Fiduciary any information, documents, files or other compilations, wherever and however stored, that are reasonably necessary to perform its duties as Independent Fiduciary under this Consent Judgment, and Defendants will deliver a copy of any documents requested by the Independent Fiduciary to the Plan Committee;

I.     The Independent Fiduciary has full authority and discretion to sell all Pension Plan assets, including Employer Real Properties and Settlement Assets, to bring the Pension Plan into compliance with ERISA in a time and manner determined by the Independent Fiduciary. Defendants and the Pamplin Family Fiduciaries may not object to any such sales for any reason, including price;

J.     The Independent Fiduciary may terminate any lease between the Pension Plan and Dr. Pamplin, Pamplin Corporation, or the Pamplin Affiliates, in anticipation of selling of any Employer Real Property or Settlement Asset upon providing 30-days' written notice to Defendants. Defendants agree to such terminations, agree that such terminations are without recourse, and waive any objections to such terminations. Upon being notified that the Independent Fiduciary is in contract to sell a real property leased by Defendants or the Pamplin Affiliates from the Pension Plan, Defendants shall execute a written termination of the applicable lease agreement, vacate the property, and ensure that their guests, invitees, licensees, occupants, and/or tenants vacate the property within thirty (30)

days. Defendants shall ensure that any vacated property, including any real estate fixtures, is returned to the Pension Plan in good condition, reasonable use and wear excepted. Defendants shall remove any equipment located on the property unless such equipment is transferred to the Pension Plan or otherwise agreed to by the Independent Fiduciary;

K.      The Independent Fiduciary shall report all net gains or losses on the sales of each Employer Real Property to the Acting Secretary within 14 days of each sale to enable the Acting Secretary to calculate the Loss Amount;

L.      The Independent Fiduciary shall inform the Acting Secretary of all expenses and liabilities incurred by the Pension Plan for each Employer Real Property to enable the Acting Secretary to calculate the Property Expenses and Liabilities Amount;

M.      The Independent Fiduciary shall inform the Acting Secretary of all expenses and liabilities incurred by the Pension Plan for each Settlement Asset and any net sales gains or losses to enable the Acting Secretary to calculate the Loss Amount and any amounts satisfied from the sale of any Settlement Assets;

N.      The Independent Fiduciary shall maintain all Employer Real Property and Settlement Assets consistent with its fiduciary obligations under ERISA and in the best interests of the Pension Plan's participants and beneficiaries;

O.      The Independent Fiduciary shall inform the Acting Secretary of all lease payments the Pension Plan received for each Employer Real Property;

P.      At least every 180 days, the Independent Fiduciary shall confirm with the Acting Secretary the total Interest accrued that is due to the Pension Plan under Paragraph 27;

Q.      The Independent Fiduciary will bring the Pension Plan into compliance with

ERISA by selling or attempting to sell the Settlement Assets in a manner and schedule consistent with ERISA and sufficient to pay the IF Costs and the Loss Amount;

R.      The Independent Fiduciary shall continue to have full access to all data, information, and calculations in the Pension Plan's possession or under its control, including information and records maintained by Defendants, their attorneys, their accountants, and other agents, as well as the Pension Plan's service providers and the Plan Committee;

S.      The Independent Fiduciary shall confirm with the Acting Secretary the total Loss Amount due after the Pension Plan has sold all Employer Real Property necessary to come into compliance with ERISA;

T.      The Independent Fiduciary shall comply with all applicable rules and laws; and

U.      The Independent Fiduciary shall obtain a bond in conformance with the requirements of ERISA § 412, 29 U.S.C. § 1112; and

V.      The Independent Fiduciary shall cooperate with the Acting Secretary, including by providing the Acting Secretary with any information she requests to enforce this Consent Judgment within 7 days of such a request.

61.     Nothing herein shall be construed to limit the rights of the Acting Secretary to maintain access to documents, information, or persons, or to waive or restrict the exercise by the Independent Fiduciary and any individual of his or her constitutional rights.

62.     The Acting Secretary may provide to the Independent Fiduciary any documents necessary to perform its duties under the Consent Judgment and to assist in the identification and recovery of Pension Plan assets. If any privilege or confidentiality applies to any such documents, the privilege or confidentiality is not waived and is preserved when documents are

1    provided to the Independent Fiduciary.

2    63.    The payment of expenses and all fees to the Independent Fiduciary and the

3    Independent Fiduciary's assistants, attorneys, accountants, actuaries and other necessary service

4    providers for the Pension Plan's day-to-day administration are to be considered priority expenses

5    of the Pension Plan, superior to any other class of expense or obligation of the Pension Plan. The

6    Independent Fiduciary's second priority is the payment of legitimate benefits to participants and

7    beneficiaries of the Pension Plan.

8    64.    The Independent Fiduciary shall report to the Court, the Acting Secretary, and the

9    Plan Committee at least every 90 days all significant actions to bring the Pension Plan into

10    compliance with ERISA and discharge its duties under this Consent Judgment, including all

11    Pension Plan assets expended. The first report shall be submitted 90 days from entry of this

12    Consent Judgment. This provision does not preclude the Independent Fiduciary from bringing

13    any appropriate matter to the Court's attention at any time.

14    65.    The Independent Fiduciary shall file quarterly billings to the Pension Plan with

15    the Court and provide a copy to the Acting Secretary and the Plan Committee. Quarterly billing

16    shall include IF Costs. Expenses shall be described in sufficient detail to allow the Court, the

17    Acting Secretary, and the Plan Committee to review the reasonableness of each expense. If

18    neither the Acting Secretary nor the Court objects, payments may be made 30 days after notice

19    has been given. If the Acting Secretary objects to any payment, the matter shall be resolved by

20    the Court prior to payment. To object, the Acting Secretary must file an objection with the Court.

21    **X.    DEFENDANTS MUST PAY A 502(l) PENALTY**

22    66.    Defendants shall be assessed a civil penalty under ERISA § 502(l), 29 U.S.C.

23    § 1132(l) of twenty percent of the applicable recovery amount ("Penalty Amount"). When

24    calculating the Penalty Amount, the Acting Secretary shall use the Loss Amount as the

25

applicable recovery amount. The Acting Secretary shall calculate the Penalty Amount using the Loss Amount once it has been paid in full to the Pension Plan. The Acting Secretary shall then notify Defendants of the Penalty Amount. Defendants waive the notice of assessment and service requirement of 29 C.F.R. § 2570.83 and, within 60 days following the full payment of the Loss Amount, Defendants shall pay the Penalty Amount, unless they file a petition for waiver or reduction of the Penalty Amount, as provided for in 29 C.F.R. §§ 2570.83-2570.87 and the Acting Secretary agrees to waive or reduce the Penalty Amount. If the Department denies Defendants' application for waiver or accepts the Defendants' application for reduction but still assesses a reduced Penalty Amount, Defendants will pay the Acting Secretary the Penalty Amount within 60 days of being notified of the Acting Secretary's decision regarding waiver or reduction of the penalty.

67.    The Penalty Amount shall be reduced by the amount of any penalty or tax imposed on Defendants per ERISA section 502(l)(4), 29 U.S.C. § 1132(l)(4), and section 4975 of title 26, 26 U.S.C. § 4975.

68.    To pay the Penalty Amount, Defendants shall go to www.pay.gov, enter "EBSA" in the search field, click search, select the "Debt Collection EBSA-ERISA Civil Penalty" payment form, click the blue "Continue to the Form," and follow payment instructions. If prompted for the case number, Defendants should enter "71-011103(48)."

69.    Within 30 days following entry of this Consent Judgment, Defendants shall execute a trust deed(s) on real property worth at least $3,000,000 (the "Deeded Property") in the form attached hereto as Exhibit 9, along with a recording cover sheet suitable for the county in which the Deeded Property is located, to serve as security for Defendants' obligation to pay the Penalty Amount and any other amounts that may be due under this Consent Judgment.

Defendants shall utilize $3,000,000 on the trust deed(s) as the amount secured and shall name the Acting Secretary of Labor, United States Department of Labor, as the beneficiary. The trust deed(s) required under this paragraph is separate and apart from the trust deeds required under Section VII.

70.     Defendants represent that they own the Deeded Property, that Defendants have authority to execute the trust deed(s) on the Deeded Property, and that the Deeded Property is not encumbered with anything other than unpaid property taxes. If the Deeded Property is co-owned, all owners must sign the trust deed(s).

71.     The Acting Secretary shall record the trust deed(s). Defendants agree not to further encumber the Deeded Property after the trust deed(s) is recorded and before reconveyance. If the Deeded Property is encumbered with unpaid property taxes, that property's value towards the $3,000,000 shall be discounted by the amount owed in unpaid property taxes. Defendants also agree to take immediate action, as necessary, to cure the trust deed(s) if it is deemed defective, or otherwise execute a trust deed listing alternative property as security for the payment of $3,000,000.

72.     If Defendants fail to pay the Penalty Amount within 60 days after the later of (a) the Acting Secretary notifying Defendants of the Penalty Amount due or (b) issuing a decision on Defendants' petition for waiver or reduction of the penalty requiring the payment of a penalty, Defendants shall not contest any sale or foreclosure of the Deeded Property. The Deeded Property's net sales proceeds will be used to pay any outstanding amounts due to the Pension Plan or to the Independent Fiduciary under this Consent Judgment. If any net sales proceeds remain after the Pension Plan and the Independent Fiduciary have been paid all amounts due under this Consent Judgment, the remaining proceeds shall be used to pay the Penalty Amount,

or if no amounts are due, to Defendants.

73.    If the Acting Secretary reduces the Penalty Amount imposed in this section and all the IF Costs and the Loss Amount have been paid in full, the amount owed under the trust deed(s) is reduced accordingly. If the Penalty Amount is waived and all the IF Costs and the Loss Amount have been paid in full, the Acting Secretary shall execute and record a reconveyance for the Deeded Property.

74.    If Defendants pay in full the Penalty Amount, IF Costs, and the Loss Amount, the Acting Secretary shall execute and record a full reconveyance for the Deeded Property within 60 days upon confirming Defendants' satisfaction of their obligations under this Consent Judgment.

## XI.    **PAMPLIN FAMILY FIDUCIARIES' OBLIGATIONS**

75.    If Defendants fail or are unable to comply with any of their obligations under this Consent Judgment, the Acting Secretary shall notify Defendants in writing of their default and provide at least 14 days for Defendants to cure such default. If Defendants do not cure their default within the time afforded by the Acting Secretary, the Acting Secretary may file a notice with the Court indicating Defendants' default. Upon such filing, the Pamplin Family Fiduciaries shall assume and must satisfy all of Defendants' obligations under this Consent Judgment, and the Acting Secretary may collect from them all monies Defendants owe under this Consent Judgment.

## XII.    **INJUNCTIVE TERMS CONCERNING EMPLOYER REAL PROPERTIES**

76.    Defendants are hereby enjoined from violating the provisions of any lease agreement they have with the Pension Plan, including violations of lease provisions requiring that Defendants pay utilities and real property taxes; maintain property and liability insurance; and maintain the property in good condition and repair.

77.    For all Employer Real Property currently held by the Pension Plan or Settlement

Assets transferred to the Pension Plan, and within 60 days of the entry of this Consent Judgment, Defendants shall purchase and maintain property and liability insurance satisfying the terms in this paragraph. The following insurance requirements shall apply unless the Independent Fiduciary approves different insurance requirements. Specifically, for any property that is not ranchland, such insurance shall be sufficient to cover the replacement costs of any structures located on the property, as well as $10,000,000 in liability coverage. For any property that is ranchland, Defendants shall maintain liability insurance coverage at a level equal to cover $500 per acre of ranchland. Defendants must provide notice to the Acting Secretary and the Independent Fiduciary at least 60 days before the insurance policies expire. If Defendants fail to do so, Defendants will be liable for any losses resulting from the failure to insure the properties. Defendants will remain liable for the cost of purchasing and maintaining property and liability insurance until such properties are no longer held by the Pension Plan. The Pension Plan shall be the named insured on all insurance policies and certificates of insurance. Defendants shall provide a copy of each policy, including notice requirements and endorsements, to the Independent Fiduciary and the Department within 30 days of entry of this Consent Judgment. Defendants must notify the Independent Fiduciary of any potential lapses or renewals.

78.    Defendants are responsible for the safety, negligence, and actions of their guests, invitees, licensees, occupants, and/or tenants who enter and/or reside on the real property leased by the Pension Plan to Defendants. Defendants shall fully indemnify the Pension Plan for any and all liabilities arising from Defendants' guests, invitees, licensees, occupants, and/or tenants.

79.    Upon being notified that the Independent Fiduciary is in contract to sell a real property leased by Defendants from the Pension Plan, Defendants shall execute a written termination of the applicable lease agreement, vacate the property, and ensure that their guests,

invitees, licensees, occupants, and/or tenants vacate the property within thirty (30) days of notification by the Independent Fiduciary.

80.    Defendants shall not in any way modify, sever, or diminish any water rights associated with the real property leased by the Pension Plan to Defendants. Further, Defendants shall maintain any and all water rights associated with the leased properties in accordance with Oregon state law governing water rights and shall exercise the use of such water rights on a regular basis sufficient to avoid a presumption of forfeiture due to nonuse.

81.    If any Employer Real Property, Pamplin Ranchland, or Settlement Asset is currently leased to a third party, Defendants shall assign that lease to the Pension Plan, subject to the approval of the Independent Fiduciary. The Independent Fiduciary will thereafter ensure that the third party complies with all lease terms and remits lease payments to the Pension Plan. The Loss Amount will be reduced by any lease payments the Pension Plan receives.

## XIII.  **OTHER INJUNCTIVE TERMS**

82.    All notices and submissions to the Acting Secretary required by this Consent Judgment shall be sent via e-mail to the Acting Secretary's counsel on this case as well as the Employee Benefits Security Administration ("EBSA") Seattle District Supervisor and the EBSA Lead Investigator assigned to this case. Presently, the EBSA Seattle District Supervisor is Liam Roberts, whose email address is roberts.liam@dol.gov, and the EBSA lead investigator assigned to this case is David Wehr, whose email address is wehr.david.m@dol.gov. All submissions to the Acting Secretary should include in the subject line: "Pamplin Settlement, Case No. 71-011103(48)." The Acting Secretary shall immediately inform Defendants, the Independent Fiduciary, and the Plan Committee of any changes to her contact information.

83.    All notices and submissions to Defendants required by this Consent Judgment shall be sent via email to the Defendants' counsel, Kevin O'Brien, at Kobrien@ipbtax.com as

well as Wanda Caron at wcaron@pamplincorporation.com. All submissions to the Defendants should include in the subject line: "Pamplin Settlement, Case No. 71-011103(48)." Defendants shall immediately inform the Acting Secretary, the Independent Fiduciary, and the Plan Committee of any changes to their contact information.

84.    All notices and submissions to the Independent Fiduciary required by this Consent Judgment shall be sent via email to Darin Hoffner at Darin_Hoffner@ajg.com. All submissions to the Independent Fiduciary should include in the subject line: "Pamplin Settlement, Case No. 71-011103(48)." The Independent Fiduciary shall immediately inform Defendants, the Acting Secretary, and the Plan Committee of any changes to their contact information.

85.    All notices and submissions to the Plan Committee required by this Consent Judgment shall be sent via email to Gary Williams at garyw@mvmills.com and Bill Rogers at billr@mvmills.com. All submissions to the Plan Committee should include in the subject line: "Pamplin Settlement, Case No. 71-011103(48)." The Plan Committee shall immediately inform Defendants, the Acting Secretary, and the Independent Fiduciary of any changes to their contact information.

86.    If either Defendant files for bankruptcy protection under any chapter of the United States Bankruptcy Code or are subject to any bankruptcy proceedings, Defendants shall (i) notify the Acting Secretary of the bankruptcy within 30 calendar days of the initiation of such proceedings in any U.S. Bankruptcy Court; and (ii) if the Acting Secretary requests it, execute a stipulation with the Acting Secretary and consent to the entry of an Order equal to the total outstanding amount due under this Consent Judgment[7] as calculated by the Acting Secretary

---

[7] This includes the Loss Amount and IF Costs.

1    stating that the outstanding amount due under this Consent Judgment is a nondischargeable debt

2    under section 523(a)(4) of the U.S. Bankruptcy Code, 11 U.S.C. § 523(a)(4).

3        87.    Defendants shall immediately notify the Acting Secretary if they acquire cash or

4    cash equivalents[8] with a combined value in excess of $500,000 and agree that such amounts shall

5    be used to immediately restore the Loss Amount and IF Costs, or if no such amounts are

6    outstanding, then Defendants agree to set aside such cash or cash equivalents for the payment of

7    the Penalty Amount, as necessary. Further, Defendants shall remit to the Pension Plan all

8    amounts paid by the Defendants' insurance carrier(s) to cover Defendants' fiduciary liability

9    arising in this matter as necessary to satisfy all outstanding amounts owed under this Consent

10    Judgment. This provision shall not apply to (a) income or receivables generated by Pamplin

11    Corporation or Pamplin Affiliates in the normal course of business; (b) *bona fide* business loans

12    obtained by Pamplin Corporation or Pamplin Affiliates, including Mount Vernon Mills, Inc.,

13    from third-party financial institution lenders; or (c) cash generated by Mount Vernon Mills, Inc.

14    from the sales of its assets if such sales proceeds are used to satisfy debts owed to third-party

15    financial institution lenders under applicable lending agreements. Additionally, nothing in this

16    paragraph shall prohibit Defendants from using cash or cash equivalents of less than $500,000 to

17    (a) cover loan repayments due to *bona fide* third-party financial institution lenders; (b) cover

18    Defendants' payroll expenses, including payroll taxes; (c) pay employee benefits; or (d) make

19    required contributions to the Pension Plan or the R.B. Pamplin Corporation 401(k) Plan.

20    However, in no event shall assets with a combined value of over $500,000 be given directly or

21    indirectly to Dr. Pamplin or his family members, successors, assigns, heirs, and representatives if

22

23    _____

[8] "Cash equivalents" include assets meant for short-term investing and/or that are highly liquid,
24    meaning that they can quickly be converted to actual cash in 90 days or less.

25

Defendants owe money under this Consent Judgment. This paragraph shall not apply if Defendants have satisfied their obligation to transfer assets to secure payment of their liabilities under this Consent Judgment or satisfy the amounts due under this Consent Judgment.

88. Nothing in this Consent Judgment shall be construed to prevent or prohibit the Pension Plan from lawfully purchasing an annuity to satisfy the Pension Plan's obligations to Pension Plan participants and beneficiaries. Defendants agree that the selection and purchase of any annuity shall be subject to the Independent Fiduciary's approval.

## JUDGMENT

89. JUDGMENT IS HEREBY ENTERED in favor of the Acting Secretary against Defendants Dr. Robert B. Pamplin, Jr. and R.B. Pamplin Corporation in the amount of $20,642,905, which reflects Defendants' minimum liability under this Consent Judgment. This amount is subject to increase as set forth in this Consent Judgment.

90. The Acting Secretary shall submit an amended judgment for the Court's entry when (1) the Acting Secretary determines the final IF Costs and Loss Amount, not including any Interest that may continue accruing, defined above and/or (2) if the Acting Secretary files the notice specified in Paragraph 75, in which case the Acting Secretary may enforce this Judgment against the Pamplin Family Fiduciaries. The final Loss Amount cannot be calculated until all Employer Real Property and sufficient Settlement Assets to satisfy the Loss Amount have been sold.

91. The Acting Secretary, Defendants, and the Pamplin Family Fiduciaries shall each bear their own costs, expenses, and attorneys' fees incurred to date in connection with any stage of this proceeding, including but not limited to attorneys' fees which may be available under the Equal Access to Justice Act, as amended. Defendants and the Pamplin Family Fiduciaries further expressly waive any and all claims of any nature that they have or may have against the Acting

Secretary or any of her officers, agents, attorneys, employees or representatives, arising from the

allegations contained in the Complaint on file in this action, any related proceedings or

investigation incidents or claims based on the Equal Access to Justice Act, as amended.

## **OTHER PROVISIONS**

92.     Nothing in this Consent Judgment is binding on any governmental agency other

than the United States Department of Labor, Employee Benefits Security Administration.

Nothing in this Consent Judgment shall preclude the Acting Secretary from: (a) filing any amicus

briefs in any case; (b) asserting any claim or filing any documents in any bankruptcy case; (c)

assessing and collecting any mandatory civil penalty against Defendants in an amount equal to

twenty percent of the applicable recovery amount pursuant to ERISA section 502(l), 29 U.S.C.

§ 1132(l); (d) assessing and collecting any penalty under ERISA section 502(c)(2), 29 U.S.C.

§ 1132(c)(2), through administrative and judicial proceedings; (e) seeking immediate or *ex parte*

injunctive relief in connection with the Pension Plan, if deemed necessary by the Acting

Secretary, in her sole discretion; or (f) instituting, recommending, and or referring for any

criminal proceeding.

93.     If any of the Pamplin Family Fiduciaries declines to sign this Consent Judgment,

this Consent Judgment shall continue to apply in full force and effect as to Defendants, the

Acting Secretary, the Independent Fiduciary, and all other Pamplin Family Fiduciary signatories

to this Consent Judgment.

94.     This Court retains jurisdiction of this action to enforce compliance with the terms

of this Consent Judgment.

95.     This Consent Judgment may be executed in counterparts, each of which shall be

deemed to be an original, but all of which, taken together, shall constitute one and the same

instrument.

96.      Pursuant to Fed. R. Civ. P 73(b), the Parties and the Pamplin Family Fiduciaries consent to have a United States Magistrate Judge conduct any and all proceedings in this case, including entry of orders on dispositive motions, trial, motions to enforce this consent judgment, and entry of final judgment. The Parties and the Pamplin Family Fiduciaries understand that withholding consent will not result in any adverse consequences. Pursuant to Fed. R. Civ. P 73(b), the Parties and the Pamplin Family Fiduciaries agree that an appeal from a judgment entered at a Magistrate Judge's direction may be taken to the court of appeals as would any other appeal from a district court judgment.

97.      The Court directs the entry of this Consent Judgment.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

1    IT IS SO ORDERED.

2    Dated: Dec. 26, 2024

3                                    The Honorable Youlee Yim You
                                     United States Magistrate Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Entry of this Consent Order and Judgment is hereby consented to:

2    **FOR THE PLAINTIFF:**

3    Dated: December 23, 2024

4                                          SEEMA NANDA
                                           Solicitor of Labor

5                                          MARC A. PILOTIN
                                           Regional Solicitor

6                                          LAURA C. BREMER
                                           Counsel for ERISA
7
                                           ANDREW M. KATZ
8                                          Senior Trial Attorney

9

10

                                           ADRIANA AHUMADA
11                                         Senior Trial Attorney

12                                         *Attorneys for Plaintiff Julie Su,*
                                           *Acting United States Secretary of Labor*
13

14

15

16

17

18

19

20

21

22

23

24

25

1  **FOR THE DEFENDANTS:**

2

3                                    **R.B. PAMPLIN CORPORATION**

4

5  Dated: _12/20_, 2024           By: ___Dr. Robert B. Pamplin___
                                         Dr. Robert B. Pamplin

6

7                                    **DR. ROBERT B. PAMPLIN**

8

9  Dated: _12/20_, 2024           By: ___Dr. Robert B. Pamplin___
                                         Dr. Robert B. Pamplin

10

11 **Approved as to Form:**

12

13 Dated: _12/20_, 2024           ___Kevin O'Brien___

14                                 KEVIN O'BRIEN
                                   Attorney for Defendants
15                                 R.B. Pamplin Corporation and
                                   Dr. Robert B. Pamplin

16

17

18

19

20

21

22

23

24

25 CONSENT JUDGMENT AS TO R.B. PAMPLIN CORPORATION AND ROBERT B. PAMPLIN, JR.

1    **FOR THE INDEPENDENT FIDUCIARY:**

2
     Dated:  December 23  , 2024

3                                                MICHAEL JOHNSON
                                                 Gallagher Fiduciary Advisors LLC
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**FOR THE PAMPLIN FAMILY FIDUCIARIES**

MRS. MARILYN PAMPLIN

Dated: 12 - 20 , 2024

By:    Mrs. Marilyn Pamplin

MRS. ANNE PAMPLIN EVENSON

Dated: 12 - 20 , 2024

By:    Mrs. Anne Pamplin Evenson

MRS. AMY PAMPLIN NORTH

Dated: _____, 2024

By:    Mrs. Amy Pamplin North

1    **FOR THE PAMPLIN FAMILY FIDUCIARIES**

2

3

4                                              MRS. MARILYN PAMPLIN

5

6    Dated: _____, 2024              _____

7                                              By:    Mrs. Marilyn Pamplin

8

9

10                                             MRS. ANNE PAMPLIN EVENSON

11

12   Dated: _____, 2024              _____

13                                             By:    Mrs. Anne Pamplin Evenson

14

15                                             MRS. AMY PAMPLIN NORTH

16

17   Dated: Dec 24, 2024                     *Mrs. Amy Pamplin North*

18                                             By:    Mrs. Amy Pamplin North

19

20

21

22

23

24

25   _____
     CONSENT JUDGMENT AS TO R.B. PAMPLIN CORPORATION AND ROBERT B. PAMPLIN, JR.
     Case No. 3:24-cv-01548-YY                                      Page 47

# Exhibit 1

# Employer  Real Property List

| Property | Recorded Amount | Lost Income Amount For Each Property |
|---|---|---|
| Anne Amie Vineyards | $5,200,000 | $1,091,853 |
| Ross Island Property | $10,600,000 | $3,772,418 |
| Swan Property | $11,580,000 | $3,888,690 |
| McDonald Property | $1,610,000 | $430,637 |
| Friend Property | $1,060,000 | $256,924 |
| Gay Property | $2,120,000 | $468,020 |
| Rhode Property | $1,240,000 | $245,016 |
| Grabhorn Farm | $1,645,000 | $345,933 |
| Warnock Rangeland | $4,380,000 | $885,948 |
| Carlson-Konkler Property | $2,734,650 | $560,465 |
| Cooper Farm | $1,585,000 | $311,460 |
| Swan II Property | $1,666,475 | $102,835 |
| Johnson Ranch I and II | $2,713,500 | $593,810 |
| Albina Property | $1,650,000 | $418,126 |
| Dundee Property | $95,000 | -$67,554 |
| Gresham Outlook | $1,550,000 | $682,843 |
| Madras Office | $370,000 | $196,537 |
| Prineville Office & Warehouse | $640,000 | $179,755 |
| Tait Property | $4,800,000 | $2,548,160 |
| Lake Oswego Property | $1,100,000 | $495,902 |
| Yamhill County House | $656,000 | $157,631 |

# Exhibit 2

## THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT AND BUYER CONTINGENCY WAIVER

THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT AND BUYER CONTINGENCY WAIVER (this "**Amendment**") is entered into by and between R.B. PAMPLIN CORPORATION AND SUBSIDIARIES PENSION PLAN & TRUST ("**Seller**") and MOORE EXCAVATION, INC. dba MEI GROUP and WCP, INC. (collectively, "**Buyer**"), as of October 23, 2020 (the "**Effective Date**"). R.B. PAMPLIN CORPORATION, KF JACOBSEN & CO., INC. and ROSS ISLAND SAND & GRAVEL CO. (collectively, "**Seller Affiliate Indemnitors**") as affiliates of Seller and are executing this Amendment for the purpose of being additional indemnitors under the indemnity provisions contained in this Amendment.

A. Seller and Buyer have entered into that certain Purchase and Sale Agreement and Receipt for Earnest Money with Execution Date of June 18, 2020, as amended by that certain First Amendment to Purchase and Sale Agreement dated June 18, 2020 and that certain Second Amendment to Purchase and Sale Agreement dated September 25, 2020 ("**Purchase Agreement**") pertaining to certain real property commonly known as 1208 N. River Street, Portland, OR, as more particularly described in the Purchase Agreement (the "**Property**"). All capitalized terms used herein that are not defined shall have the meaning ascribed to them in the Purchase Agreement.

B. Seller and Buyer desire to amend the Purchase Agreement as provided herein and confirm Buyer's waiver of Buyer's inspection contingency contained in Section 2.1 of the Purchase Agreement pursuant to the terms and conditions of this Amendment.

**1.** **Amendment of Purchase Agreement**. The Purchase Agreement is amended to include the following provision in the Purchase Agreement:

**1.0** **Indemnity for Pre-Existing Environmental Condition.**

1.1 Seller and Seller Affiliate Indemnitors unconditionally covenants and agrees, at its sole cost and expense, to indemnify, protect, save and hold harmless Buyer, its directors, officers, employees, agents, attorneys, endorsees, successors, and assigns against and from any and all damages, losses, liabilities, obligations, penalties, claims, fines, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, reasonable attorneys' and experts' fees, administrative expenses, prejudgment interest, court costs and disbursements) including, but not limited to, the cost and expense of any required or necessary investigation, testing, monitoring, repair, cleanup, removal, detoxification, decontamination, preparation of any closure or other required plans, investigation or remedial action at or relating to the Property (collectively, "Claims and Costs"), with respect to, as a result of, or arising out of any of the following:

any requirement, lawsuit, notice of violation, notice letter, warning letter, administrative order, compliance order, EPA Section 104(e) or similar information request letter from a regulatory agency, enforcement action, settlement, agreement, consent order, decree or judgment, injunction, restraining order or prohibition (collectively "Action") relating to: (i) the generation, presence, storage, management, disposal, release, discharge, escape, emission, spill, seepage, leakage, dumping, pumping, pouring, emptying or cleanup of Hazardous Materials at, on, in, above, from, or under all or a portion of the Property that occurred prior to the Closing Date; (ii) or the migration of Hazardous Materials from the Property to any other property or onto the Property from any property or area adjacent to the Property that occurred prior to the Closing Date or is otherwise directly related to or arising from the pre-Closing activities at, on, above, near, or under all or a portion of the Property described in the preceding Section 1.1(i); in either instance, except to the extent such basis of an Action is directly related to or otherwise arises from Buyer's activities on or off of the Property.

1.2 For purposes of this Amendment, the term "Hazardous Materials" shall include, but not be limited to: any substance defined as "hazardous substances," "hazardous air pollutant," "pollutants," "contaminants," "hazardous materials," "hazardous wastes," "toxic chemicals," "petroleum or petroleum products," "pesticides" or

CONFIDENTIAL    CBRE0021186

related materials now or hereafter defined in any applicable federal, state, or local law, regulation, ordinance, policy, or directive, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., as amended by the Hazardous and Solid Waste Amendments of 1984; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001, et seq.; the Hazardous Materials Transportation Authorization Act of 1994, 49 U.S.C. § 5101, et seq.; the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. § 1251, et seq.; the Clean Air Act, 42 U.S.C. § 7401, et seq.; the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136, et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f, et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq.; any applicable state superfund law, storage tank law, hazardous waste management law, water pollution control law, air quality law, or the like ("Environmental Laws") and as any such acts or laws may be amended.

1.3    Upon the initiation of any Action against Buyer, Buyer shall promptly notify Seller in writing, and Seller and Seller Affiliate Indemnitors shall assume the defense thereof, including the employment of counsel approved by Buyer, which approval shall not be unreasonably withheld, and the payment of all costs and expenses. Seller (and Seller Affiliate Indemnitors) in assuming the defense shall, however, have no authority to represent to any claimant that it has the authority to enter into any settlement of any Action, consent judgment, confession of judgment or any other agreement purporting to bind Buyer without Buyer's advance written approval, which shall not be unreasonably withheld. Buyer shall have the right, but not the obligation, at its sole expense, to employ separate counsel in any such action and to participate in the defense thereof. Buyer shall cooperate fully with Seller's defense of any Action, including without limitation, providing Seller or its agents reasonable access to the Property and timely responding to information requests from Seller necessary towards Seller's performing said defense. Seller and Seller Affiliate Indemnitors shall fully inform Buyer of the status of any defense on a monthly basis or more often should events warrant. Seller and Seller Affiliate Indemnitors shall consult Buyer at all critical stages of any defense of any Action.

1.4    In the event that Buyer shall suffer or incur any Claims and Costs as the result of an Action, Seller and Seller Affiliate Indemnitors shall pay to Buyer the total of all such costs upon demand by Buyer.

1.5    Within six (6) months of Closing, Seller and Seller Affiliate Indemnitors shall provide Buyer with reasonable evidence of Commercial General Liability (CGL) insurance policies issued to owners or operators of the Property that do not contain an Absolute Pollution Exclusion (generally CGL policies issued prior to 1985). Reasonable evidence of CGL policies shall include documentation that includes insurance company names, policy numbers, issuance and expiration date, and amount of coverage. Seller and Seller Affiliate Indemnitors shall make a good faith effort to provide reasonable evidence of CGL policies that is in its possession, but is not required to generate new records or to provide every record in its possession for purposes of complying with this section.

## 2.0    Decommissioning of Underground Storage Tanks.

2.1    Seller shall decommission the five (5) underground storage tanks (USTs), consisting of three (3) presumed asphalt USTs, one (1) UST of unknown contents, and one (1) petroleum UST, at the site. The general locations of the USTs are identified in the attached Exhibit A. If additional USTs are discovered, located, or identified by Seller as part of Seller's decommissioning activities, Seller shall also be responsible for decommissioning such USTs. Seller shall have the option to decommission the tanks in place or remove the tanks. Seller shall provide to Buyer written confirmation that such decommissioning activities are acceptable to Oregon Department of Environmental Quality (DEQ) or other agencies with oversight authority. Seller's completion of the decommissioning activities does not alter, absolve, or reduce Seller of its indemnity obligations included in Section 1 above.

2.2    Buyer acknowledges that decommissioning activities and completion of decommissioning activities will commence and be completed after Closing of the transaction. Seller will have 365 days from the date of closing to complete decommissioning. If Seller is diligently pursuing decommissioning but is unable to finalize decommissioning or obtain confirmation from DEQ or the applicable agency of completion, Buyer and Seller will, in good faith, agree on a reasonable extension to the deadline for completing decommissioning. Such agreement shall

CONFIDENTIAL                                                                                                    CBRE0021187

include reasonable steps for Seller to take to complete decommissioning and obtain confirmation of completion within a reasonable time.

2.3    Seller shall coordinate all onsite activities with Buyer to minimize interference with Buyer's activities. Buyer shall provide Seller access to conduct the activities necessary to complete decommissioning, but may condition such access to ensure Seller and its agents or contractors are insured and following facility safety requirements. Seller shall indemnify Buyer for any Claims and Costs arising from the negligence of Seller or its contractors or agents relating to the decommissioning of the USTs.

**3.0    Responsibility for Bulkhead**

Buyer and Seller have inspected the bulkhead and each agree that such bulkhead appears stable, however Seller is unable to provide as-built engineering drawings to confirm the implementation of the engineering design. The location of the bulkhead is identified in the attached Exhibit A. As a condition of Closing, Seller agrees to provide a limited indemnity for collapse or significant structural failure of the bulkhead, provided that such collapse or significant structural failure is not caused by an act by Buyer. This limited indemnity shall diminish steadily, on an annual prorated basis, over seven (7) years following Closing, such that on the day of Closing Seller shall be 100% liable for a collapse of the bulkhead and Buyer shall be 100% liable for a collapse that occurs on the 7th anniversary of Closing. For the sake of clarity, the liability for the collapse or significant structural failure of the bulkhead will shift continuously, on an annual prorated basis, from Seller to Buyer over the seven years.

**4.0    Industrial Process and Stormwater.**

4.1    Seller and Seller Affiliate Indemnitors shall remain liable for violations of the 1200-A water quality permit until the permit transfers to Buyer. Buyer shall diligently pursue transfer upon closing. For 9 months following Closing, Seller and Seller Affiliate Indemnitors shall be responsible for ensuring that stormwater collecting in the uncovered collection tank (also referred to as the sump or vault) along the river, as identified in the attached Exhibit A, does not overflow or otherwise cause a discharge. To ensure the sump does not overflow, Buyer shall notify Seller or Seller's agent (designated in writing) when water levels in the stormwater vault have risen to within 3 feet of overtop freeboard. Failure by Buyer to timely provide notice to Seller when water levels in the stormwater vault have risen to within 2.5 feet of overtop freeboard relieves Seller and Seller Affiliate Indemnitors of the responsibilities and liabilities outlined in this Section 4. Prior to Closing, Buyer shall empty the sump of any water collected therein.

4.2    From 10 months to 18 months of Closing, at Buyer's request, Seller shall continue to manage the water in the collection tanks as described above in Section 4.1. During this time period, Buyer shall pay Seller for such service on a time and materials basis.

4.3    Buyer shall, at all times necessary to Seller in order to carry out its obligations outlined in this Section 4, provide Seller reasonable access to the Property, including access to the sumps.

**5.0    Survival.**

The provisions of this amendment to the Purchase Agreement contained in this Amendment shall survive the Closing and remain in full force and effect after the Closing.

CONFIDENTIAL    CBRE0021188

2.    **Buyer's Waiver of Contingencies.**    The mutual execution of this Amendment shall constitute Buyer's notice of Buyer's waiver of Buyer's inspection contingencies under Section 2.1 of the Purchase Agreement. Notwithstanding the foregoing, this waiver of Buyer's inspection contingencies shall not constitute nor be deemed a waiver of any of Buyer's other remaining rights under the Purchase Agreement.

3.    **General Provisions.**

a.    Due Authorization.    Seller and Buyer each represent and warrant to the other party that each has full power and authority to enter into this Amendment without the consent of any other person or entity.

b.    Counterparts; Facsimile and Scanned Email Signatures.    This Amendment may be executed in counterparts and when each party has signed and delivered at least one such executed counterpart to the other party, then each such counterpart shall be deemed an original, and, when taken together with the other signed counterpart, shall constitute one agreement which shall be binding upon and effective as to all signatory parties. Facsimile and scanned email signatures shall operate as originals for all purposes under this Amendment.

c.    Effect of Amendment.   The Purchase Agreement is unmodified except as expressly set forth in this Amendment.   Except for the modifications to the Purchase Agreement set forth in this Amendment, the Purchase Agreement remains in full force and effect.   To the extent any provision of the Purchase Agreement conflicts with or is in any way inconsistent with this Purchase Agreement, the Purchase Agreement is deemed to conform to the terms and provisions of this Amendment.

d.    Binding Effect.   The provisions of this Amendment shall be binding upon and inure to the benefit of the parties and their respective successors and assigns and no amendment to this Amendment shall be binding upon the parties unless in the form of writing executed by each party hereto.

e.    Integration.   This Amendment contains the entire agreement and understanding of the parties with respect to the matters described herein, and supersedes all prior and contemporaneous agreements between them with respect to such matters.

CONFIDENTIAL                                                                    CBRE0021189

IN WITNESS WHEREOF, the parties hereto have executed this Amendment to be effective as of the Effective Date, regardless of the date signed by Buyer and Seller.

**SELLER:**

R.B. PAMPLIN CORPORATION AND SUBSIDIARIES PENSION PLAN & TRUST

By: *Robert B. Pamplin, Jr.*
Name: Robert B. Pamplin, Jr.
Title: Trustee

**SELLER AFFILIATE INDEMNITORS:**

KF JACOBSEN & CO., INC.

By: *Robert B. Pamplin, Jr.*
Name: Robert B. Pamplin, Jr.
Title: CEO

ROSS ISLAND SAND & GRAVEL CO.

By: *Robert B. Pamplin, Jr.*
Name: Robert B. Pamplin, Jr.
Title: CEO

R.B. PAMPLIN CORPORATION

By: *Robert B. Pamplin, Jr.*
Name: Robert B. Pamplin, Jr.
Title: President and
     CEO

**BUYER:**

WCP, INC.

By: *David Bernert*
Name: David Bernert
Title: President

**BUYER:**

MOORE EXCAVATION, INC. dba MEI GROUP

By: *Roy Moore*
Name: Roy Moore
Title: President

CONFIDENTIAL     CBRE0021190

CONFIDENTIAL

CBRE0021191

{00144587/3}

Page 6

201

200

Exhibit A



Exhibit A
Site Features
1208 N River St.
Portland, Oregon

Legend
Property boundary (approximate)
Tax lot

# Exhibit 3

**AMENDMENT TO THE**

**R.B. PAMPLIN CORPORATION PENSION PLAN**

**Amendment No. 3**

R.B. PAMPLIN CORPORATION does hereby amend the R.B. Pamplin Corporation and Subsidiaries Pension Plan and Trust ("the Plan"), as amended and restated effective January 1, 2007, as follows:

Sections 1.10, 1.30, 1.40, 7.13, 7.14, 7.15, 8.02, and 9.01 shall be added or amended to read as follows:

1.10    Corporation means R.B. Pamplin Corporation, a Delaware corporation, with its principal place of business in Portland, Oregon or any successor thereto.  The Corporation is the sponsor and named Fiduciary as it relates to the Employees of each Employer.

1.30    Plan Administrator means the administrator of the Plan as provided for in Article VIII. The Plan Committee, as defined in Section 7.13, shall be deemed to be the Plan Administrator. The Corporation has no ability to remove the Plan Committee and appoint another Plan Administrator.

1.40    Independent Fiduciary means the fiduciary with full authority and discretion to administer, manage, and control the Pension Plan appointed pursuant to the Consent Judgment and any subsequent orders entered in the case of *Su v. Robert B. Pamplin, Jr., et. al*. (Case No. 3:24-cv-01548), in the U.S. District Court, District of Oregon ("Consent Judgment").

7.13.    Plan Committee - The Plan Committee is hereby established to serve as the Plan Administrator under the Plan as provided in Section 8.03. In addition to serving as the Plan Administrator, the Plan Committee shall be a named fiduciary under ERISA. Notwithstanding any other provision of Article VII of the Plan, the Plan Committee shall have the authority to appoint a Plan Trustee and an ERISA § 3(38) investment manager to hold, maintain and invest the assets of the Plan subject to the terms, conditions and limitations as the Plan Committee deems appropriate. The Plan Committee shall ensure that the Pension Plan has an independent ERISA § 3(38) investment manager, which will be given all responsibilities under Article VII of the Plan except for the ability to appoint a Plan Trustee or ERISA § 3(38) investment manager. The Plan Committee may not serve as the Pension Plan's ERISA § 3(38) investment manager. The Plan Committee shall review periodically the performance of the Trustee and the investment manager and shall have the power to retain or remove any such Trustee or investment manager at its discretion. The Plan Committee has the power to appoint such other professional or administrative personnel, Plan Administrative Representatives, or third-party service providers as they deem necessary to assist it in fulfilling its responsibilities under the Plan. The Plan Committee shall establish such rules as it may deem appropriate for the conduct of its business with respect to the Plan. Finally, the Plan Committee will assume any fiduciary duties and responsibilities assigned to the Corporation and the Board under the Plan.

The Plan Committee is comprised of William Rogers and Gary Williams and such successors as they may appoint. In the event that William Rogers and Gary Williams cease to be members of the Plan Committee without the appointment of a successor, the automatic successors shall be the chief financial officer of Mount Vernon Mills and the executive vice president of Mount Vernon Mills. Further, because the appointment of any member or successor member of the Plan Committee is a fiduciary act, the Corporation, Dr. Robert B. Pamplin, Jr., Marilyn Pamplin, Amy Pamplin North, and Anne Pamplin Evenson and their affiliates, successors, assigns, heirs, agents, and representatives are prohibited from serving on the Plan Committee, acting directly or indirectly in the appointment or removal of any Plan Committee member, or influencing or attempting to influence the Plan Committee in any way.  Dr. Robert B. Pamplin shall not act directly or indirectly in the removal of any Plan Committee member or in the appointment of any additional or successor members of the Plan Committee.

The Plan Committee shall establish such rules as it may deem appropriate for the conduct of its business with respect to the Plan, including a rule addressing how tie votes are to be resolved.

To the extent permitted by applicable law, the Corporation shall indemnify each member of the Committee against any expense and liability that such person may incur as a result of any act or failure to act, in good faith, by such person in relation to the Plan or funds of the Plan. This indemnification does not affect any other indemnification rights available under the by-laws or articles of incorporation of the Corporation or its affiliates.

To the extent this Section conflicts with the Consent Judgment, the Consent Judgment's provisions control. Accordingly, the authority of the Plan Committee to appoint or remove any trustee, investment manager, or other fiduciary, including the Independent Fiduciary appointed to the Plan under the terms of the Consent Judgment, is suspended until the U.S. Department of Labor has provided written notice that Defendants have fully satisfied their obligation to restore all plan losses, pay Independent Fiduciary costs, and pay all other amounts due to the Pension Plan under the Consent Judgment.  If a successor member of the Plan Committee is not appointed pursuant to the terms of the first paragraph of this Section 7.13, the Independent Fiduciary acting under the Consent Judgment shall appoint a successor member of the Plan Committee (other than itself or affiliated entity or person).

The Plan Committee may request documents necessary to monitor the performance of the Independent Fiduciary, the investment manager, or other fiduciary appointed by the Plan Committee or under the Consent Judgment.  Within a reasonable time period but no later than 60 days after the request by the Plan Committee, the Independent Fiduciary, investment manager, or other fiduciary appointed by the Plan Committee or under the Consent Judgment shall provide the requested documents.

7.14.  <u>Dissolution of Other Committees</u> - To the extent that any other document has created or purports to create any other Plan committee, including the "Plan Fiduciary Selection Committee" and "Administrative Committee," such committees are hereby dissolved and terminated.

7.15.  <u>Discharge of Co-Trustees</u> - To the extent that Gary R. Williams and William E. Duncan were previously appointed as co-trustees of the Plan, they are hereby discharged as trustees or co-trustees.

8.02    <u>Employer Responsibilities</u> - The Corporation established and maintains the Plan for the benefit of the Employees.  Under the Consent Judgment and in accordance with specific provisions of the Plan, the Corporation has, as herein indicated, delegated certain of these rights and obligations to the Independent Fiduciary and/or Trustee and the Plan Administrator, and these parties shall be solely responsible for these, and only these, delegated rights and obligations.

The Corporation shall cause periodic actuarial valuations of the Plan to be made which will indicate the amount of Contributions necessary to maintain the Plan on an actuarially sound basis and comply with the minimum funding standards as may be required by law, such actuarial valuation normally to be made annually, but not less than once every three (3) years.  The Corporation shall provide the Plan Administrator, the Independent Fiduciary, the Trustee, and/or the investment manager, if one has been employed as herein provided, with a copy of the results of each actuarial valuation or shall otherwise communicate to the Plan Administrator, the Trustee, the Independent Fiduciary, and/or the investment manager, if applicable, the short- and long-range requirements of the Fund, the anticipated level of annual Contributions and any material changes thereto occurring between actuarial valuations.

The Corporation shall supply such full and timely information for all matters relating to the Plan to the Plan Administrator, the Independent Fiduciary, the Trustee, the investment manager, the actuary, and the accountant, as they may require for the effective discharge of their respective duties.

9.01    <u>Amendment of the Plan</u> - The Corporation shall have the right at any time by action of the Board to modify, alter, or amend the Plan, in whole or in part; provided, however, that the duties, powers, and liability of the Trustee hereunder shall not be increased without its written consent; and provided, further, that the amount of benefits which at the time of any such modification, alteration, or amendment shall have accrued for any Participant, Spouse, or Beneficiary hereunder shall not be adversely affected thereby.  Each Employer will be deemed to have adopted any amendment made by the Corporation unless the Employer notifies the Plan Administrator of its rejection in writing within thirty (30) days after it receives a copy of the amendment.  A rejection will constitute a withdrawal from this Plan by that Employer unless the Corporation acquiesces in the rejection.  Except as permitted by the applicable Treasury Regulations (including Treasury Regulation Section 1.411(d)-(4)), no Plan amendment or transaction having the effect of a Plan amendment (such as a merger, plan transfer or similar transaction) shall be effective if it eliminates or reduces any "Section 411(d)(6) protected benefit" or adds or modifies conditions relating to "Section 411(d)(6) protected benefits" the result of which is a further restriction on such benefit unless such "protected benefits" are preserved with respect to benefits accrued as of the later of the adoption date or the effective date of the amendment.  "Section 411(d)(6) protected benefits" are benefits

described in Section 411(d)(6)(A) of the Code, early retirement benefits and retirement-type subsidies, and optional forms of benefits.

The Corporation's right to amend the Plan under this section is suspended until the U.S. Department of Labor has provided written notice that Defendants have fully satisfied their obligation to pay all amounts due under the Consent Judgment, including restoring all Plan losses, paying Independent Fiduciary costs, and paying 502(l) penalties. The Plan Committee shall have the authority to amend the Plan under this section, subject to the Independent Fiduciary's approval, until Defendants have fully satisfied their monetary obligations as required under the Consent Judgment.

## Effective Date

Amendments No. 3 shall be effective _____, 202__.

## Ratification

All of the provisions of the Plan not hereby modified are ratified and affirmed.

Adopted this _____ day of _____ 20__.

**R.B. PAMPLIN CORPORATION**

By_____

ATTEST:

_____

# Exhibit 4

# R. B. Pamplin Corporation

# Pension Plan and Trust

Introduction ................................................................................... 2

Article I        Definitions ................................................................ 4

Article II       Participation ........................................................... 21

Article III      Retirement Dates ................................................... 23

Article IV       Retirement Benefits ............................................... 27

Article V        Normal and Optional Methods of

                 Retirement Benefit Payments .................................. 48

Article VI       Benefits on Death or Termination of Employment ................. 67

Article VII      Trust Provisions .................................................... 73

Article VIII     Fiduciaries ........................................................... 82

Article IX       Amendment and Termination of the Plan .................. 88

Article X        Provisions Relative to Employers Included

                 in the Plan and Trust ............................................ 93

Article XI       Top Heavy Plan Provisions ...................................... 95

Article XII      Miscellaneous ....................................................... 99

Article XIII     Adoption of Plan and Trust ..................................... 113

                 Appendices ........................................................... 115

INTRODUCTION

Effective January 1, 1987, the Mount Vernon Salaried Employees Retirement Plan, the Mount Vernon Hourly Employees Pension Plan, the Riegel Textile Corporation Retirement Income Plan and Trust for Salaried Employees, and the Riegel Textile Corporation Retirement Plan for Hourly Paid Employees were merged into one plan known as the Mount Vernon Mills, Inc. Pension Plan (the "Mount Vernon Plan"). Assets held pursuant to each of the four plans were transferred to the Trust established pursuant to the amended and restated Mount Vernon Plan. The Mount Vernon Plan was amended and restated effective January 1, 1989, to comply with Tax Reform Act of 1986, Omnibus Budget Reconciliation Act of 1986, and other recent legislation and regulations.

Effective January 1, 1992, the Mount Vernon Plan and the Prior Pamplin Plan were merged into one plan with the Mount Vernon Plan being the surviving plan with R. B. Pamplin Corporation (the "Corporation") as the sponsor. Concurrent with the merger of the plans, the Corporation amended and restated the merged plans to change the name of the Mount Vernon Plan to the R. B. Pamplin Corporation and Subsidiaries Pension Plan (the "Plan") and to incorporate the provisions of the separate Trust agreement into the Plan. Assets held pursuant to each of the Plans were transferred to the Trust established under the amended and restated Plan.

Effective January 1, 1997, the Corporation amended and restated the Plan to comply with the Retirement Protection Act of 1994, The Small Business Job Protection Act of 1996, the Uniformed Services Employment and Reemployment Rights Act of 1994, and the Taxpayer Relief Act of 1997 and made other clarifying and desirable changes. The Plan was subsequently amended from time to time and benefit accruals were frozen effective as of January 1, 2005.

Effective January 1, 2002, the Corporation amended and restated the Plan in order to (1) comply with the Economic Growth and Tax Relief Reconciliation Act of 2001 (with technical corrections made by the Job Creation and Worker Assistance Act of 2002), the Pension Funding Equity Act of 2004 and the American Jobs Creation Act of 2004, and certain provisions of the Pension Protection Act of 2006, and associated guidance thereunder, as promulgated by the Secretary of the Treasury; and (2) make other clarifying administrative changes.  The Plan was subsequently amended from time to time thereafter.

Effective January 1, 2007 (unless a different effective date is stipulated by a particular provision herein), the Corporation has decided to amend and restate the Plan in order to (1) comply with applicable provisions of the Pension Protection Act of 2006; the Worker, Retiree and Employer Recovery Act of 2008;  and the Heroes Earnings Assistance and Relief Tax Act of 2008 and associated guidance thereunder, as promulgated by the Secretary of the Treasury; and (2) make other clarifying and administrative changes.

The provisions of the Plan, as in effect immediately prior to this January 1, 2007 amendment and restatement, shall remain in effect for those Participants who are not actively employed by the participating Employers at any time after such date.

Effective January 1, 2007, the Plan as amended and restated has the terms and provisions hereinafter set forth.

ARTICLE I

DEFINITIONS

As used herein, unless otherwise required by the context, the following words and phrases shall have the meanings indicated:

1.01   Accrued Benefit means, for any Participant, as of any date, the monthly retirement benefit payable at Normal Retirement Date and determined in accordance with Section 4.01 with Compensation and Benefit Service as of such date. A Participant's total Accrued Benefit as of the end of a Plan Year shall be the sum of the separately determined benefit for that Plan Year and the total Accrued Benefit as of the end of the preceding Plan Year.

1.02   Actuarial Equivalent means a benefit of equivalent value when computed on the basis of interest and mortality tables adopted by the Corporation for use in the computation of actuarial equivalents under the Plan.   Such Actuarial Equivalent shall be reflected hereunder by the application of the factors denoted in Appendix A, which is attached to and made a part of this Plan, unless specifically stated otherwise in applicable sections of the Plan.

1.03   Affiliate means a corporation which is a member of the same controlled group of corporations [as defined in IRC Sections 414(b), (c), (m), and (o)] as the Employer, but which is not an Employer.

1.04   Annuity Starting Date means (i) the first day of the first period for which an amount is payable as an annuity or (ii) in the case of a benefit not payable as an annuity, the day as of which the distribution occurs.

1.05 <u>Beneficiary</u> means any person designated by a Participant pursuant to the Plan or otherwise entitled to receive such benefits as may become payable under the provisions of the Plan after the death of such Participant.

1.06 <u>Benefit Service</u> means, as of any date, the sum of past Benefit Service, if any, under Section 1.06(a) and subsequent Benefit Service under Section 1.06(b), subject to Sections 1.06(c) and 1.06(d) below.

    (a) If a Participant was a participant in the Mount Vernon Plan or the Prior Pamplin Plan as of December 31, 1991, he shall receive credit for past Benefit Service. Past Benefit Service shall be determined as of December 31, 1991, in accordance with the following provisions of this Section 1.06(a). If an Employee was a participant in the Mount Vernon Plan on December 31, 1991, his past Benefit Service shall be equal to his benefit service as defined under the Mount Vernon Plan as in effect through December 31, 1991. If an Employee was a participant in the Prior Pamplin Plan on December 31, 1991, his past Benefit Service shall be equal to his total service as defined under the Prior Pamplin Plan plus one (1) year, as in effect through December 31, 1991.

    (b) Subsequent Benefit Service shall be the total number of Plan Years during which a Participant has at least one thousand (1,000) Hours of Service for the Employer during the period of time commencing January 1, 1992.

    (c) Notwithstanding the above, if a non-vested terminated Participant is subsequently reemployed and again becomes a Participant, his Benefit Service shall not include any periods of employment prior to reemployment and his pre-break Accrued Benefit shall be canceled if his consecutive One Year Breaks in Service as of his reemployment date are equal to or exceed five (5) consecutive One Year Breaks in Service.

(d) If a terminated or retiring Participant who has received a lump sum distribution pursuant to Section 6.05 is subsequently reemployed and again becomes a Participant of this Plan, his pre-break Benefit Service shall not be restored and his pre-break Accrued Benefit shall be canceled. For such a Participant who is reemployed during the period beginning January 1, 1997, and ending December 31, 1999, the pay-back provisions under Section 6.04 of the Plan as in effect on December 31, 1996, shall apply.

(e) If a Participant's pre-break Benefit Service is canceled pursuant to Section 1.06(c) or 1.06(d), then on his subsequent termination of employment, his Accrued Benefit shall be based only upon his Benefit Service and Compensation earned from his date of re-participation, as determined under Section 2.02. If a Participant's pre-break Benefit Service is not canceled pursuant to Section 1.06(c) or 1.06(d), then it shall be reinstated upon his recommencing participation pursuant to Section 2.02 and upon such re-participation his Accrued Benefit shall be restored to the amount on the date his prior period of employment terminated.

1.07   Board means the board of directors of the Corporation.

1.08   Compensation means, for any Plan Year for any Employee, amounts received during the Plan Year by the Employee from the Employer, that are wages within the meaning of Code Section 3401(a) and all other payments of compensation to an Employee by his Employer (in the course of the Employer's trade or business) for which the Employer is required to furnish the Employee a written statement under Code Sections 6041(d), 6051(a)(3) and 6052 (Form W-2 or substitute). Compensation must be determined without regard to any rules under Code Section 3401 (a) that limit the remuneration included in ages based on the nature or location of the employment or the services performed (such as the exception

for agricultural labor in Code Section 3401 (a) (2)) and without regard to the application of Code Section 125, 402 (e)(3), 403(b), 402(h)(1)(B), 457 or 132 (f)(4). Compensation shall be reduced by all of the following items (even if includible in gross income): reimbursements or other expense allowances, fringe benefits (cash and non-cash), moving expenses, deferred compensation, and welfare benefits. Compensation of an Employee who is at any time simultaneously in the employ of more than one Employer shall be the sum of such earnings received by the Employee from all such Employers.

In addition to other applicable limitations set forth in the Plan, and not withstanding any other provision of the Plan to the contrary, the annual compensation limit of each Employee taken into account under the Plan shall not exceed:

> (i) for Plan Years beginning on or after January 1, 1994, but before January 1, 2002, the "OBRA '93 annual compensation limit", which is $150,000; and

> (ii) for Plan Years beginning on or after January 1, 2002, the "EGTRRA '01 annual compensation limit", which is $200,000.

The OBRA '93 Annual Compensation Limit and the EGTRRA '01 annual compensation limit (collectively the "Annual Compensation Limit") shall be adjusted by the Commissioner for increases in the cost of living in accordance with section 401 (a) (17) (B) of the Internal Revenue Code. The cost of living adjustment in effect for a calendar year applies to any period not exceeding 12 months, over which compensation is determined (determination period) beginning in such calendar year. If a determination period consists of fewer than 12 months, the Annual Compensation Limit will be multiplied by a fraction, the numerator of which is the number of months in the determination period, and the denominator of which is 12.

Reference in this Plan to the limitation under Section 401 (a) (17) of the Code shall mean the applicable Annual Compensation Limit for that Plan Year as set forth in this provision.

If compensation for any prior determination period is taken into account in determining an Employee's benefits accruing in the current Plan Year, the compensation for that prior determination period is subject to the Annual Compensation Limit in effect for that prior determination period.  Annual Compensation Limits shall not have the effect of reducing any benefit accrued prior to January 1, 1994.

1.09  <u>Contributions</u> mean the payments as provided herein by the Employer to the Fund.

1.10  <u>Corporation</u> means R. B. Pamplin Corporation, a Delaware corporation, with its principal place of business in Portland, Oregon or any successor thereto.  The Corporation is the sponsor, Plan Administrator, and named Fiduciary as it relates to the Employees of each Employer.

1.11  <u>Defined Benefit Plan</u> means a plan which is established and qualified under IRC Section 401 or 403, except to the extent it is, or is treated as, a Defined Contribution Plan.

1.12  <u>Defined Contribution Plan</u> means a plan which is established and qualified under IRC Section 401 or 403, which provides for an individual account for each Participant therein and for benefits based solely on the amount contributed to each Participant's account and any income and expenses or gains or losses (both realized and unrealized) which may be allocated to such accounts.

1.13  <u>Effective Date</u> means, for purposes of this amended and restated Plan, January 1, 2007, unless a different effective date is stipulated by a particular provision, or such later date as of which an Employer shall have adopted the Plan for its Employees.

1.14 <u>Employee</u> means any person employed by the Employer as a common law employee on or after the Effective Date, excluding any person who is represented by a collective bargaining unit for the purpose of bargaining with the Employer with respect to wages, hours of employment, or other conditions of employment, any employee considered a leased employee within the definition of IRC Section 414(n), and any nonresident alien within the definition of Code Section 410(b)(3)(C).  Notwithstanding the foregoing, effective as of January 1, 1997, a "leased employee" means any person who is not a common-law Employee of the Employer and who provides services to the Employer if:

(a)  such services are provided pursuant to an agreement between the Employer and any leasing organization;

(b)  such person has performed such services for the Employer (or for the Employer and Affiliates) on a substantially full-time basis for a period of at least one year; and

(c)  such services are performed under the primary direction or control of the Employer.

1.15 <u>Employer</u> means, collectively or individually as the context may indicate, the Corporation, and any other entity which the Board shall have authorized to adopt the Plan, and by action of its own board of directors shall have adopted the Plan and Trust; or any successor to one or more of such entities.

1.16 <u>ERISA or Act</u> means the Employee Retirement Income Security Act of 1974, as amended from time to time.

1.17 <u>Fiduciary</u> means the Corporation, the Employer, the Trustee, the Plan Administrator, and any individual, corporation, firm, or other entity which assumes, in accordance with Article VIII, responsibilities of the Corporation, the Employer, the Trustee, or the Plan Administrator respecting management of the Plan or the disposition of its assets.

1.18  <u>Fund</u> means the trust fund created in accordance with Article VII hereof.

1.19  <u>Highly Compensated Employee</u> (or HCE) means an Employee who for any Plan Year,

(a) during the current Plan Year (the "Determination Year") or the immediately preceding Plan Year (the "Look-Back Year") was at any time an owner of more than five percent (5%) of the outstanding stock of the Employer or any Affiliate, or of more than five percent (5%) of the total combined voting power of all stock of the Employer or an Affiliate; or

(b) during the Look-Back Year received annual compensation in excess of $80,000, which amount shall be adjusted for changes in the cost of living as provided in regulations issued by the U.S. Secretary of the Treasury.

For purposes of this Section 1.19, the term "compensation" means wages, as defined in Code Section 3401(a), and any other payments or compensation to an Employee by his Employer or Affiliate (in the course of the Employer's or Affiliate's trade or business) for which the Employer or Affiliate is required to furnish the Employee a written statement under Code Sections 6041(d), 6051(a)(3), and 6052, but determined without regard to any rules under 3401(a) that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401 (a)(2)). Compensation shall include any before-tax deferrals made pursuant to Code Sections 125, 402(e)(3), 403 (b), 402(h)(1)(B), 457 or 132 (f)(4).  Effective for years beginning on or after January 1, 2009, compensation shall include any differential wage payment (within the meaning of Code Section 3401(h)(2)).

A <u>former</u> Employee shall be treated as an HCE if:

(1) such Employee was an HCE when such Employee separated from service; or

(2) such Employee was an HCE at any time after attaining age 55.

The determination of who is an HCE will be made in accordance with Section 414(q) of the Code and the regulations thereunder.

1.20  <u>Hours of Service</u> means the sum of:

(a) Each hour for which an Employee is paid, or entitled to payment, for the performance of duties for the Employer during the applicable computation period.

(b) Each hour for which an Employee is paid, or entitled to payment, by the Employer on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, or leave of absence.  However, the determination of hours under this Section 1.20(b) shall be subject to the following restrictions:

(i)  No more than five hundred one (501) hours shall be credited to an Employee during any single continuous period during which the Employee performs no duties (whether or not such period occurs in a single computation period).

(ii)  No such hours shall be credited to an Employee if payment is made or due under a plan maintained solely for the purpose of complying with applicable workers' compensation or unemployment compensation or social security disability insurance laws.

(iii)  Hours shall not be credited for a payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee.

(iv)  For purposes of this paragraph b, a payment shall be deemed to be made by or due from an employer regardless of whether such payment is made by or due from

the employer directly, or indirectly through, among others, a trust fund, or insurer, to which the employer contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer or other entity are for the benefit of particular employees or are on behalf of a group of employees in the aggregate.

(c) For purposes of Article II and for determining the Participant's vesting service under Section 6.04, each hour during which an Employee is paid, or entitled to payment, by the Employer or each hour for which an Employee is not paid, or entitled to payment, by the Employer on account of a period of time during which no duties are performed due to military duty and any other periods in which an Employee was not paid, or entitled to payment, and would presumably have performed services for the Employer but for the fact that such individual was on a military leave of absence for service in the Armed Forces of the United States of America, provided the individual entered such service directly from the employ of the Employer, was discharged from such service and was reemployed by the Employer within the period during which his employment rights as a veteran are protected by law.

(d) Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Employer, provided, however, that the same hours shall not be credited both under Section 1.20(a), Section 1.20(b), or Section 1.20(c) above, as the case may be, and under this Section 1.20(d).

Except as otherwise stipulated by the Board in an adoption agreement pursuant to Section 10.01, applicable to an Employer, Hours of Service shall not include any period

during which the Employee was employed by a predecessor organization of the Employer, unless such organization maintained the Plan or a predecessor plan.

Hours of Service under Section 1.20(a), Section 1.20(c), and Section 1.20(d) above shall be determined from the Employer records for hourly Employees; for salaried Employees such hours of service shall be determined on the bases of one hundred ninety (190) Hours of Service for each month for which the Employee receives at least one (1) Hour of Service.  Hours of Service under Section 1.20(b) above shall be determined in accordance with Department of Labor Regulations 2530.200b-2.  Hours of Service hereunder shall be credited to the appropriate computation period in accordance with Department of Labor Regulations 2530-200b-2(c).  Notwithstanding anything herein to the contrary, nothing in this Section 1.20 shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States, or any rule or regulation issued under any such law.

1.21  IRC or Code means the Internal Revenue Code of 1986, as amended from time to time. Any reference to any section to the IRC shall be deemed to include any applicable regulations and rulings pertaining to such section and shall also be deemed a reference to comparable provisions of future laws.

1.22  Limitation Year means the twelve (12) month period commencing on January 1 and ending on December 31 of the Plan Year.

1.23  Mount Vernon Hourly Plan means the Mount Vernon Hourly Employees Pension Plan as in effect from time to time through December 31, 1986.

1.24  Mount Vernon Plan means the Mount Vernon Mills, Inc. Pension Plan as in effect from time to time through December 31, 1991.

1.25 <u>Mount Vernon Salaried Plan</u> means the Mount Vernon Salaried Employees Retirement Plan as in effect from time to time through December 31, 1986.

1.26 <u>Normal Retirement Age</u> means the date a Participant attains the age of sixty-five (65) or the fifth (5th) anniversary of his Plan participation, whichever is later.

1.27 <u>One Year Break in Service</u> means a Plan Year during which the Employee has not completed more than five hundred (500) Hours of Service. For purposes of determining whether an Employee incurs a One Year Break in Service for eligibility to participate in the Plan pursuant to Article II, the computation period stated in Section 2.01 shall apply.

Hours of Service shall be credited solely for purposes of determining whether a One Year Break in Service has occurred with respect to an Employee who is absent from work, for the following reasons, regardless of whether the Employee is paid for such absence:

(a) by reason of the pregnancy of the Employee,

(b) by reason of the birth of a child of the Employee,

(c) by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee,

(d) for purposes of caring for such child for a period beginning immediately following such birth or placement, or

(e) for any other purpose covered under the Family and Medical Leave Act.

Hours of Service to be credited for such purpose shall be:

(i) the Hours of Service which otherwise would normally have been credited to such Employee but for such absence, or

(ii) in any case in which the Plan Administrator is unable to determine the hours in (i) above, eight (8) Hours of Service per normal workday of absence,

except that the total number of hours treated as Hours of Service by reason of 1.27(a), 1.27(b), 1.27(c), 1.27(d), and /or 1.27(e) shall not exceed five hundred one (501) hours. The hours in items (i) and (ii) above shall be treated as Hours of Service hereunder:

    (iii)    only in the Plan Year in which the absence from work begins, if an Employee would be prevented from incurring a One Year Break in Service in such Plan Year solely because the period of absence is treated as Hours of Service as provided in Section 1.27(a), Section 1.27(b), Section 1.27(c), Section 1.27(d) above; or

    (iv)    In the appropriate computation period in accordance with DOL Regulation 2530.200b-2(c), because the period of absence is treated as Hours of Service under Section 1.27(e)

    (v)    in any other case, in the immediately following Plan Year.

Further, the Plan Administrator may request that Employee furnish any information the Plan Administrator may require to establish that the absence is for the reasons hereinbefore provided and the number of days for which there was such an absence. In the event such information is not submitted in a timely manner, no Hours of Service shall be credited pursuant to this paragraph.

1.28  <u>Participant</u> means any Employee who becomes a Participant as provided in Article II hereof.

1.29  <u>Plan</u> means the R. B. Pamplin Corporation and Subsidiaries Pension Plan and Trust, as contained herein or as duly amended.

1.30  <u>Plan Administrator</u> means the administrator of the Plan as provided for in Article VIII.  If a Plan Administrator is not so appointed, the Corporation shall be deemed to be the Plan Administrator.

1.31  <u>Plan Year</u> means each twelve (12) month period beginning January 1, and ending on December 31.

1.32  <u>Prior Pamplin Plan</u> means R. B. Pamplin Corporation Retirement Plan as in effect from time to time through December 31, 1991.

1.33  <u>Riegel Hourly Plan</u> means the Riegel Textile Corporation Retirement Plan for Hourly Paid Employees as in effect from time to time through December 31, 1986.

1.34  <u>Riegel Salaried Plan</u> means the Riegel Textile Corporation Retirement Income Plan and Trust for Salaried Employees as in effect from time to time through December 31, 1986.

1.35  <u>Spouse</u> means the husband or wife to whom the Participant is legally married (as documented in writing) as of the earlier of his Annuity Starting Date or date of death.

1.36  <u>Top-Heavy Plan</u> generally means any plan under which, as of any determination date, the present value of the cumulative accrued benefits under the plan for Key Employees [as defined in Article XI] exceeds sixty percent (60%) of the present value of the cumulative accrued benefits under the plan for all Employees.

For purposes of this definition:

(a) The present value of cumulative accrued benefits shall be the lump-sum present value determined pursuant to Article XI, as adjusted by Section 1.36 (e) below.

(b) A plan shall be considered a Top-Heavy Plan for any Plan Year if, on the last day of the preceding Plan Year (the "determination date"), the above rules were met.  For the first Plan Year that the Plan shall be in effect, the determination of whether said Plan is a

Top-Heavy Plan shall be made as of the last day of such Plan Year. Any such determination shall be based on the valuation date falling within that Plan Year. For this purpose, the valuation date must be the same valuation date used for computing Plan costs for minimum funding regardless of whether a valuation is performed that year.

(c) Each plan of the Employer required to be included in an "aggregation group" shall be treated as a Top-Heavy Plan if such group is a top-heavy group.

(d) The term "aggregation group" means

    (i)   each plan of the Employer in which a Key Employee is a Participant, and

    (ii)  each other plan of the Employer which enables any plan in (i) to meet the requirements of IRC Section 401(a)(4) or 410(b).

        A permissive aggregation group consists of plans of the Employer that are required to be aggregated, plus one (1) or more plans of the Employer that are not part of a required aggregation group, but that satisfy the requirements of IRC Sections 401(a)(4) and 410(b) when considered together with the required aggregation group.

(e) The present values of accrued benefits and the amounts of account balances of an employee as of the determination date shall be increased by the distributions made with respect to the employee under the Plan and any plan aggregated with the Plan under Section 416 (g) (2) of the Code during the 1-year period ending on the determination date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the plan under Section 416 (g) (2) (A) (i) of the Code. In the case of a distribution

made for a reason other than severance from employment, death, or disability, this provision shall be applied by substituting "5-year period" for "1-year period". The accrued benefits and accounts of any individual who has not performed services for the employer during the 1-year period ending on the determination date shall not be taken into account.

(f) This definition shall be interpreted consistent with IRC Section 416 and rules and regulations issued thereunder. Further, such law and regulations shall be controlling in all determinations under this definition inclusive of any provisions and requirements stated thereunder but hereinabove absent.

1.37 <u>Trustee</u> means such individual, individuals, corporation, or financial institution, or a combination of them as shall be designated pursuant to Article VII to hold in trust the assets of the Plan, and shall include any successor Trustee to the Trustee initially designated thereunder.

1.38 <u>Vesting Service</u> means, as of any date, the sum of past Vesting Service, if any, under Section 1.38(a) and subsequent Vesting Service under Section 1.38(b), subject to Section 1.38(c), Section 1.38(d), Section 1.38(e), and Section 1.38(f) below, if applicable.

(a) If the Employee was employed by the Employer on December 31, 1991, he shall receive credit for past Vesting Service. Past Vesting Service as of December 31, 1991, shall be equal to the following:

(i) If an Employee was a Participant in the Mount Vernon Plan or the Prior Pamplin Plan on December 31, 1991, his past Vesting Service shall be equal to his vesting service as defined under the Mount Vernon Plan, or total service plus one (1) year

as defined under the Prior Pamplin Plan, as applicable, as in effect through December 31, 1991.

(ii) If an Employee was not a Participant in the Mount Vernon Plan or the Prior Pamplin Plan on December 31, 1991, his past Vesting Service shall be equal to his vesting service as defined under the Mount Vernon Plan, or total service as defined under the Prior Pamplin Plan, as applicable, as in effect through December 31, 1991.

(b) Subsequent Vesting Service shall be the total number of Plan Years during which an Employee has at least one thousand (1,000) Hours of Service for the Employer during the period of time commencing on January 1, 1992.

(c) Notwithstanding the above, if a non-vested terminated Participant is subsequently reemployed and again becomes a Participant, his Vesting Service shall not include any periods of Employment prior to reemployment if his consecutive One Year Breaks in Service as of his reemployment date are equal to or exceed five (5) consecutive One Year Breaks in Service.

(d) Periods of employment with an Affiliate which would have constituted a year(s) of Vesting Service had the Participant been employed by the Employer, shall be included as if such periods had been performed for the Employer.

(e) Periods of employment with the Employer other than as an Employee which would have constituted a year(s) of Vesting Service had the Participant been employed as an Employee, shall be included as if such periods had been performed as an Employee.

(f) Any Vesting Service prior to the Plan Year in which the Participant attains the age of eighteen (18) shall be excluded.

1.39  <u>Year of Service</u> means for any Employee, a stated twelve (12) consecutive month period during which such Employee completed one thousand (1,000) or more Hours of Service as an Employee.

In the event an Employee is simultaneously in the employ of more than one Employer or is transferred from the employment of one Employer to the employment of another Employer, the number of Hours of Service completed during any twelve (12) consecutive month period shall be the sum of the number of Hours of Service completed for all Employers during such period. For purposes of determining participation in Article II:

(a) Periods of employment with an Affiliate which would have constituted a Year(s) of Service had the Employee been employed by the Employer shall be included as if such period had been performed for the Employer; and

(b) Periods of employment with the Employer other than as an Employee which would have constituted a Year(s) of Service had the Employee been employed as an Employee shall be included as if such periods had been performed as an Employee.

ARTICLE II

PARTICIPATION

2.01  <u>Eligibility</u> – Each Employee who was a Participant of the Plan on December 31, 2006, subject to the provisions hereinafter contained, shall continue as a Participant of this Plan as of January 1, 2007.

Each Employee who was not a Participant of the Plan on December 31, 2006, and each person who becomes an Employee after such date and who is not already a Participant shall automatically become a Participant on the first day of the month coinciding with or next following the later of (a) the Effective Date, and (b) the completion of a Year of Service subsequent to the date on which he completed his first Hour of Service.

Upon the completion of the first twelve (12) month period noted in (b) above, the twelve (12) month period for determining the Year of Service shall be based on Plan Years starting with the Plan Year in which occurs the first anniversary of the date on which he completes the applicable first Hour of Service.

Notwithstanding anything in this Article to the contrary, effective January 1, 2008, any person who becomes an Employee on or after that date, whether newly hired or re-hired, shall not be eligible to participate in the Plan.

2.02  <u>Participation</u> - Each Employee who becomes a Participant shall remain a Participant so long as he remains an Employee, or is entitled to future benefits under the terms of the Plan.   If an Employee is reemployed with the Employer following a termination of employment, the following rules shall apply in determining when he becomes a Participant in the Plan:

(a) Reemployment of an Employee who Terminated Before Becoming a Participant:

    (i) Before a One Year Break in Service - If an Employee whose participation in the Plan had not commenced is reemployed before he has a One Year Break in Service, he shall become a Participant on the date determined under Section 2.01, based upon his original date of hire.

    (ii) After a One Year Break in Service - If an Employee whose participation in the Plan had not commenced is reemployed after he has a One Year Break in Service, his participation in the Plan shall be determined under Section 2.01 as if he were a new Employee.

(b) Reemployment of an Employee who Terminated After Becoming a Participant:

    (i) Before a One Year Break in Service - If a Participant, whether or not vested, is reemployed before he has a One Year Break in Service, his participation in the Plan shall recommence as of his date of reemployment.

    (ii) After a One Year Break in Service - If a vested Participant is reemployed after he has a One Year Break in Service, his participation in the Plan shall recommence as of his date of reemployment. If a non-vested Participant is reemployed after he has a One Year Break in Service and his pre-break Vesting Service is not canceled pursuant to Section 1.38(c), then his participation in the Plan shall recommence as of his date of reemployment. If a non-vested Participant is reemployed after he has a One Year Break in Service and his pre-break Vesting Service is canceled pursuant to Section 1.38(c), then his participation in the Plan shall be determined under Section 2.01 as if he were a new Employee.

ARTICLE III

RETIREMENT DATES

3.01  <u>Normal Retirement Date</u> - The Normal Retirement Date of a Participant shall be the first day of the month coinciding with or next following the date on which the Participant attains his Normal Retirement Age.  A Participant reaching his Normal Retirement Date while an Employee may at that date retire from the employment of the Employer; otherwise the provisions of Section 3.02 shall be applicable.

3.02  <u>Delayed Retirement Date</u> - If a Participant does not retire upon attainment of his Normal Retirement Date, he shall be considered to have retired at his Delayed Retirement Date. The Delayed Retirement Date of a Participant who continues his employment with the Employer beyond his Normal Retirement Date shall be the first day of the month coinciding with or next following the actual date the Participant terminates his employment with the Employer.

Payment of the monthly retirement benefit hereunder shall be subject to the following requirements:

(a) Each Participant whose monthly retirement benefit is suspended under this Section 3.02 shall be notified of the suspension.  The notification shall be made by personal delivery or first-class mail during the first calendar month or payroll period in which the Participant's monthly retirement benefit is suspended.  The notification shall contain the following information (either expressly or by reference to the Plan's Summary Plan Description):

(i)    a description of the specific reasons why benefit payments are being suspended;

(ii)  a general description and copy of the Plan provisions relating to the suspension of benefit payments;

(iii)  a statement that applicable Department of Labor Regulations may be found in Title 29, Section 2530.203-3 of the Code of Federal Regulations; and

(iv)  a description of the Plan's procedure for affording a review of the suspension of benefits.

(b)  A Participant's monthly retirement benefit shall be suspended under this Section 3.02 if the Participant completes forty (40) or more Hours of Service (other than Hours of Service credited only on account of back pay that was awarded or agreed to by the Employer) during any month.  Such a Participant shall be considered in the "service" of the Employer for purposes of this Section 3.02.  A Participant who has reached his Normal Retirement Date and who does not complete forty (40) or more Hours of Service during any month shall not be considered to be in the service of the Employer.  Such a Participant's monthly retirement benefit shall not be suspended for such time as described in this Section 3.02.  Payment of such Participant's monthly retirement benefit will commence not later than the first day of the third (3rd) calendar month after the calendar month in which the Participant retires.

(c)  Following the procedure described in the Plan's Summary Plan Description for the review of claims, a Participant may request, and the Plan Administrator shall render, a determination whether specific contemplated employment will result in a suspension of benefit payments.

3.03   Early Retirement Date - A Participant may retire from the employment of the Employer on the first day of any month prior to his Normal Retirement Date, provided he has attained

the age of sixty (60) or more and completed at least fifteen (15) years of Vesting Service (or prior to January 1, 2000, fifteen years of Benefit Service).

3.04  <u>Disability Retirement Date</u> – Except as provided below, a Participant who is totally and permanently disabled may retire from the employment of the Employer on the first day of any month prior to his Early Retirement Date, provided he has completed at least five (5) years of Vesting Service (or prior to January 1, 2000 five years of Benefit Service). A Participant shall be deemed to be totally and permanently disabled if he is determined to be eligible for disability benefits under the provisions of the Federal Social Security Act. The Participant's Disability Retirement Date shall be the first day of the month coincident with or next following the date of entitlement to disability benefits under the provisions of the Federal Social Security Act.

Effective January 1, 2011, a Participant who becomes "totally and permanently disabled" (as defined below) while employed by the Employer may retire from such employment on the first day of any month prior to his Early Retirement Date, provided that the Participant has completed at least five (5) years of Vesting Service (or, prior to January 1, 2000, five years of Benefit Service). A Participant shall be deemed to be "totally and permanently disabled" as of the date the Participant files an application with the federal Social Security Administration (SSA) to receive disability benefits under the federal Social Security Act, provided that SSA subsequently approves the Participant's application. At any time following SSA approval of the Participant's application, the Participant may make application with the Plan Administrator to receive benefits pursuant to Section 4.04, but benefits cannot begin until the first day of the month after the later of (a) the date that the Participant leaves the employ of the Employer or (b) the date that the Participant is entitled to

begin receiving SSA disability benefits. The date benefits begin under the foregoing shall be considered the Disability Retirement Date.

ARTICLE IV

RETIREMENT BENEFITS

4.01   Normal Retirement Benefit - A Participant, upon retirement at his Normal Retirement Date, shall receive a monthly retirement benefit which shall commence on such retirement date and shall be paid in accordance with Article V.  The amount of such monthly retirement benefit shall be one-twelfth (1/12) of the sum of his Past Service Benefit under Section 4.01(a) and his Subsequent Service Benefit under Section 4.01(b).

(a) Past Service Benefit means the Participant's accrued benefit as of December 31, 1991, determined under the provisions of the Mount Vernon Plan as in effect on December 31, 1991.

(b)  Subsequent Service Benefit for each year of Benefit Service commencing on and after January 1, 1992 and on or prior to March 31, 2002 is equal to one and one-half percent (1.5%) of the Participant's Compensation.  Subsequent Service Benefit for each year of Benefit Service commencing on or after April 1, 2002 through December 31, 2004 is equal to one percent (1%) of the Participant's Compensation.  No Subsequent Service Benefit, or Benefit Service of any kind, shall be provided in Plan Years beginning on or after January 1, 2005.  For purposes of this Section 4.01(b) only, Compensation prior to an Employee's date of participation in the Plan as determined under Section 2.01 shall not be considered.

4.02   Delayed Retirement Benefit - A Participant, upon retirement at his Delayed Retirement Date in accordance with Section 3.02, shall receive a monthly retirement benefit which shall commence on the date of such retirement and shall be paid in accordance with

Article V.  The amount of such monthly retirement benefit shall be determined under Section 4.01 as of the Delayed Retirement Date.

4.03    <u>Early Retirement Benefit</u> - A Participant, upon retirement at his Early Retirement Date in accordance with Section 3.03, shall receive a monthly retirement benefit which shall commence on his Annuity Starting Date and shall be in the form of payment as elected under Article V.  The amount of such monthly retirement benefit shall be determined as the Participant's Accrued Benefit as of his Early Retirement Date, reduced by one-half of one percent (1/2%) for each month by which the Participant's Annuity Starting Date precedes his Normal Retirement Date.

4.04    <u>Disability Retirement Benefit</u> - A Participant, upon retirement at his Disability Retirement Date in accordance with Section 3.04, shall receive a monthly retirement benefit which shall commence on such retirement date and shall be paid in accordance with Article V. The amount of such monthly retirement benefit shall be the Participant's Accrued Benefit as of his Disability Retirement Date, reduced to its Actuarial Equivalent as of the Annuity Starting Date.  A Participant shall be entitled to elect to defer payment of his disability retirement benefit to the first day of any subsequent month up to and including his Normal Retirement Date.

Notwithstanding the foregoing, for a Participant who was, or would have been, a participant in the Mount Vernon Plan prior to October 15, 1992, his disability retirement benefit shall not be less than the amount of disability retirement benefit he would have been entitled to under the provisions of that plan as in effect through December 31, 1991.

4.05    <u>Cessation of Disability Retirement</u> - If a Participant in receipt of a monthly retirement benefit in accordance with the provisions of Section 4.04 recovers to the extent that he is

no longer receiving benefits under the Federal Social Security Act, he shall no longer be entitled to a monthly retirement benefit under the provisions of Section 4.04. Effective January 1, 2011, unless the provisions of Section 4.06(c) apply, the amount of the Participant's Accrued Benefit will be adjusted to reflect the retirement payments made to the Participant during the Participant's period of disability. If the Participant returns to the employ of the Employer, he shall resume his status as an active Participant. Prior to January 1, 2011, if the Participant does not return to the employ of the Employer, he shall be considered to have terminated his employment with the Employer as of the date he is no longer receiving benefits under the Federal Social Security Act. Effective January 1, 2011, if the Participant does not return to the employ of the Employer at the time that the Participant ceases to receive SSA disability benefits, the Participant's status shall be the same as other Participants who have previously terminated employment with the Employer. In any event, the period during which the Participant was retired for disability shall not be considered for purposes of Benefit Service and Vesting Service except to the extent required by Section 1.20(b)(i) but a One Year Break in Service shall not be deemed to have occurred.

4.06 <u>Reemployment of Retired Participants</u> - If a Participant is reemployed as an Employee after the commencement of a retirement benefit, the following rules shall apply:

(a) <u>Reemployment Prior to January 1, 2000 and Prior to Normal Retirement Age</u>: If a Participant is reemployed prior to January 1, 2000, but (i) after the commencement of a benefit pursuant to his retirement under the provisions of Sections 3.03 or 3.04 or Section 6.04 and (ii) prior to his attainment of Normal Retirement Age, his retirement benefit shall be discontinued. Such Participant's rights to future benefits under the Plan shall be subject to redetermination upon any subsequent termination of employment or

retirement under the Plan in accordance with the Plan provisions then in effect. Any benefits thereafter payable shall be reduced on an Actuarial Equivalent basis to reflect the value of the retirement benefit payments received by the Participant in the period during which he was in receipt of a retirement benefit. Notwithstanding the previous sentence, the monthly retirement benefit thereafter payable shall not be less than the monthly retirement benefit payable immediately before his latest reemployment.

(b) <u>Reemployment Prior to January 1, 2000 and After Normal Retirement Age</u>: Payment of the monthly retirement benefit of a Participant who is reemployed prior to January 1, 2000 and after reaching his Normal Retirement Date shall be suspended until he subsequently terminates his active employment with the Employer, subject to the following requirements:

(i) Each Participant whose monthly retirement benefit is suspended under this Section 4.06(b) shall be notified of the suspension. The notification shall be made by personal delivery or first-class mail during the first calendar month or payroll period in which the Participant's monthly retirement benefit is suspended. The notification shall contain the following information (either expressly or by reference to the Plan's Summary Plan Description):

(A) a description of the specific reasons why benefit payments are being suspended;

(B) a general description and copy of the Plan provisions relating to the suspension of benefit payments;

(C) a statement that applicable Department of Labor Regulations may be found in Title 29, Section 2530.203-3 of the Code of Federal Regulations; and

(D)    a description of the Plan's procedure for affording a review of the suspension of benefits.

(ii)    A Participant's monthly retirement benefit shall be suspended under this Section 4.06(b) once the Participant completes one thousand (1,000) or more Hours of Service (other than Hours of Service credited only on account of back pay that was awarded or agreed to by the Employer) during a Plan Year.  Such a Participant shall be considered in the "service" of the Employer for purposes of this Section 4.06(b).  A Participant who is reemployed after his Normal Retirement Date and who does not perform the one thousand (1,000) or more Hours of Service during the Plan Year shall thereafter be considered not to be in the service of the Employer and shall be considered to have retired.  The monthly retirement benefit of such a Participant shall not thereafter be suspended as described in this Section 4.06(b).  Payment of such Participant's monthly retirement benefit will commence not later than the first day of the third (3rd) calendar month after the calendar month in which the Participant retires.

(iii)    Following the procedure described in the Plan's Summary Plan Description for the review of claims, a Participant may request, and the Plan Administrator shall render, a determination whether specific contemplated employment will result in a suspension of benefit payments.

(c)    Reemployment On or After January 1, 2000:  If a Participant receiving a retirement benefit pursuant to Article III or Section 6.04 is reemployed, he shall continue to be deemed retired under the Plan, and his benefit payments shall continue uninterrupted upon his reemployment, regardless of his Hours of Service; provided, however, any

benefit payable to or on behalf of such Participant upon his subsequent retirement or death shall include any additional benefit accrued under the Plan during such reemployment.

(d) <u>Form of Payment of Additional Accrued Benefits:</u> With respect to any additional Accrued Benefit credited to a Participant after his reemployment, whether before or after January 1, 2000, the following rules shall apply:

(i) If such a Participant's original Annuity Starting Date occurred prior to his Normal Retirement Date, then the form of payment elected by the Participant pursuant to Article V on such original Annuity Starting Date shall continue to apply with respect to the benefit in pay status prior to his reemployment. With respect to any benefit earned during such Participant's reemployment, such benefit shall have a new Annuity Starting Date and such Participant shall make a new election under Article V as to the form of payment for such benefit.

(ii) If such a Participant's original Annuity Starting Date occurred on or after his Normal Retirement Date, then the form of payment elected by the Participant pursuant to Article V on such original Annuity Starting Date shall continue to apply with respect to both the benefit in pay status prior to his reemployment and to any benefit earned during his reemployment.

4.07 <u>Maximum Retirement Benefit:</u> Anything to the contrary notwithstanding, for all Participants who have one (1) Hour of Service on or after January 1, 2002, a benefit computed under this Plan, when expressed as an annual benefit, shall not exceed the lesser of (1) $160,000 (the "Dollar Limitation"), or (2) one hundred percent (100%) of the Participant's average compensation during the three (3) consecutive calendar years in which the total

compensation paid to him or her was the highest (the "Compensation Limitation"), but subject to the following:

(a)     <u>Payment Form Adjustment:</u>   The above-described limitation shall apply to the benefit payable to the Participant in the form of a single life annuity.   Except as provided below, a benefit payable in the form other than a single life annuity shall be adjusted to an Actuarial Equivalent single life annuity before applying the limitations of this Section.   The amount so adjusted hereunder shall be the greater of the Actuarial Equivalent of such limitations determined using (1) a five percent (5%) interest rate and the Applicable Mortality Table, as defined in Section 6.05, or (2) the Actuarial Equivalent assumptions for purposes other than payments subject to Code Section 417(e); provided, however, that should the payment be in the form of a payment subject to Code Section 417(e), the amount so adjusted hereunder shall be determined using the Applicable Mortality Table and Applicable Interest Rate, as defined in Section 6.05; further provided, however, that for the 2004 and 2005 Limitation Years the interest assumption for such payment shall be five and one-half percent (5.5%), if greater, and the transition rule under Notice 2004-78 shall not apply.   Notwithstanding the foregoing, effective for Limitation Years beginning on or after January 1, 2006, should the payment be in the form of a payment subject to Code Section 417(e), the amount so adjusted hereunder shall be determined using whichever of the following produces the greatest amount: (1) the interest and mortality table, or tabular factor, specified in the Plan; (2) five and one-half percent (5.5%) interest and the Applicable Mortality Table; or (3) the Applicable Interest Rate and the Applicable Mortality Table, divided by 1.05.There shall be no actuarial

adjustment to the benefit for (i) the value of a qualified joint and survivor annuity, (ii) the value of benefits that are not directly related to retirement benefits (such as a qualified disability benefit, pre-retirement death benefits, and postretirement medical benefits), or (iii) the value of post-retirement cost-of-living increases made in accordance with Section 415(d) of the Code and Section 1.415.3(c)(2)(iii) of the Treasury Regulations.

(b)   <u>Adjustment of Dollar Limitation for benefit commencement before age 62.</u>

    (i)   <u>Limitation Years beginning before July 1, 2007.</u>

        If the Annuity Starting Date for the Participant's benefit is prior to the Participant reaching age 62 and occurs in a Limitation Year beginning before July 1, 2007, the Dollar Limitation for the Participant's Annuity Starting Date is the annual amount of a benefit payable in the form of a straight life annuity commencing at the Participant's Annuity Starting Date that is the actuarial equivalent of the Dollar Limitation (adjusted under Section 4.07 (d) for years of participation less than ten (10), if required) with actuarial equivalence computed using whichever of the following produces the smaller annual amount: (1) the tabular factor specified in Section 4.03; or (2) a five percent (5%) rate assumption and the applicable mortality table as defined in Section 6.05.

    (ii)   <u>Limitation Years beginning on or after July 1, 2007.</u>

        (A)   <u>Plan does not have immediately commencing straight life annuity payable at both age 62 and the age of benefit commencement.</u> If the Annuity Starting Date for the Participant's benefit is prior to the

Participant reaching age 62 and occurs in a Limitation Year beginning on or after July 1, 2007, and the Plan does not have an immediately commencing straight life annuity at both age 62 and at the age of benefit commencement, the Dollar Limitation for the Participant's Annuity Starting Date is the annual amount of a benefit payable in the form of a straight life annuity commencing at the Participant's Annuity Starting Date that is the actuarial equivalent of the Dollar Limitation (adjusted under Section 4.07 (d) for years of participation less than ten (10), if required) with actuarial equivalence computed using a five percent (5%) interest rate assumption and the applicable mortality table for the Annuity Starting Date as defined in Section 6.05 (and expressing the Participant's age based on completed calendar months as of the Annuity Starting Date).

(B)    <u>Plan has immediately commencing straight life annuity payable at both age 62 and the age of benefit commencement.</u> If the Annuity Starting Date for the Participant's benefit is prior to the Participant reaching age 62 and occurs in a Limitation Year beginning on or after July 1, 2007, and the Plan has an immediately commencing straight life annuity payable at both age 62 and at the age of benefit commencement, the Dollar Limitation for the Participant's Annuity Starting Date is the lesser of the limitation determined under Section 4.07 (b)(ii)(A) and the Dollar Limitation (adjusted under Section 4.07 (d) for years of participation less than ten (10), if required) multiplied

by the ratio of the annual amount of the immediately commencing straight life annuity under the Plan at the Participant's Annuity Starting Date to the annual amount of the immediately commencing straight life annuity under the Plan at age 62, both determined without applying the limitations of this Section.

(iii)    Notwithstanding anything in this subsection (b) to the contrary, benefits under the Plan that were frozen as of December 31, 2004, as limited under Code Section 415, shall not be increased as a result of this subsection and the final regulations regarding Code Section 415 limitations that became effective for Limitation Years beginning on or after July 1, 2007.

(c)    <u>Adjustment of Dollar Limitation for benefit commencement after age 65.</u>

(i)    <u>Limitation Years beginning before July 1, 2007</u>.

If the Annuity Starting Date for the Participant's benefit is after the Participant reaches age 65 and occurs in a Limitation Year beginning before July 1, 2007, the Dollar Limitation for the Participant's Annuity Starting Date is the annual amount of a benefit payable in the form of a straight life annuity commencing at the Participant's Annuity Starting Date that is the actuarial equivalent of the Dollar Limitation (adjusted under Section 4.07 (d) for years of participation less than ten (10), if required) with actuarial equivalence computed using whichever of the following produces the smaller annual amount:  (1) the interest rate specified in Section 5.06 and the mortality table (or other tabular factor) specified in Section 5.06, or (2) a five percent (5%)

interest rate assumption and the applicable mortality table as defined in Section 6.05.

(ii)   <u>Limitation Years beginning on or after July 1, 2007.</u>

(A)   <u>Plan does not have immediately commencing straight life annuity payable at both age 65 and the age of benefit commencement.</u> If the Annuity Starting Date for the Participant's benefit is after the Participant reaches age 65 and occurs in a Limitation Year beginning on or after July 1, 2007, and the Plan does not have an immediately commencing straight life annuity payable at both age 65 and the age of benefit commencement, the Dollar Limitation at the Participant's Annuity Starting Date is the annual amount of a benefit payable in the form of a straight life annuity commencing at the Participant's Annuity Starting Date that is the actuarial equivalent of the Dollar Limitation (adjusted under Section 4.07 (d) for years of participation less than ten (10), if required) with actuarial equivalence computed using a five percent (5%) interest rate assumption and the applicable mortality table for that Annuity Starting Date as defined in Section 6.05 (and expressing the Participant's age based on completed calendar months as of the Annuity Starting Date).

(B)   <u>Plan has immediately commencing straight life annuity payable at both age 65 and the age of benefit commencement.</u> If the Annuity Starting Date for the Participant's benefit is after the Participant reaches age 65 and occurs in a Limitation Year beginning on or after July 1, 2007

and the Plan has an immediately commencing straight life annuity payable at both age 65 and at the age of benefit commencement, the Dollar Limitation at the Participant's Annuity Starting Date is the lesser of the limitation determined under Section 4.07 (c)(ii)(A) above and the Dollar Limitation (adjusted under Section 4.07 (d) for years of participation less than ten (10), if required) multiplied by the ratio of the annual amount for the adjusted immediately commencing straight life annuity under the Plan at the Participant's Annuity Starting Date to the annual amount of the adjusted immediately commencing straight life annuity under the Plan at age 65, both determined without applying the limitations of this Section. For this purpose, the adjusted immediately commencing straight life annuity under the Plan at the Participant's Annuity Starting Date is the annual amount of such annuity payable to the Participant, computed disregarding the Participant's accruals after age 65 but including actuarial adjustments even if those actuarial adjustments are used to offset accruals; and the adjusted immediately commencing straight life annuity under the Plan at age 65 is the annual amount of such annuity that would be payable under the Plan to a hypothetical Participant who is age 65 and has the same accrued benefit as the Participant.

(iii)   Notwithstanding anything in this subsection (c) to the contrary, benefits under the Plan that were frozen as of December 31, 2004, as limited under Code Section 415, shall not be increased as a result of this subsection and the final

regulations regarding Code Section 415 limitations that became effective for Limitation Years beginning on or after July 1, 2007.

(d)    <u>Participation and Service Reductions:</u>    Should the Participant have fewer than ten (10) years of Plan participation, the Dollar Limitation shall be multiplied by a fraction, the numerator of which is the Participant's number of years (computed to fractional parts of a year) of participation in the Plan, and the denominator of which is ten (10). Should the Participant have fewer then ten (10) years of Vesting Service, the Compensation Limitation shall be multiplied by a fraction, the numerator of which is the Participant's  number of years of Vesting Service (computed to fractional parts of a year), and the denominator of which is ten (10).

(e)    <u>Cost-of-Living Increases:</u>    For all purposes of this Plan, the maximum Dollar Limitation shall be automatically increased effective January 1 of each year under Section 415(d) of the Code, as permitted by Treasury Department regulations to reflect cost-of-living adjustments.  As a result of such an adjustment, a benefit that had been limited by the provisions of this Section in a previous Plan Year may be increased with respect to future payments to the lesser of the adjusted Dollar Limitation amount or the amount of benefit that would have been payable under this Plan without regard to the provisions of this Section.

For purposes of the Section, the year used in applying the limitations of Code Section 415 (the Limitation Year), shall be the Plan Year.  Benefit increases resulting from the increase in the Code Section 415(b) limitations effective for Limitation Years ending after December 31, 2001, as described in accordance with the foregoing provisions of this

Section, shall apply to all Employees participating in the Plan who have one (1) Hour of Service on or after January 1, 2002.

The above described limitations are intended to comply with the provisions of Code Section 415 as amended, so that the maximum benefits provided by plans of the Employer and the Affiliates shall be exactly equal to the maximum amounts allowed under Code Section 415 and regulations thereunder. Should there be any discrepancy between the provisions of this Section and the provisions of Code Section 415, such discrepancy shall be resolved in a way that gives full effect to the provisions of Code Section 415.

For the purposes of the Section, "compensation" means compensation paid or made available during the Limitation Year as defined as wages in Code Section 3401(a), and all other payments of compensation to an Employee by his or her Employer or Affiliate (in the course of the Employer's of Affiliate's trade or business) for which the Employer or Affiliate is required to furnish the Employee a written statement under Code Section 6041(d), 6051(a)(3) and 6052 (Form W-2 or substitute), including any pre-tax elective deferrals (as defined in Code Section 402(g)(3)) and any amount which is contributed or deferred by the Employer or Affiliate at the election of the Employee and which is not includible in gross income by reason of Code Section 125, 132(f)(4), 403(b), 402(e)(3), 402(h)(1)(B), 414(v) or 457. Compensation must be determined without regard to any rules under Code Section 3401(a) that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401(a)(2)). This definition is intended to be the equivalent of the definition of compensation under Code Section 415(c)(3). Compensation

shall be limited to $200,000 or such other amount as determined pursuant to Code Section 401(a)(17).

4.08    Special Provisions Applicable to Participants of the Mount Vernon Hourly Plan - Special provisions shall apply to Participants who were participants of the Mount Vernon Hourly Plan as in effect on December 31, 1986.  These provisions are detailed in Appendix C which is attached to and made a part of this Plan.

4.09    Special Provisions Applicable to Participants of the Mount Vernon Salaried Plan - Special provisions shall apply to Participants who were participants of the Mount Vernon Salaried Plan as in effect on December 31, 1986.  These provisions are detailed in Appendix D which is attached to and made a part of this Plan.

4.10    Special Provisions Applicable to Participants of the Riegel Hourly Plan - Special provisions shall apply to Participants who were participants of the Riegel Hourly Plan as in effect on December 31, 1986.  These provisions are detailed in Appendix E which is attached to and made a part of this Plan.

4.11    Special Provisions Applicable to Participants of the Riegel Salaried Plan - Special provisions shall apply to Participants who were participants of the Riegel Salaried Plan as in effect on December 31, 1986.  These provisions are detailed in Appendix F which is attached to and made a part of this Plan.

4.12    Special Provisions Applicable to Prior Pamplin Plan - Special provisions shall apply to Participants who were participants of the Prior Pamplin Plan as in effect on December 31, 1991.  These provisions are detailed in Appendix B which is attached to and made a part of this Plan.

4.13   <u>Special Provisions Applicable to "West Coast Employees"</u> – Special provisions shall apply to Participants employed by the following companies, when they adopted the Plan effective as of January 1, 1998: Pamplin Communications Corporation; Christian Supply Center, Inc.; Pamplin Entertainment Corporation; Pamplin Music Corporation; Pamplin Broadcasting-Oregon, Inc.; Pamplin Broadcasting-Washington, Inc.; United Tile Corp.; United Tile Co., Inc.; Sonoma Tilemakers, Inc.; Pamplin Foundation; The Pastor Of Christ Community Church And His Successors, A Corporation Sole; and Columbia Empire Farms, Inc. (salaried employees only). These provisions are detailed in Appendix G which is attached to and made part of this Plan.

4.14   <u>Special Provisions Applicable to "Arkwright Employees"</u>  - Effective December 31, 1998, the employees of Arkwright Mills, Inc., and their agents, as of such date who became Employees of Mount Vernon Mills, Inc. as of such date (the "Arkwright Employees") will be subject to the following provisions:

(a) Participation - For purposes of determining eligibility to become a Member of the Plan in accordance with Article II of the Plan, periods of employment with Arkwright Mills, Inc. and their agents prior to the acquisition date shall be recognized from their most recent hire date with Arkwright Mills, Inc. The initial entry date for those employees satisfying the eligibility requirements shall be January 1, 1999, or later, as determined under Article II.

(b) Vesting - The Arkwright Employees will be credited with Vesting Service prior to the acquisition date beginning with their most recent date of hire with Arkwright Mills, Inc. and their agents. Such Vesting Service will be determined in accordance with the provisions of this Plan.

(c) Benefit Service – Benefit Service for Arkwright Employees begins January 1, 1999 or their date of participation if later, in accordance with Section 1.06.

4.15    <u>Special Provisions Applicable to "Your Northwest Employees"</u>  - Effective December 31, 1998, the employees of Your Northwest as of such date (the "Your Northwest Employees") will be subject to the following provisions:

(a) Participation - For purposes of determining eligibility to become a Member of the Plan in accordance with Article II of the Plan, periods of employment with Your Northwest, Inc. shall be recognized from their most recent hire date with Your Northwest, Inc. The initial entry date for those employees satisfying the eligibility requirements shall be January 1, 1999, or later, as determined under Article II.

(b) Vesting - The Your Northwest Employees will be credited with Vesting Service beginning with their most recent date of hire with Your Northwest, Inc.  Such Vesting Service will be determined in accordance with the provisions of this Plan.

(c) Benefit Service – Benefit Service for Your Northwest Employees begins January 1, 1999 or their date of participation if later, in accordance with Section 1.06.

4.16    <u>Special Provisions Applicable to "Pamplin Broadcasting Inc. Employees"</u>  - Effective February 10, 1999, the employees of Pamplin Broadcasting Inc. as of such date (the "Pamplin Broadcasting Inc. Employees") will be subject to the following provisions:

(a) Participation - For purposes of determining eligibility to become a Member of the Plan in accordance with Article II of the Plan, periods of employment with Pamplin Broadcasting Inc., shall be recognized from their most recent hire date with Pamplin Broadcasting Inc. The initial entry date for those employees satisfying the eligibility requirements shall be March 1, 1999, or later, as determined under Article II.

(b) Vesting - The Pamplin Broadcasting Inc. Employees will be credited with Vesting Service beginning with their most recent date of hire with Pamplin Broadcasting Inc. Such Vesting Service will be determined in accordance with the provisions of this Plan.

(c) Benefit Service – Benefit Service for Pamplin Broadcasting Inc. Employees begins March 1, 1999 or their date of participation if later, in accordance with Section 1.06.

4.17 <u>Special Provisions Applicable to "LeCep II, Inc. Employees"</u> - Effective November 4, 1999, the salaried employees of LeCep II, Inc. as of such date who became Employees of the Corporation of such date (the "LeCep II, Inc.") will be subject to the following provisions:

(a) Participation - For purposes of determining eligibility to become a Member of the Plan in accordance with Article II of the Plan, periods of employment with LeCep II, Inc. prior to the acquisition date shall be recognized from their most recent hire date with LeCep II, Inc. The initial entry date for those employees satisfying the eligibility requirements shall be December 1, 1999, or later, as determined under Article II.

(b) Vesting - The LeCep II, Inc. Employees will be credited with Vesting Service prior to the acquisition date beginning with their most recent date of hire with LeCep II, Inc. Such Vesting Service will be determined in accordance with the provisions of this Plan.

(c) Benefit Service – Benefit Service for Your Northwest Employees begins December 1, 1999 or their date of participation if later, in accordance with Section 1.06.

4.18 <u>Special Provisions Applicable to "Nisshinbo California, Inc. Employees"</u> - Effective August 23, 1999, the employees of Nisshinbo California, Inc. as of such date who became Employees of the Corporation of such date (the " Nisshinbo California, Inc. Employees") will be subject to the following provisions:

(a) Participation - For purposes of determining eligibility to become a Member of the Plan in accordance with Article II of the Plan, periods of employment with Nisshinbo California, Inc., prior to the acquisition date shall be recognized from their most recent hire date with Nisshinbo California, Inc. The initial entry date for those employees satisfying the eligibility requirements shall be September 1, 1999, or later, as determined under Article II.

(b) Vesting - The Nisshinbo California, Inc. Employees will be credited with Vesting Service prior to the acquisition date beginning with their most recent date of hire with Nisshinbo California, Inc.  Such Vesting Service will be determined in accordance with the provisions of this Plan.

(c) Benefit Service - Benefit Service for Nisshinbo California, Inc. Employees begins September 1, 1999 or their date of participation if later, in accordance with Section 1.06.

4.19    Special Provisions Applicable to "Western Textile Products Company, Inc. Employees" - Effective September 30, 1999, the employees of Western Textile Products Company, Inc. as of such date who became Employees (the "Western Textile Products Company, Inc. Employees") will be subject to the following provisions:

(a) Participation - For purposes of determining eligibility to become a Member of the Plan in accordance with Article II of the Plan, periods of employment with Western Textile Products Company, Inc., prior to the acquisition date shall be recognized from their most recent hire date with Western Textile Products Company, Inc. The initial entry date for those employees satisfying the eligibility requirements shall be October 1, 1999, or later, as determined under Article II.

(b) Vesting - The Western Textile Products Company, Inc. Employees will be credited with Vesting Service prior to the acquisition date beginning with their most recent date of hire with Western Textile Products Company, Inc.  Such Vesting Service will be determined in accordance with the provisions of this Plan.

(c)  Benefit Service – Benefit Service for Western Textile Products Company, Inc. Employees begins October 1, 1999 or their date of participation if later, in accordance with Section 1.06.

4.20  <u>Special Provisions Applicable to Philchem, Inc. Employees</u> - Effective November 24, 2003 the employees of Philchem, Inc. as of such date who become Employees (the "Philchem Employees") will be subject to the following provisions:

(a) Participation – For purposes of determining eligibility to become a Member of the Plan in accordance with Article II of the Plan, the Philchem Employees who have completed 1,000 Hours of Service (as defined in the Plan) during the period January 1, 2003 to November 24, 2003 will be eligible to participate in the Plan as of January 1, 2004.

(b) Vesting Service – The Philchem Employees will not be credited with any Years of Service for vesting purposes prior to the 2004 Plan Year.

4.21  <u>Special Provisions Applicable to Avondale Trucking Employees</u> - Effective July 21, 2006, the employees of Avondale Trucking as of such date who became Employees (the "Avondale Trucking Employees") will be subject to the following provisions:

(a) Participation – For purposes of determining eligibility to become a Member of the Plan in accordance with Article II of the Plan, the Avondale Trucking Employees who have completed 1,000 Hours of Service (as defined in the Plan) during the period January 1, 2006 to July 31, 2006 will be eligible to participate in the Plan as of August 1, 2006.

(b) Vesting Service – The Avondale Trucking Employees will not be credited with any Years of Service for vesting purposes prior to the 2006 Plan Year.

4.22    <u>Special Provisions Applicable to CPC Chemical Holdings LLC Employees</u> - Effective September 14, 2007, the employees of CPC Chemical Holdings LLC and its subsidiaries Apollo Chemical Company LLC, Chemical Technologies LLC and FCI Technology LLC as of such date who became Employees (the "CPC Employees") will be subject to the following provisions:

(a) Participation – For purposes of determining eligibility to become a Member of the Plan in accordance with Article II of the Plan, the CPC Employees will be eligible to participate in the Plan upon satisfying the provisions of Section 2.01 relating to employment with Mount Vernon Mills, Inc.

(b) Vesting Service – The CPC Employees will not be credited with any Hours of Service for vesting purposes prior to September 14, 2007.

4.23    <u>Benefits for Military Service</u> - Notwithstanding any provision of this Plan to the contrary, effective for any Employee reemployed with the Employer on or after December 12, 1994, from qualified military service in accordance with the Uniformed Services Employment and Reemployment Rights Act of 1994, contributions, benefits, years of Vesting Service and Benefit Service with respect to qualified military service will be provided in accordance with Code Section 414(u), provided, however, that no Benefit Service shall be provided and no compensation will be considered in Plan Years beginning on or after January 1, 2005.

ARTICLE V

NORMAL AND OPTIONAL METHODS OF RETIREMENT BENEFIT PAYMENTS

5.01  <u>Normal Form of Payment</u> - The normal form of payment to which the retirement benefit indicated in Article IV or Section 6.04 applies shall be a monthly retirement benefit payable as a single-life annuity.

5.02  <u>Available Option</u> - Pursuant to the provisions provided in Section 5.04, each Participant, with the consent of his Spouse, if any, shall have the right to elect to have his retirement benefit paid under the option hereinafter set forth in this Section 5.02 in lieu of the applicable automatic retirement benefit otherwise provided for in Section 5.04.  The amount of the optional retirement benefit shall be the Actuarial Equivalent of the amount of such retirement benefit that otherwise would have been payable to him as provided for in Section 5.01.

A Participant who desires to have his retirement benefit paid under the optional form provided in this Section 5.02 shall make such an election, in accordance with Section 5.04(c), by written request to the Plan Administrator on forms provided by the Plan Administrator. After benefit payments commence, no future elections, designation of Beneficiary, or revocations of the optional form will be permitted under any circumstances, except as stated in Section 4.06(d).

JOINT AND SURVIVOR OPTIONAL FORM

A Participant may elect to receive decreased retirement benefit during his lifetime and have one hundred percent (100%), or fifty percent (50%), or effective January 1, 2008 seventy-five percent (75%), of such decreased retirement benefit continue after his death to his designated Beneficiary,

during the lifetime of the Beneficiary.  If the designated Beneficiary is not living at the death of the Participant, no additional benefits shall be payable on behalf of the Participant.

5.03  <u>Maximum Option Payable</u> - In the event a Participant elects an optional form of payment and the designated Beneficiary is not the Spouse of the Participant, the option elected shall be restricted so that the present value of the payments expected to be made to the Participant is fifty percent (50%) or more of the present value of the total payments expected to be made to the Participant and his Beneficiary; provided, however, that such restriction shall be deemed to be satisfied if such benefit payments satisfy the minimum distribution incidental benefits requirements in Section 5.05(c).

5.04  <u>Automatic Option</u> - Subject to the provisions of Section 6.05, benefit payments shall be made to a Participant as follows:

(a) <u>If a Participant has a Spouse</u>: If a Participant has a Spouse on his Annuity Starting Date, his benefit shall be paid in the form of a Qualified Joint and Survivor Annuity, as described in this section, unless he elects otherwise in writing and his Spouse consents in writing to such election in accordance with Section 5.04(c). Under a Qualified Joint and Survivor Annuity, a reduced amount shall be paid to the Participant for his lifetime; and his Spouse, if surviving at the Participant's death, shall be entitled to receive thereafter a lifetime survivorship benefit in a monthly amount equal to fifty percent (50%) of the reduced monthly amount which had been payable to the Participant. The reduced amount payable to the Participant under the Qualified Joint and Survivor Annuity, shall be determined so that the aggregate of the benefit payments expected to be made to the Participant and his Spouse shall be the Actuarial Equivalent of the

single-life benefit determined under Section 5.01. The last payment of a Qualified Joint and Survivor Annuity shall be made for the month in which the death of the survivor occurs.

(b) <u>If a Participant has no Spouse</u>: If a Participant does not have a Spouse on his Annuity Starting Date, he shall receive the single-life benefit (which shall be deemed a Qualified Joint and Survivor Annuity for purposes of the written explanation and election provisions required in Section 5.04 (c)) computed under Section 5.01 subject to his right to elect in writing an optional form of benefit under Section 5.02. The last payment of the single-life benefit shall be made for the month in which the death of the Participant occurs.

(c) <u>Election of Form of Payment</u>: A Participant may make or revoke in writing to the Plan Administrator an election of any form of benefit to which the Participant is entitled under Section 5.01 or 5.02, and such election or revocation shall be subject to the following conditions:

   (1) <u>Qualified Joint and Survivor Annuity Notice</u>: No more than ninety (90) days (effective January 1, 2007, one hundred eighty (180) days) prior to the date distribution of benefits begins, the Plan Administrator shall provide, in accordance with Treasury Regulation 1.417(a)(3), the Participant with a written explanation of: (i) the terms and conditions of the Qualified Joint and Survivor Annuity and the optional payment forms under Section 5.02, (ii) the Participant's right to elect a single-life benefit or an optional form of payment under Section 5.02 in lieu of the Qualified Joint and Survivor Annuity and subject to his Spouse's consent, (iii) a general explanation of the financial effect on the Participant's benefit if such an

election is made, (iv) the Participant's right to reinstate coverage under the Qualified Joint and Survivor Annuity prior to the date of his distribution of benefits by revoking an election of a single-life benefit or an optional form of benefit under Section 5.02, (v) the relative values of the optional forms of benefit, and (vi) effective January 1, 2007, the right of a participant to defer receipt of benefits and the consequences of failing to defer such receipt, all as determined in accordance with applicable Treasury regulations. This written explanation shall herein be referred to as the "Qualified Joint and Survivor Annuity Notice".

(2) Election Procedures: In lieu of the Qualified Joint and Survivor Annuity, a Participant may elect in writing to receive an optional form of benefit under Section 5.02, within the ninety (90) day period (effective January 1, 2007, one hundred eighty (180) day period) prior to the date distribution commences, but no less than 30 days after the Qualified Joint and Survivor Annuity Notice is provided (the "Applicable Election Period"). However, if a Participant who has a Spouse does elect an optional form of benefit under Section 5.02, then his optional election shall be canceled and his benefit shall be paid in the form of a Qualified Joint and Survivor Annuity unless, within the Applicable Election Period, his Spouse consents in writing to his optional election.

Effective January 1, 2000, notwithstanding the preceding paragraph, if the Participant, after having received the Qualified Joint and Survivor Annuity Notice, affirmatively elects a form of distribution and the Spouse consents to that form of distribution and Beneficiary designation (if necessary) in accordance with this Section 5.04(c), then the Participant and Spouse, if any, may waive the minimum

30-day Applicable Election Period and benefit payments may begin, provided that the following requirements are met: (i) the Plan Administrator provides information to the Participant clearly indicating that he has a right to at least thirty (30) days after the Qualified Joint and Survivor Annuity Notice is provided to consider whether to waive the Qualified Joint and Survivor Annuity and consent to a form of distribution other than a Qualified Joint and Survivor Annuity; (ii) the Participant is permitted to revoke an affirmative distribution election at any time prior to the expiration of the 7-day period that begins the day after the Qualified Joint and Survivor Annuity Notice is provided to the Participant; and (iii) distribution in accordance with the affirmative election does not commence before the expiration of the 7-day period that begins the day after the Qualified Joint and Survivor Annuity Notice is provided to the Participant and no later than 90 days (effective January 1, 2007, 180 days) after such Notice is provided to the Participant, except in the case of administrative delay.

A Participant may also revoke any election made under this Section 5.04 at any time during the Applicable Election Period. The number of revocations shall not be limited. Any new waiver or change of Beneficiary will require a new spousal consent, unless the purpose of such revocation is to reinstate coverage under the Qualified Joint and Survivor Annuity.

The Spouse's consent to any election made pursuant to this Plan and requiring the Spouse's consent shall be in writing and shall acknowledge the effect of such consent. In addition, the Spouse's signature on the written consent must be witnessed by a notary public or the authorized Plan representative. The

Spouse's consent need not be obtained if the Plan Administrator is satisfied that there is no Spouse, that the Spouse cannot be located or because of any other circumstances which may be prescribed in regulations issued by the Secretary of the Treasury. The Spouse's consent under this Plan shall be valid only respect to the specified alternate Beneficiary and form of payment designated by the Participant. If such alternate Beneficiary is subsequently changed, a new consent by the Spouse will be required if the Participant desires to designate an alternate Beneficiary. The Spouse's consent to any election made by the Participant pursuant to this Plan, once made, may not be revoked by the Spouse and shall be valid only with respect to such Spouse.

(d)  Retroactive Annuity Starting Date: Notwithstanding any other provisions of the Plan to the contrary, effective for distributions with Annuity Starting Dates on or after January 1, 2004, if the requirements of this Section 5.04(d) are met, a Participant may elect to receive his benefit based on a "Retroactive Annuity Starting Date" in any form of payment under the Plan, with the exception of the lump sum option under Section 6.05.  A Participant's Retroactive Annuity Starting Date is a date for which benefit payments under the Plan may commence that occurs on or before the date the written explanation required by Section 5.04(c)(i) is provided to the Participant.   The Participant may not elect a Retroactive Annuity Starting Date that is prior to the date on which the Participant submitted a written application, pursuant to the last paragraph of Section 8.03, to receive his benefit under the Plan.

If a Participant elects to receive his benefit based on a Retroactive Annuity Starting Date, the following rules shall apply:

(i)     <u>Same Future Payments:</u> The future benefit payments made to a Participant who elects the Retroactive Annuity Starting Date must be the same as the future benefit payments that would have been paid to the Participant had the payments actually commenced on the Retroactive Annuity Starting Date.

(ii)    <u>Interest on Missed Payments:</u> The first payment to a Participant who elects a Retroactive Annuity Starting Date shall be equal to such Participant's benefit payment plus an amount equal to each monthly benefit payment missed during the period from the Retroactive Annuity Starting Date to the date of the actual payment, plus interest at eight percent (8.0%) per annum through the actual date in which benefit payments actually commence.

(iii)   <u>Eligible Spouse's Consent:</u> The Participant's election of a Retroactive Annuity Starting Date shall require the Spouse's written consent in the form and manner described in Section 5.04(c)(ii).  For purposes of this Section 5.04(d), the person who constitutes a Participant's Spouse shall be determined as of the date the first actual payment is made to the Participant pursuant to his election of a Retroactive Annuity Starting Date.

(iv)    <u>Maximum Benefits:</u> The distribution of the Participant's benefit pursuant to the elected Retroactive Annuity Starting Date must satisfy the requirements of Section 4.07 as of such Retroactive Annuity Starting Date.

5.05   <u>Payment of Benefits</u> -

In regard to the payment of a monthly benefit as described in this Article V or a lump-sum distribution as described in Section 6.05, the benefit commencement date will be no sooner than the first business day of the second month immediately following the month in which the termination of employment occurred.

Payment of any benefit provided under the Plan shall commence no later than the sixtieth (60th) day after the end of the Plan Year in which occurs the latest of (i) the Participant's attainment of age sixty-five (65), (ii) the participant's severance date, or (iii) the tenth (10th) anniversary of the Participant's participation in the Plan, unless the Participant elects otherwise. However, notwithstanding the foregoing provisions, any benefit to which a Participant attaining age 70 ½ is entitled shall commence not later than his or her Required Beginning Date, as defined in Section 5.06.

With respect to distributions under the Plan that are made for the calendar year beginning in 2002, the Plan will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the regulations under Code Section 401(a)(9) that were proposed in January 2001, notwithstanding any provision of the Plan to the contrary.

For purposes of determining required minimum distributions for calendar years beginning on or after January 1, 2003, notwithstanding any provision of the Plan to the contrary, the following rules shall apply:

(a) <u>Time and Manner of Distribution</u>:

(1)   <u>Required Beginning Date</u>: The Participant's entire interest shall be distributed, or begin to be distributed, to the Participant no later than the Participant's Required Beginning Date.

(2) <u>Death of Participant Before Distribution Begins</u>:  Should the Participant die before distributions begin, the Participant's entire interest shall be distributed, or begin to be distributed, no later than as follows:

    (A)    Should the Participant's surviving spouse be the Participant's sole Designated Beneficiary, distributions to the surviving spouse shall begin not later than December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70 ½ , if later.

    (B)    Should the Participant's surviving spouse not be the Participant's sole Designated Beneficiary, distributions to the Designated Beneficiary shall begin not later than December 31 of the calendar year immediately following the calendar year in which the Participant died.

    (C)    Should there be no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest shall be distributed not later than December 31 of the calendar year containing the fifth (5th) anniversary of the Participant's death.

    (D)    Should the Participant's surviving spouse be the Participant's sole Designated Beneficiary and the surviving spouse dies after the Participant but before distributions to the surviving spouse begin, this subsection (a)(2), other than subsection (a)(2)(A), shall apply as if the surviving spouse were the Participant.    For purposes of this

subsection (a)(2) and subsection (d), distributions are considered to begin on the Participant's Required Beginning Date (or, if subsection (a)(2)(D) applies, the date distributions are required to begin to the surviving spouse under subsection (a)(2)(A)).   Should annuity payments irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's surviving spouse before the date distributions are required to begin to the surviving spouse under subsection (a)(2)(A)), the date distributions are considered to begin is the date distributions actually commence.

(3)   <u>Form of Distribution</u>:  Unless the Participant's interest is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the Required Beginning Date, then as of the first Distribution Calendar Year, distributions shall be made in accordance with subsections (b), (c), and (d) of this Section 5.05.  Should the Participant's interest be distributed in the form of an annuity purchased from an insurance company, distributions thereunder shall be made in accordance with the requirements of Section 401(a)(9) of the Code.  Any part of the Participant's interest that is in the form of an individual account described in Section 414(k) of the Code shall be distributed in a manner satisfying the requirements of Section 401(a)(9) of the Code that applies to individual accounts.

(b) <u>Determination of Amount to be Distributed Each Year</u>:

(1)  <u>General Annuity Requirements</u>:  Should the Participant's interest be paid in the form of annuity distributions under the Plan, payments under the annuity shall satisfy the following requirements:

(A)  the annuity distributions shall be paid in periodic payments made at intervals not longer than one year;

(B)  the distribution period shall be over a life (or lives) or over a period certain not longer than the period described in subsection (c) or (d);

(C)  after payments have begun over a period certain, the period certain shall not be changed, regardless of whether the period certain is shorter than the maximum permitted;

(D)  payments shall either be nonincreasing, or increase only as follows:

(i)  by an annual percentage increase that does not exceed the annual percentage increase in a cost-of-living index that is based on prices of all items and issued by the Bureau of Labor Statistics;

(ii)  to the extent of the reduction in the amount of the Participant's payments required to provide for a survivor benefit upon death, but only if the Beneficiary whose life was being used to determine the distribution period described in subsection (c) dies or is no longer the Participant's Beneficiary pursuant to a qualified domestic relations order within the meaning of Code Section 414(p);

      (iii)    to provide cash refunds of employee contributions upon the Participant's death; or

      (iv)    to pay increased benefits that result from a Plan amendment.

(2)  <u>Amount Required to be Distributed by Required Beginning Date</u>:  The amount that must be distributed on or before the Participant's Required Beginning Date (or, if the Participant dies before distributions begin, the date distributions are required to begin under subsection (a)(2)(A) or (a)(2)(B)) is the payment that is required for one payment interval.  The second payment need not be made until the end of the next payment interval, regardless of whether that payment interval ends in the next calendar year.  Payment intervals are the periods for which payments are received, e.g., bi-monthly, monthly, semi-annually, or annually.  All of the Participant's benefit accruals as of the last date of the first Distribution Calendar Year shall be included in the calculation of the amount of the annuity payments for payment intervals ending on or after the Participant's Required Beginning Date.

(3)  <u>Additional Accruals After First Distribution Calendar Year</u>:  Any additional benefits accruing to the Participant in a calendar year after the first Distribution Calendar Year shall be distributed beginning with the first payment interval ending in the calendar year immediately following the calendar year in which such amount accrues.

(c)  <u>Requirements For Annuity Distributions That Commence During Participant's Lifetime</u>:

(1)  <u>Joint Life Annuities Where the Beneficiary Is Not the Participant's Spouse</u>:  Should the Participant's interest be distributed in the form of a joint and survivor annuity for the joint lives of the Participant and a nonspouse Beneficiary, annuity payments to

be made on or after the Participant's Required Beginning Date to the Designated Beneficiary after the Participant's death must not at any time exceed the applicable percentage of the annuity payment for such period that would have been payable to the Participant using the table set forth in Q&A-2 of section 1.401(a)(9)-6 of the Treasury regulations, provided, however, that for purposes of applying the provisions of this subsection (c)(1), effective as of January 1, 2005, the Participant's Annuity Starting Date shall be treated as the Required Beginning Date. Should the form of distribution combine a joint and survivor annuity for the joint lives of the Participant and a nonspouse Beneficiary and a period certain annuity, the requirement in the preceding sentence shall apply to annuity payments to be made to the Designated Beneficiary after the expiration of the period certain.

(2) <u>Period Certain Annuities</u>:  Unless the Participant's surviving spouse is the sole Designated Beneficiary and the form of distribution is a period certain and no life annuity, the period certain for an annuity distribution commencing during the Participant's lifetime may not exceed the applicable distribution period for the Participant under the Uniform Lifetime Table set forth in section 1.401(a)(9)-9 of the Treasury regulations for the calendar year that contains the Annuity Starting Date. Should the Annuity Starting Date precede the year in which the Participant reaches age 70, the applicable distribution period for the Participant is the distribution period for age 70 under the Uniform Lifetime Table set forth in section 1.401(a)(9)-9 of the Treasury regulations plus the excess of 70 over the age of the Participant as of the Participant's birthday in the year that contains the Annuity Starting Date.  Should the Participant's spouse be the Participant's sole

Designated Beneficiary and the form of distribution is a period certain and no life annuity, the period certain may not exceed the longer of the Participant's applicable distribution period, as determined under this subsection (c)(2), or the joint life and last survivor expectancy of the Participant and the Participant's spouse as determined under the Joint and Last Survivor Table set forth in section 1.401(a)(9)-9 of the Treasury regulations, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the calendar year that contains the Annuity Starting Date.

(d) <u>Requirements For Minimum Distributions When Participant Dies Before Date Distributions Begin</u>:

    (1) <u>Participant Survived by Designated Beneficiary</u>:  Should the Participant die before the date distribution of his or her interest begins and there is a Designated Beneficiary, the Participant's entire interest shall be distributed, beginning no later than the time described in subsection (a)(2)(A) or (a)(2)(B), over the life of the Designated Beneficiary or over a period certain not exceeding:

        (A)  unless the Annuity Starting Date is before the first Distribution Calendar Year, the Life Expectancy of the Designated Beneficiary determined using the Beneficiary's age as of the Beneficiary's birthday in the calendar year immediately following the calendar year of the Participant's death; or

        (B)  should the Annuity Starting Date be before the first Distribution Calendar Year, the Life Expectancy of the Designated Beneficiary

determined using the Beneficiary's age as of the Beneficiary's birthday in the calendar year that contains the Annuity Starting Date.

(2) <u>No Designated Beneficiary</u>:  Should the Participant die before the date distributions begin and there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest shall be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(3) <u>Death of Surviving Spouse Before Distributions to Surviving Spouse Begin</u>:  Should the Participant die before the date distribution of his or her interest begins, the Participant's surviving spouse is the Participant's sole Designated Beneficiary, and the surviving spouse dies before distributions to the surviving spouse begin, this subsection (d) shall apply as if the surviving spouse were the Participant, except that the time by which distributions must begin shall be determined without regard to subsection (a)(2)(A).

(e) <u>Special Definitions Solely for Purposes of this Section 5.05</u>:

(1) <u>Designated Beneficiary</u>:  The individual who is designated as the Beneficiary under the provisions of the Plan and is the Designated Beneficiary under Section 401(a)(9) of the Code and Section 1.401(a)(9)-4, Q&A-4, of the Treasury regulations.

(2) <u>Distribution Calendar Year</u>:  A calendar year for which a minimum distribution is required.   For distributions beginning before the Participant's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year that contains the Participant's Required Beginning Date.   For distributions

beginning after the Participant's death, the first Distribution Calendar Year is the calendar year in which distributions are required to begin pursuant to subsection (a)(2).

(3) <u>Life Expectancy</u>:  Life expectancy as computed by use of the Single Life Table in section 1.401(a)(9)-9 of the Treasury regulations.

(4)<u>Required Beginning Date</u>:  The date as of which a Participant's benefits must begin, as defined in Section 5.06.

(f) <u>Intent to Comply with Regulations</u>:  The provisions of this Section 5.05 shall be interpreted consistently with the provisions of Code Section 401(a)(9) and  rules and regulations issued thereunder.  Further, such laws and regulations shall be controlling in all determinations under this Section, inclusive of any provisions and requirements stated thereunder but hereinabove absent.

5.06   <u>Age 70½  Distribution Rules</u> - Notwithstanding the foregoing, distribution of a Participant's benefits (the "Required Beginning Date") shall be determined in accordance with the following rules:

(a) <u>If Participant Has Attained Age 70½ Before 1997</u>:  If a Participant has attained age 70½ before calendar year 1997 and continues in the employ of the Employer, distribution of his benefits must begin no later than April 1 of the calendar year following the calendar year in which he attains age  70½  in accordance with the provisions of the Plan, as in effect on December 31, 1996 and benefit payments for any such Participant already receiving distributions as of December 31, 1996 shall continue in accordance with such Plan provisions.

(b) <u>If Participant Attains Age 70½ in 1997, 1998, or 1999</u>: If a Participant (other than a 5% owner, as described in Code Section 416(i)) attains age 70½ in calendar year 1997, 1998 or 1999 and continues in the employ of the Employer beyond the end of the calendar year in which he attains age 70½, such Participant shall make a one-time irrevocable election to commence distribution of his benefits either (1) as of April 1 of the calendar year following the calendar year in which he attains age 70½ or (2) after actual retirement in accordance with Plan provisions. Such election must be made on the form and in the time and manner specified by the Plan Administrator. In any event, distribution of such a Participant's benefits must begin no later than April 1 of the calendar year following the later of the calendar year in which such Participant attains age 70½ or retires.

(c) <u>If Participant Attains Age 70½ in 2000 or Later</u>: If a Participant (other than a 5% owner, as described in Code Section 416(i)) attains age 70½ in calendar year 2000 or later and continues in the employ of the Employer beyond the end of the calendar year in which he attains age 70½, distribution of such Participant's benefits must begin no later than April 1 of the calendar year following the later of the calendar year in which he attains age 70½ or retires. Such a Participant's benefit payments shall not begin while he is still in the employ of the Employer, except as provided in Sections 3.02 and 4.06.

(d) <u>Actuarial Equivalent Increase If Payments are Deferred to Retirement</u>: In the event a Participant remains in the employ of the Employer beyond the end of the calendar year in which he attains age 70½ and, in accordance with the foregoing provisions of Sections 5.06(b) and 5.06(c), distributions from the Plan have not commenced as of April 1 of the calendar year following the calendar year in which such Participant attains

age 70½, such Participant's Accrued Benefit as of December 31 of the year in which he attains age 70½ shall be increased to its Actuarial Equivalent, in accordance with guidance issued by the Secretary of the Treasury, to reflect the  delay in payment of such Accrued Benefit under the Plan for the period starting on April 1 of the calendar year following the calendar year in which such Participant attains age 70½  and ending on such Participant's Annuity Starting Date after retirement. Such Actuarial Equivalent increase must reflect the value of such Accrued Benefit which would have been payable for 9 months during the calendar year following the calendar year in which such Participant attains age 70½ plus the value of any additional benefits accrued under the Plan by such Participant during each calendar year following the calendar year in which he attains age 70½ which would have been payable as of the January 1 following the year in which such benefits were accrued; provided, that such Actuarial Equivalent increases shall be offset by the Actuarial Equivalent value of any such additional benefits accrued during such period.

(e) <u>Participants Who Are 5% Owners and Work Beyond Age 70½</u>:  If a Participant who is a five percent (5%) owner (as defined in Code Section 416(i)) remains in the employ of the Employer beyond the end of the calendar year in which he or she attains age 70 ½, such Participant must commence distribution of his Accrued Benefit no later than as of April 1 of the calendar year following the calendar year in which he attains age 70½, whether or not his employment has terminated in such year.

(f) <u>Intent to Comply with Regulations</u>: The provisions of this Section 5.06 shall be interpreted consistently with the provisions of Code Section 401(a)(9) and rules and regulations issued thereunder. Further, such laws and regulations shall be controlling in

all determinations under this Section, inclusive of any provisions and requirements stated thereunder but hereinabove absent.

## ARTICLE VI

## BENEFITS ON DEATH OR TERMINATION OF EMPLOYMENT

6.01   <u>Death After Eligibility for Retirement</u> - In the event of the death of a Participant (a) prior to actual retirement but after having completed the eligibility requirements for normal, delayed, or early retirement as set forth in Sections 3.01, 3.02, and 3.03, or (b) who has retired but prior to the Annuity Starting Date, there shall be payable to his Spouse, if any, a monthly benefit as hereinafter defined.

Said monthly benefit shall be equal to the benefit that would have been payable to the Participant's Spouse upon such Participant's death subsequent to retirement had he survived and retired on the first day of the month coinciding with or next following the date of his death, having elected to have his retirement benefit payable under the Qualified Joint and Survivor Annuity of Section 5.04.   Said Annuity Starting Date shall be on the assumed date of retirement of the Participant and shall be continued to the Spouse on the first day of each month thereafter during the lifetime of the Spouse.   However, the Spouse may elect to defer the Annuity Starting Date to the first day of any subsequent month which precedes the Participant's Normal Retirement Date.   If the death of the Spouse should occur prior to the Annuity Starting Date, the surviving Spouse benefit shall be forfeited.

6.02   <u>Death of a Vested Participant</u> - In the event of the death of an active Participant or terminated Participant who has met the service requirement for vesting pursuant to Section 6.04 but has not otherwise met the requirements for retirement hereunder and prior to the Annuity Starting Date, there shall be payable to his Spouse, if any, a monthly benefit as

hereinafter defined.  Death benefits hereunder shall be payable only to the extent that they are not made available pursuant to Section 6.01.

The Participant's Spouse shall receive a monthly benefit based on the Participant's vested Accrued Benefit determined as of the date of the Participant's death which shall be equal to the monthly benefit that would have been payable to the Participant's Spouse upon the Participant's death subsequent to retirement had he survived and retired on the first day of the month coinciding with or next following the earliest date under the Plan to which he would otherwise be eligible to commence a benefit pursuant to Section 6.04 having elected to have his retirement benefit payable under the Qualified Joint and Survivor Annuity of Section 5.04.  Said Annuity Starting Date shall be on the first day of the month coinciding with or next following the first date on which the Participant would have otherwise been eligible to commence benefits assuming he had survived to such date. However, the Spouse may elect to defer the Annuity Starting Date to the first day of any subsequent month which precedes the Participant's Normal Retirement Date.  If the death of the Spouse should occur prior to the Annuity Starting Date, the surviving Spouse benefit shall be forfeited.

6.03  <u>Death Subsequent to Retirement</u> - When a retired or totally and permanently disabled Participant who is receiving benefits hereunder shall die, his Spouse or Beneficiary shall be entitled to any benefits due under the form of payment of his monthly retirement benefit.

6.04  <u>Termination of Employment</u> - All rights to all benefits under the Plan will cease upon a Participant's termination of employment with the Employer or Affiliate prior to retirement, other than by death, except as otherwise provided in the following paragraphs of this Section 6.04 and in Section 6.02.

If the employment of a Participant is terminated with the Employer or Affiliate prior to retirement, other than by death, but after he has completed at least five (5) years of Vesting Service, he shall be entitled to a monthly retirement benefit determined as hereinbelow provided, commencing on his Normal Retirement Date, if he is then alive, and paid in accordance with Article V.  In all events, a Participant shall be one hundred percent (100%) vested upon the attainment of his Normal Retirement Age.

The amount of monthly retirement benefit payable hereunder shall be determined as the Participant's Accrued Benefit as of his date of termination of employment.

In the event that a Participant entitled to a deferred retirement benefit under the provisions of this Section 6.04 should be later reemployed as an Employee prior to the commencement of such retirement benefit, his rights to any such retirement benefit shall thereupon be suspended, and the Participant's rights to benefits under the Plan shall be subject to redetermination at any subsequent termination of employment or retirement under the Plan, in accordance with the provisions of the Plan then in effect.

Any amendments to the Plan made subsequent to the termination of employment of any Participant shall in no way affect the amount of retirement benefit to which such Participant is entitled except as otherwise specifically provided herein.

A terminated Participant who has completed at least fifteen (15) years of Vesting Service (or, prior to January 1, 2000, fifteen (15) years of Benefit Service) at his date of termination of employment may elect, by written notice to the Plan Administrator, to have his otherwise deferred monthly retirement benefit commence on the first day of the month coinciding with or next following his attainment of age sixty (60).  The amount of the monthly retirement benefit payable at such earlier benefit commencement date shall be

equal to the amount of monthly benefit otherwise deferred to his Normal Retirement Date reduced by one-half of one percent (½ %) for each of the first sixty (60) months by which the earlier benefit commencement date precedes his Normal Retirement Date.  If the Participant does not elect an earlier benefit commencement date, the benefit commencement date shall be on what would otherwise be his Normal Retirement Date. Notwithstanding anything contained herein to the contrary, a Participant's benefit commencement date may commence earlier than the Normal Retirement Date but not prior to such request with the above reduction factors applying only for the period between Normal Retirement Date and the benefit commencement date.

Notwithstanding the foregoing, a terminated vested Participant who is eligible for the lump sum option under Section 6.05 (i.e., the Actuarial Equivalent value of his deferred vested benefit exceeds $5,000, but is not less than $25,000) may elect in lieu of such lump sum, by written notice to the Plan Administrator in accordance with Section 5.04, to receive an immediate monthly retirement benefit payable at the lump sum distribution date. The amount of such benefit commencing at such date shall be equal to such Participant's Accrued Benefit, reduced to its Actuarial Equivalent as of the Annuity Starting Date.  Such immediate monthly retirement benefit shall be payable under the automatic option described in Section 5.04(a) or 5.04(b), depending on such Participant's marital status as of the Annuity Starting Date; provided, however, that a Participant who has a Spouse shall also be entitled to elect the 100% Joint and Survivor option, or effective January 1, 2008, the 75% Joint and Survivor option, with his Spouse as Beneficiary, as described in Section 5.02.

A Participant shall forfeit the non-vested portion of his Accrued Benefit as of his date of termination of employment and shall be deemed to be paid his entire interest in the Plan as of such date.

6.05  <u>Lump-Sum Payments</u> - Notwithstanding the provisions of Sections 4.01, 4.02, 4.03, 4.04, 6.01, 6.02, and 6.04, if (a) the Actuarial Equivalent value of a benefit payable to a Participant or Spouse, as applicable, is equal to or less than five thousand dollars ($5,000) (or, prior to January 1, 1998, three thousand five hundred dollars ($3,500)), or (b) a Participant and his Spouse, if any, (or if either the Participant or Spouse has died, the survivor) consents in writing, and such consent is witnessed by a representative of the Plan Administrator or a notary public in accordance with Section 5.04 and the amount of such Actuarial Equivalent is less than twenty-five thousand dollars ($25,000), such benefit will be paid in a lump sum to a Participant or Spouse, as applicable. Notwithstanding the foregoing, effective for lump sums payable on or after March 28, 2005, to the extent that the participant does not elect to have a mandatory distribution as defined in IRS Notice 2005-5 made directly to an eligible retirement plan as a direct rollover in accordance with Section 12.12 or to receive the distribution directly hereunder,  then the Plan Administrator will make the distribution in a direct rollover to an individual retirement plan designated by the Plan Administrator in accordance with Code Section 401(a)(31)(B).  The lump sum value payable under this Section 6.05 shall be based on the Accrued Benefit payable at Normal Retirement Age, or later if applicable.  No lump-sum distribution shall be made hereunder after the Annuity Starting Date unless the Participant or Spouse, as applicable, consents in writing to such distribution. For purposes of determining (1) the Actuarial Equivalent lump sum value of the benefit payable under this Section 6.05 and (2) whether

the Actuarial Equivalent value of such benefit exceeds five thousand dollars ($5,000) (or, prior to January 1, 1998, three thousand five hundred ($3,500)), the following assumptions shall apply:

(a) <u>Applicable Mortality Table</u>: The mortality table described in Code Section 417e, as specified by the Secretary of the Treasury in revenue rulings, notices or other guidance as updated from time to time.

(b) <u>Applicable Interest Rate</u>: For any Plan Year for any lump sum distribution occurring during such year, the interest rate to be used shall be the annual interest rate described in Code Section 417e, as specified by the Secretary of the Treasury in revenue rulings, notices or other guidance published in the Internal Revenue Bulletin, for the month of November immediately preceding the first day of such Plan Year.

ARTICLE VII

TRUST PROVISIONS

7.01    <u>Contributions by the Employer</u> - The entire cost of benefits under the Plan shall be borne by the Employer through the Fund.  The Employer intends to make its Contributions in such actuarially determined amounts as shall be sufficient to provide the benefits of the Plan and meet the minimum funding standards as required by law.  Funds released through terminations of employment shall be applied to reduce the Employer's future Contributions.

7.02    <u>Establishment of Trust; Trust Fund</u> - The Corporation has established and hereby reaffirms and reestablishes the Trust as provided herein.  The Trust shall hold and maintain the assets of the Plan. The assets of the Plan shall include all funds deposited for use by the Plan by or on behalf of the Corporation and any of the Employers, together with any income or proceeds therefrom and any other property, real or personal, that may from time to time constitute an asset of the Plan.  The assets of the Plan should collectively be known as the Fund.

7.03    <u>Trustee Powers and Duties Generally</u> - The Trust shall be maintained by one or more Trustees, as designated by the Board.  The Trustee(s) shall have the powers, rights, duties, and obligations as set forth in this Article VII, including the general responsibility for holding and maintaining the Fund.  Nothing herein shall preclude the Board from assigning specific powers or duties to particular Trustees without assigning those powers and duties to all Trustees, provided that no Trustee, whether alone or in conjunction with the other Trustees, shall have any powers, rights, duties, or obligations not set forth in this Article

VII.  For purposes of any paragraph of this Plan other than this Section 7.03, the word "Trustee" shall be deemed to include any and all Trustees designated by the Board.

7.04    <u>Payments from the Fund</u> - The Trustee shall make such payments from the Fund as the Plan Administrator may from time to time request, upon designation by the Plan Administrator that such amounts are for the payment of benefits under the Plan or for the payment of expenses of administering the Plan.  Such payments may be made as the Plan Administrator may direct, either directly to the person designated by the Plan Administrator to be entitled to receive them under the Plan, or for the payment of the expenses of administering the Plan, or to the Plan Administrator for distribution to such persons, or for the payment of such expenses as may be specified in the directions of the Plan Administrator.

7.05    <u>Investment of the Fund</u> - The Trustee shall invest and reinvest in his discretion the principal and income of the Fund and keep the Fund invested, without distinction between principal and income, in any and all common stocks, preferred stocks, bonds, notes, debentures, options on securities owned, mortgages, bank certificates of deposit, equipment trust certificates, investment trust certificates, insurance or annuity contracts, and in mutual funds and money market funds, and in such other property, investments, and securities of any kind, class, or character as the Trustee may deem suitable for the Fund.  Any portion of the Fund may, pending its permanent investment or distribution, be invested in short-term securities issued or guaranteed by the United States of America or in any agency of instrumentality thereof or any other investments of a short-term nature, including corporate obligations or participations therein.

The Fund shall be valued by the Trustee as of the close of business at the end of each calendar year, or as may be agreed upon by the Corporation and the Trustee, hereinafter referred to as "Valuation Dates."

The investment performance of the Fund shall be evaluated and monitored by the Corporation.  The Corporation may direct the Trustee in the management of the Fund or may appoint one or more independent investment managers to direct or advise the Trustee in the management of all or part of the investment or reinvestment of the Fund. The Corporation shall be responsible for evaluating and monitoring the investment performance of the Trustee and any investment managers.

7.06    <u>Other Powers and Duties</u> - Except as hereinafter provided in Section 7.07, the Trustee is authorized and empowered in his discretion but not by way of limitation:

(a) to sell, exchange, convey, transfer, lease, or otherwise dispose of, and also to grant options with respect to, any property, whether real or personal, at any time held by him, and any sale may be made by private contract or by public auction, and for cash or upon credit, or partly for cash and partly upon credit, as the Trustee may deem best, and no persons dealing with the Trustee shall be bound to see to the application of the purchase money or other proceeds or to inquire into the validity, expediency, or propriety of any such disposition;

(b) to acquire any real or personal property as the result of any foreclosure, liquidation, or other salvage of an investment previously made by him;

(c) to compromise, compound, or settle any debt or obligation due to or from him as Trustee hereunder and to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon default, or otherwise enforce any such obligation;

(d) to vote in person or by general or limited proxy on any stocks, bonds, or other securities held by him; to exercise any options appurtenant to any stocks, bonds, or other securities for the conversion thereof into other stocks, bonds, or securities, or to exercise any rights to subscribe for additional stocks, bonds, or other securities and to make any and all necessary payments therefor; to join in, or to dissent from, or to oppose the reorganization, recapitalization, consolidation, liquidation, sale, or merger of corporations or properties in which he may be interested as Trustee, upon such terms and conditions as he may deem wise;

(e) to make, execute, acknowledge, and deliver any and all deeds, leases, assignments, and other instruments;

(f) with the approval of the Corporation, to borrow or raise monies for the purposes of the trust to the extent that the Trustee shall deem desirable or proper upon such terms and conditions as the Trustee may deem desirable or proper, and for any amounts so borrowed to issue his promissory note as Trustee and to secure the repayment thereof by mortgaging or pledging all or any part of the Fund; and no person dealing with the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency, or propriety of any such borrowing;

(g) to cause any investments from time to time held by him to be registered in, or transferred into, his name as Trustee or in the name of his nominee or nominees, or in the name of the trust hereby created, or to retain them unregistered or in form permitting transferability by delivery, but the books and records of the Trustee shall at all times show that all such investments are part of the Fund; any investments from time to time held by him may be transferred by or from the Trustee, upon the

assignment by the Trustee then appointed and qualified as a trustee under this Plan and Trust;

(h) to use the services of such banking institution or institutions, or any savings and loan associations regardless of whether the funds thereof are fully insured, as he may deem advisable, for the deposit or safekeeping of any funds or securities at any time in the Fund;

(i) to transfer, at any time and from time to time, all or any part of the Fund to, or withdraw the same from, any pooled investment fund or group or collective trust, invested in similar types of securities, maintained by a bank or trust company supervised by a state or federal agency, which has been determined by the Internal Revenue Service to be a qualified trust or fund exempt from federal income tax under Code Section 501(a) and which has been established to permit separate pension and profit sharing trusts qualified under Section 401(a) of the Code to pool some or all of their funds for investment purposes; to the extent the Fund is invested in such a pooled fund or group or collective trust, the terms of the instrument establishing such pooled fund or group or collective trust are made a part of this Plan and Trust as fully as if set forth at length herein; the mingling of assets of this trust with assets of other qualified participating trusts in such pooled funds or group or collective trusts is specifically authorized;

(j) to enter into a group annuity contract issued by an insurance company under which all or any part of the Fund may be invested; and

(k) to do all acts whether or not expressly authorized herein which he may deem necessary or proper for the protection of the property held hereunder;

(l) to consult with legal counsel (who may be of counsel to the Corporation) concerning any question which may arise with reference to his powers, rights, duties, and obligations under this Plan and Trust, and the opinion of such counsel shall, to the extent permitted by applicable law, be full and complete protection with respect to any action taken or suffered by the Trustee hereunder in good faith and in accordance with the opinion of such counsel; and

(m) to employ such counsel, accountants, and other agents as he may deem advisable. The Trustee may charge the compensation of such counsel, accountants and other agents, the Trustee's compensation, if any, for their or his services in such amounts as may be agreed upon from time to time by the Corporation and the Trustee, and any other expenses against the Fund to the extent that they are not paid by the Corporation.  In the performance of any of his ministerial acts, the Trustee may engage any of the service of the Corporation.

7.07   <u>Prohibited Transactions</u> - Notwithstanding the foregoing, the Trustee shall not engage in any transaction which he knows or should know constitutes a direct or indirect

(a) sale, exchange, or leasing of any property between the Fund and a party in interest;

(b) lending of money or other extension of credit between the Fund and a party in interest;

(c) furnishing of goods, services, or facilities between the Fund and a party in interest; or

(d) transfer to, or use by or for the benefit of, a party in interest of any assets of the Fund;

(e) acquisition of any security issued by the Corporation or an affiliate of the Corporation or real property leased to the Corporation or an Affiliate of the Corporation which is not either a qualifying employer security or qualifying employer real property in the meaning of Section 407 of ERISA or which exceeds ten percent (10%) of the fair

market value of the assets of the Plan as determined in accordance with Section 407 of ERISA;

unless such action is exempt or excluded from treatment as a prohibited transaction for purposes of ERISA or of Section 4975 of the Code. Also, the Trustee shall not engage in any transaction listed in Section 406(b) of ERISA. The Trustee may, however, upon the approval of the U. S. Secretary of Labor, enter into any transaction or perform any act enumerated in this Section.

7.08  Records and Reports - The Trustee shall keep accurate accounts of all investments, receipts and disbursements, and other transactions hereunder, and all accounts, books, and records relating thereto shall be open at all reasonable times to inspection and audit by any person or persons designated by the Plan Administrator or by the Corporation.

Following the close of each Plan Year (or following the close of such other annual periods as may be agreed upon by the Trustee and the Plan Administrator) the Trustee shall file with the Corporation and the Plan Administrator a written account setting forth all securities and other property purchased and sold, all receipts, disbursements and other transactions effected by him during such annual period, and showing the securities and other property held at the end of such period.

7.09  Resignation and Removal - The Trustee may resign at any time by giving notice in writing to the Corporation and the Plan Administrator. The Trustee may be removed at any time by the Corporation upon notice in writing to the Trustee and the Plan Administrator.

In the event of the death, resignation or removal of the Trustee, the Corporation shall, within 60 days, appoint a successor Trustee. The Corporation shall have the right, from time to time, to increase or decrease the number of Trustees and in the event of any such

increase shall appoint the additional Trustee or Trustees. Any appointment by the Corporation shall be made by notice in writing to the Trustee (including the new Trustee so appointed) and such new Trustee shall qualify by delivering an acceptance in writing to the Corporation.

All of the titles, powers, rights, duties, and obligations vested in, exercisable by, and imposed upon the Trustee shall pass to and be vested in, exercisable by, and imposed upon the succeeding Trustee.

7.10   <u>Indemnification</u> - To the extent permitted by applicable law, the Trustee shall not be personally liable by virtue of any contract, agreement, bond, or other instrument made or executed by him as Trustee or on his behalf as Trustee. However, the Trustee shall be liable for his failure, if any, to meet any of the standards of conduct set forth in this Plan or Trust or Section 405 of ERISA.

7.11   <u>Termination</u> - Upon full termination of the Plan pursuant to Section 9.02, this trust shall terminate as well, once all payments are distributed.

7.12   <u>Miscellaneous</u> - All right, title, and interest in and to the Fund shall at all times be vested in the qualified and acting Trustee, subject to his right to select a nominee or nominees to hold legal title hereto, and neither the Corporation nor any Participant shall have any right, title, or interest in the Fund except to have the trust administered in accordance with the Plan. Upon the resignation, death, or removal of the Trustee, all right, title, and interest of the Trustee in the trust shall terminate automatically and without the execution of any instrument in writing or the doing of any other act.

The Trustee shall discharge his duties hereunder with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of a like enterprise.

ARTICLE VIII

FIDUCIARIES

8.01  <u>General</u> - Each Fiduciary who is allocated specific duties or responsibilities under the Plan, or any Fiduciary who assumes such a position with the Plan, shall discharge his duties solely in the interest of the Participants, Spouses, and Beneficiaries and for the exclusive purpose of providing such benefits as stipulated herein to such Participants, Spouses, and Beneficiaries, or defraying reasonable expenses of administering the Plan.  Each Fiduciary, in carrying out such duties and responsibilities, shall act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in exercising such authority or duties.

A Fiduciary may serve in more than one Fiduciary capacity and may employ one or more persons to render advice with regard to his Fiduciary responsibilities.  If the Fiduciary is serving as such without compensation, all expenses reasonably incurred by such Fiduciary shall be reimbursed by the Employer or, at the Corporation's direction, from the Fund.

A Fiduciary may allocate any of his responsibilities for the operation and administration of the Plan.  In limitation of this right, a Fiduciary may not allocate any responsibilities as contained herein relating to the management or control of the Fund except through the employment of an investment manager as provided in Article VII.

8.02  <u>Employer Responsibilities</u> - The Corporation established and maintains the Plan for the benefit of the Employees and of necessity retains control of the operation and administration of the Plan.  The Corporation, in accordance with specific provisions of the

Plan, has, as herein indicated, delegated certain of these rights and obligations to the Trustee and the Plan Administrator, and these parties shall be solely responsible for these, and only these, delegated rights and obligations.

The Corporation shall cause periodic actuarial valuations of the Plan to be made which will indicate the amount of Contributions necessary to maintain the Plan on an actuarially sound basis and comply with the minimum funding standards as may be required by law, such actuarial valuation normally to be made annually, but not less than once every three (3) years.  The Corporation shall provide the Trustee or an investment manager, if one has been employed as herein provided, with a copy of the results of each actuarial valuation or shall otherwise communicate to the Trustee or investment manager, if applicable, the short- and long-range requirements of the Fund, the anticipated level of annual Contributions and any material changes thereto occurring between actuarial valuations.

The Employer shall supply such full and timely information for all matters relating to the Plan as (a) the Plan Administrator, (b) the Trustee, (c) the actuary, and (d) the accountant, if any, engaged on behalf of the Plan by the Corporation, may require for the effective discharge of their respective duties.

8.03  <u>Plan Administrator</u> - The Corporation shall appoint the Plan Administrator.  If a Plan Administrator is not so appointed, the Corporation shall be deemed to be the Plan Administrator.  The Corporation may appoint Plan Administrator Representatives to assist the Corporation in administering the Plan, with such duties as the Corporation may designate. For purposes of this Article VIII, "Plan Administrator" shall as applicable include any such appointed Plan Administrator Representatives.

In accordance with the provisions hereof, the Plan Administrator has been delegated certain administrative functions relating to the Plan with all powers necessary to enable it to properly carry out such duties.  The Plan Administrator shall have no power in any way to modify, alter, add to, or subtract from, any provisions of the Plan.  The Plan Administrator shall have powers to construe the Plan and to determine all questions that may arise thereunder relating to (a) the eligibility of individuals to participate in the Plan, (b) the amount of retirement benefit or other benefits to which any Participant, Spouse, or Beneficiary may become entitled hereunder, and (c) any situation not specifically covered by the provisions of the Plan.  All disbursements by the Trustee, except for the ordinary expenses of administration of the Fund or the reimbursement of reasonable expenses at the direction of the Corporation as provided herein, shall be made upon, and in accordance with, the directions of the Plan Administrator.  When the Plan Administrator is required in the performance of its duties hereunder to administer or construe, or to reach a determination under any of the provisions of the Plan, it shall do so in a uniform, equitable, and non-discriminatory basis.

The Plan Administrator shall establish rules and procedures to be followed by the Participants, Spouses, and Beneficiaries in filing applications for benefits and for furnishing and verifying proofs necessary to establish age, years of Benefit Service and Vesting Service, Compensation, and any other matters required in order to establish their rights to benefits in accordance with the Plan.

8.04   <u>Claims for Benefits</u> - All claims for benefits under the Plan shall be submitted to the Plan Administrator who shall have the responsibility for determining the eligibility of any Participant, Spouse, or Beneficiary for benefits.  All claims for benefits shall be made in

writing and shall set forth the facts which such Participant, Spouse, or Beneficiary believes to be sufficient to entitle him to the benefit claimed.  The Plan Administrator may adopt forms for the submission of claims for benefits in which case all claims for benefits shall be filed on such forms.  The Plan Administrator shall provide Participants, Spouses, and Beneficiaries with all such forms.

Upon receipt by the Plan Administrator of a claim for benefits, it shall determine all facts which are necessary to establish the right of an applicant to benefits under the provisions of the Plan and the amount thereof as herein provided.  The Plan Administrator shall approve, deny, and investigate all questionable claims.  Upon request, the Plan Administrator will afford any applicant the right of a hearing with respect to any finding of fact or determination related to any claim for benefits under the Plan.  In the event any claim for benefits is denied, the Participant, Spouse, or Beneficiary shall be notified of such decision in accordance with the provisions of Section 8.05.

8.05  Claims Procedures (Notice of Benefit Determination) - The Plan Administrator shall make each benefit determination in a uniform and non-discriminatory manner.  Within ninety (90) days after the Administrator receives the completed benefit application pursuant to Section 8.04, the Administrator will grant the claim, deny the claim, or notify the Participant or Beneficiary (the "Claimant") that special circumstances require an extension of time to process the claim.  If an extension of time is necessary, the Administrator shall provide the Claimant before the end of such ninety (90) day period, a written notice explaining the reasons for the delay and the date by which he or she expects to make the benefit determination.

If the Plan Administrator approves the application for benefit, he or she must provide the Claimant with a Notice of Benefit Determination.  If the claim is wholly or partially

denied, the Plan Administrator shall send the Claimant written notice (notice of denial) by certified mail to the Claimant's last address of record with the Plan. The notice must state that the claim for benefits was denied. It must also state the specific reasons for denial, making reference to the Plan provisions (including any internal rules or guidelines) upon which the denial was based; describe any additional material or information necessary for the Claimant to perfect the claim and explain why such material or information is necessary; describe the Plan's review procedures and the time limits applicable to such procedures, including a statement of the Claimant's right to bring civil action under Section 502(a) of ERISA following an adverse benefit determination on review; and tell the Claimant how he or she can get a reconsideration of the Plan Administrator's decision. The notice of denial must explain (and the Plan provides) that if the Claimant fails to file a written appeal within sixty (60) days after receiving the Notice of Benefit Determination, this failure constitutes irrevocable consent by the Claimant to the Plan Administrator's decision.

Within sixty (60) days following receipt of the Notice of Benefit Determination, the Claimant, or his or her authorized representative, may file an appeal with the Plan Administrator requesting a reconsideration of the application. The Claimant shall have the opportunity to submit to the Plan Administrator written comments, documents, records, and other information relating to the claim and the review of the benefit determination shall take such submission into account. The Claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim.

The review of the benefit determination shall be made by a Plan Fiduciary who was not involved in the initial determination. Within sixty (60) days after the Plan Administrator

receives the appeal, the Administrator must notify the Claimant, in writing, of its decision on the appeal, or that special circumstances require an extension of time to process the appeal. In the case of an adverse determination, the notice must state the specific reasons for denial, making reference to the Plan provisions (including any internal rules or guidelines) upon which the denial was based. The notice must also state that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim; and also describe the Plan's voluntary appeal procedures; and describe the Claimant's right to obtain information about such procedures and to bring civil action under Section 502(a) of ERISA. All notices under this subsection shall be written in a manner calculated to be understood by the Claimant without legal or actuarial counsel.

8.06    <u>Records</u> - All acts and determinations of the Plan Administrator shall be duly recorded and all such records, together with such other documents as may be necessary in exercising its duties under the Plan, shall be preserved in the custody of the Plan Administrator. Such records and documents shall at all times be open for inspection to, and for the purpose of making copies, by any person designated by the Corporation. The Plan Administrator shall provide such timely information, resulting from the application of its responsibilities under the Plan, as needed by (a) the Trustee, (b) the actuary, and (c) the accountant, if any, engaged on behalf of the Plan by the Corporation, for the effective discharge of their respective duties.

ARTICLE IX

PLAN AMENDMENT AND TERMINATION; CERTAIN RESTRICTIONS

9.01 <u>Amendment of the Plan</u> - The Corporation shall have the right at any time by action of the Board to modify, alter, or amend the Plan, in whole or in part; provided, however, that the duties, powers, and liability of the Trustee hereunder shall not be increased without its written consent; and provided, further, that the amount of benefits which at the time of any such modification, alteration, or amendment shall have accrued for any Participant, Spouse, or Beneficiary hereunder shall not be adversely affected thereby. Each Employer will be deemed to have adopted any amendment made by the Corporation unless the Employer notifies the Plan Administrator of its rejection in writing within thirty (30) days after it receives a copy of the amendment. A rejection will constitute a withdrawal from this Plan by that Employer unless the Corporation acquiesces in the rejection. Except as permitted by the applicable Treasury Regulations (including Treasury Regulation Section 1.411(d)-(4)), no Plan amendment or transaction having the effect of a Plan amendment (such as a merger, plan transfer or similar transaction) shall be effective if it eliminates or reduces any "Section 411(d)(6) protected benefit" or adds or modifies conditions relating to "Section 411(d)(6) protected benefits" the result of which is a further restriction on such benefit unless such "protected benefits" are preserved with respect to benefits accrued as of the later of the adoption date or the effective date of the amendment. "Section 411(d)(6) protected benefits" are benefits described in Section 411(d)(6)(A) of the Code, early retirement benefits and retirement-type subsidies, and optional forms of benefits.

9.02 <u>Termination of the Plan</u> - The Corporation expects to continue the Plan indefinitely, but continuance is not assumed as a contractual obligation or otherwise. If the Corporation

decides to fully or partially terminate the Plan, or the Plan is otherwise terminated in whole or in part, the rights of the Participants affected thereby to benefits then accrued shall be non-forfeitable and the Trustee shall continue to administer the Fund as instructed by the Plan Administrator in accordance with the provisions hereof, and the expenses of the Trustee shall be paid out of the assets then remaining in the Fund. Notwithstanding the above, no Participant shall have any recourse toward the satisfaction of his Accrued Benefit from other than assets of the Plan or the Pension Benefit Guaranty Corporation (PBGC) if there shall be PBGC liability present. In the event of Plan termination, the benefit of any Highly Compensated Employee shall be limited to a benefit that is non-discriminatory under Code Section 401(a)(4).

If the Corporation decides to terminate the Plan, the Plan Administrator shall determine the equitable share of the Fund with respect to any Employer then participating. Should the Corporation decide to terminate the Plan only with respect to certain Employer(s), the administration of that portion of the Fund applicable to any Employer for which the Plan has not been terminated shall be unaffected and any references hereinafter contained in this Article IX to the Fund shall refer only to that portion applicable to the Employer for whom the Plan has terminated. Administration of that portion of the Fund applicable to those Employers for which the Plan has been terminated shall be handled as if such Employers had withdrawn from the Plan (see Section 10.02). Reasonable expenses incurred by the Plan Administrator in the full or partial termination of the Plan shall be payable from the Fund unless paid directly by such Employer(s) thereby affected.

The Plan Administrator shall allocate and administer the Fund to provide benefits for the Participants on the date of Plan termination and any Spouses or Beneficiaries then

receiving benefits in accordance with Article V. Such allocation of the Fund shall be made in the order of precedence indicated and in the amounts indicated in Section 4044 or ERISA.

The allocation of that portion of the Fund computed above shall be based on the method of payment of monthly retirement benefits or death benefits as specified in the Plan. In the event that Fund assets on or after the date of Plan termination are not sufficient to fund all benefits within any class, the benefits of all higher order of precedence shall be funded, the benefits of all lower order of precedence shall be unfunded, and the assets remaining shall be allocated among members of that class on the basis of their respective actuarial reserves, subject to the provisions of Section 4044 of ERISA.

The application of the Fund on the foregoing basis shall be calculated by the actuary and confirmed to the Trustee by the Plan Administrator as of the date on which the Plan terminated. Subject to the restrictions of ERISA, as it may be amended, when the calculations shall be completed, the interest of each Participant, vested terminated Participant, retired Participant, disabled Participant, Spouse, and Beneficiary shall continue to be held in the Fund pursuant to the terms of this Article IX, or, at the direction of the Plan Administrator, the appropriate portion of the Fund shall be liquidated and each of their interests distributed to them in the form of annuity contracts, annuity payments, installments, or in a lump sum as determined by the Plan Administrator. Any funds remaining after the satisfaction of all liabilities to such Participants, vested terminated Participants, retired Participants, disabled Participants, Spouses, and Beneficiaries under this Plan due to erroneous actuarial computations or assumptions shall be returned to the appropriate Employer or the Corporation.

9.03 <u>Restrictions on Benefits Payable to Highly Compensated Participants</u> - This Section sets forth limitations required by the Internal Revenue Service on the benefits payable to certain Participants.  It shall apply to a Participant only if he is a Highly Compensated Employee or a Highly Compensated former Employee and the Participant is among the twenty-five (25) highest-paid Highly Compensated Employees or Highly Compensated former Employees of the Employer in the Plan Year (a "Restricted Employee") in which benefits payments begin.

If a Participant is subject to the provisions of this Section, the annual benefit payments to him are restricted to an amount equal to the payments that would be made on behalf of the Participant under a single-life annuity that is the Actuarial Equivalent of the sum of his Accrued Benefit and his other benefits under the Plan ("Total Benefits").

The restrictions in this Section 9.03 do not apply to the annual benefit payments to a Restricted Employee, however, if any one of the following requirements is satisfied:

(a) After payment to a Restricted Employee of all his benefits under the Plan, the value of Plan assets equals or exceeds one hundred ten percent (110%) of the value of current liabilities, as that term is defined in applicable law; or

(b) The Actuarial Equivalent lump-sum value of the benefits payable to the Restricted Employee under the Plan is less than one percent (1%) of the value of such current liabilities before the distribution; or

(c) The Actuarial Equivalent lump-sum value of the benefits payable to the Restricted Employee under the Plan does not exceed five thousand dollars ($5,000) (or prior to January 1, 1998, three thousand five hundred dollars ($3,500)).

The limitations of this Section shall automatically become inoperative and of no effect upon a ruling by the Internal Revenue Service that they are not required.

ARTICLE X

PROVISIONS RELATIVE TO EMPLOYERS INCLUDED IN PLAN AND TRUST

10.01  Method of Participation - An entity, with the approval of the Board, by taking appropriate board action may become a party to the Plan and Trust, by adopting the Plan and Trust as a retirement plan for its Employees.  Any entity which becomes a party to the Plan and Trust shall thereafter promptly deliver to the Trustee a certified copy of the resolutions or other documents evidencing its adoption of the Plan and Trust and also a written instrument showing the Board's approval of such entity's becoming a party to the Plan and Trust.  This Plan and Trust shall be construed as a single Plan and Trust for all participating Employers; provided, however, that the Plan shall be maintained as a multiple employer plan for participating Employers that are not Affiliates.

10.02  Withdrawal - Each Employer reserves the right at any time by action of its board of directors to withdraw from the Plan.  To withdraw from the Plan, the Employer must give six (6) months advance notice in writing of its or their intention to withdraw to the Board and the Plan Administrator (unless a shorter notice shall be agreed to by the Board). Upon receipt of notice of any such withdrawal, the Plan Administrator, upon direction by the Board, shall advise the Trustee the equitable share of such withdrawing Employer in the Fund (to be determined by the actuary employed on behalf of the Plan by the Corporation), and the Trustee shall thereupon set aside from the Fund then held by it, such securities and other property as it shall, in its sole discretion, deem to be equal in value to such equitable share.  To the extent that such direction is not given by the Board, assets and liabilities attributable to such withdrawing Employer shall remain in the Fund with no further Accrued Benefits being credited subsequent to the withdrawal of participation hereunder.

The Trustee shall turn over such amount to the trustee as may be designated by such withdrawing Employer, and such securities and other property shall thereafter be held and invested as a separate retirement trust of the Employer which has so withdrawn, and shall be used and applied according to the terms of a new agreement and declaration of trust between the Employer so withdrawing and the trustee so designated.

Neither the segregation of the Fund assets upon the withdrawal of an Employer, nor the execution of a new agreement and declaration of trust pursuant to any of the provisions of this Section 10.02, shall operate to permit any part of the assets or income of the Fund to be used for, or diverted to, purposes other than for the benefit of Participants, Spouses, Beneficiaries, and payment of reasonable expenses of administering the Plan, except as may be otherwise provided in Section 12.08.

In the event of failure of an Employer upon withdrawal from the Plan to pay or to reimburse the Trustee, the actuary, accountant, or attorney for the outstanding charges or expenses incurred hereunder, the Trustee is empowered to satisfy such claims by lien upon that portion of the Fund attributable to that Employer, prior to making any allocation to Participants, vested terminated Participants, retired Participants, disabled Participants, Spouses, and Beneficiaries of the Plan in accordance with this Section.

ARTICLE XI

TOP-HEAVY PLAN PROVISIONS

11.01 <u>General</u> - Notwithstanding anything contained herein to the contrary, in the event that this Plan, when combined with all other plans required to be aggregated pursuant to IRC Section 416(g), is deemed to be a Top-Heavy Plan for any Plan Year, the following conditions shall become operative.

11.02 <u>Vesting</u> - In the event the vesting schedule provided in Section 6.04 is less liberal than the vesting schedule hereinafter provided, then such vesting schedule shall be substituted with the following for each Participant with an Hour of Service after the Plan becomes a Top-Heavy Plan and such schedule shall remain in effect in all future Plan Years.

| Years of Vesting Service | Vested Percentage |
|---|---|
| Less than 2 years | 0% |
| 2 years but less than 3 years | 20% |
| 3 years but less than 4 years | 40% |
| 4 years but less than 5 years | 60% |
| 5 years but less than 6 years | 80% |
| 6 years or more | 100% |

11.03 <u>Minimum Benefits</u> - For Plan Years commencing on January 1, 1984 through December 31, 2004, that the Plan shall be deemed a Top-Heavy Plan, and any Plan Year thereafter in which the Plan is a Top-Heavy Plan, there shall be a minimum annual Accrued Benefit applicable to all Non-Key Employees who are Participants equal to the lesser of two percent (2%) of Top-Heavy Compensation multiplied by the Participant's number of years of Top-Heavy Service or twenty percent (20%) of his Top-Heavy Compensation.  For purposes of satisfying the minimum benefit requirements of section 416 (c) (l) of the Code and the Plan, in determining years of service with the Employer, any service with the

Employer shall be disregarded to the extent that such service occurs during a Plan Year when the plan benefits (within the meaning of section 410 (b) of the Code) no Key Employee or former Key Employee.

11.04    <u>Definitions</u> - For purposes of this Article XI, the following definitions shall be applicable.

(a) "Top-Heavy Compensation" means his average annual Full Compensation during that period of five (5) consecutive Testing Years for which his aggregate Full Compensation was the greatest.  If he shall have fewer than five (5) consecutive Testing Years, his Top-Heavy Compensation shall mean his average annual Full Compensation during that period containing the largest number of consecutive Testing Years; provided that, if there shall be more than one such period, Top-Heavy Compensation shall be calculated on the basis of such period for which such average is the greatest.

(b) "Testing Year" means a Plan Year which (1) constitutes a year of Vesting Service for such Participant, and (2) begins prior to the end of the last Plan Year for which the Plan was a Top-Heavy Plan.  Except to the extent excluded under the preceding sentence, Plan Years beginning before 1984 shall be Testing Years.

(c) "Full Compensation" means, for any Employee for any Plan Year, his compensation [as such term is defined in Section 4.07(b)] from the Employer or Affiliate for such Plan Year.

(d) "Top-Heavy Service" means a year of Benefit Service in which the Plan is deemed to be a Top-Heavy Plan with the exception that Credited Service prior to January 1, 1984, shall be excluded.

11.05    <u>No Duplication of Minimum Benefit</u> - With respect to the operation of these Top-Heavy Plan provisions, there shall be no requirement that the entire defined benefit minimum

benefit and the defined contribution minimum contribution be provided.  To the extent that there shall be a defined benefit Accrued Benefit, it shall be controlling.  To the extent that there shall be an Employer contribution to a Defined Contribution Plan, then there shall be a determination as to whether the defined contribution amount is comparable to the difference between the defined benefit minimum benefit and the minimum defined benefit accrued benefit required under IRC Section 416.  In the event that the defined contribution amount shall not be comparable, then the difference shall be provided in the Defined Benefit Plan unless the next sentence shall apply.  Notwithstanding the above, if there shall be a contribution to the Defined Contribution Plan of at least seven and one-half percent (7½%) of compensation to non-Key Employees, it shall be conclusively presumed that the minimum benefit and/or contribution requirements of Top-Heavy Plans have been met.

11.06  <u>Actuarial Assumptions</u> - For purposes of determining whether a Defined Benefit Plan is a Top-Heavy Plan, calculations shall be based upon the UP-1984 Table of Mortality at five percent (5%) interest with such determination being made on the valuation date which occurs within the Plan Year.  In the event more than one (1) plan is being used for Top-Heavy Plan testing, the same actuarial assumptions shall be used for all such plans. Further, pursuant to Internal Revenue Service Regulations 1.416-1, T-26, and T-27, proportional subsidies shall be ignored and non-proportional subsidies shall be considered.

11.07  <u>Key Employee</u> - "Key Employee" means any Employee or former Employee (including any deceased Employee) who at any time during the Plan Year that includes the determination date (as defined in Section 1.36(b)), was an officer of the Employer having annual compensation greater than $130,000 (as adjusted under Section 416 (i) (l) of the Code for

Plan Years beginning after December 31, 2002), a 5-year percent owner of the Employer, or a 1-percent owner of the Employer having annual compensation of more than $150,000. For this purpose, annual compensation means compensation within the meaning of Section 415 (c) (3) of the Code, as defined in Section 4.07. The determination of who is a Key Employee will be made in accordance with Section 416 (i) (1) of the Code and applicable regulations and other guidance of general applicability issued thereunder. A Non-Key Employee is any Employee who is not a Key Employee. Non-Key Employees include Employees who are former Employees.

## ARTICLE XII

## MISCELLANEOUS

12.01 <u>Governing Law</u> - The Plan shall be construed, regulated and administered according to the laws of the State of Oregon except in those areas preempted by the laws of the United States of America.

12.02 <u>Construction</u> - The headings and subheadings in the Plan have been inserted for convenience of reference only and shall not affect the construction of the provisions hereof.  In any necessary construction, the masculine shall include the feminine and the singular the plural, and vice versa.

12.03 <u>No Employment Contract</u> - This Plan shall not be deemed to constitute a contract between the Employer and any Participant or to be a consideration or inducement for the employment of any Participant or Employee.  No Participant in the Plan shall acquire any right to be retained in the Employer's employ by virtue of the Plan, nor, upon his dismissal or upon his voluntary termination of employment, shall he have any right or interest in and to the Fund other than as specifically provided herein.  Except to the extent required by law, the Employer shall not be liable for the payment of any benefit provided for herein; all benefits hereunder shall be payable only from the Fund, and only to the extent that the Fund is sufficient therefor.

12.04 <u>Receipt Prior to Payment</u> - The Trustee, the Plan Administrator, or the Employer, jointly or severally, may, but need not, require a written receipt as a condition precedent to any payment called for by the Plan to be made to a Participant, Spouse, Beneficiary, or to their heirs, successors, executors, and legal representatives.

12.05 <u>Payment to Minors and Incompetents</u> - Should any Participant, Spouse, or Beneficiary be a minor, or in the judgment of the Plan Administrator, be physically or mentally incapable of personally receiving and giving a valid receipt for any payment due him under the Plan, the Plan Administrator may make such payment or any part thereof to or for the benefit of such Participant, Spouse, or Beneficiary, or directly to or for the benefit of any person determined by the Plan Administrator to have incurred expense or assumed responsibility for the expenses of such Participant, Spouse, or Beneficiary.

12.06 <u>Non-alienability of Benefits</u>

(a) <u>In General</u> -  Except with respect to (i) federal income tax withholding, (ii) as provided in IRC Section 401(a)(13)(B) related to qualified domestic relations orders, and (iii) with respect to judgements, orders and decrees issued and settlements entered into on or after August 5, 1997, requiring the offset of a Member's benefit against all or  part of the amount a Members is required to pay to the Plan for certain crimes or violations of ERISA pursuant to IRC Section 401(a)(13)(C), no benefits or other amounts payable under the Plan shall be subject in any manner to anticipation, sale, transfer, assignment, pledge, encumbrance, charge, or alienation.  If the Plan Administrator determines that any person entitled to any payments under the Plan has become insolvent or bankrupt or has attempted to anticipate, sell, transfer, assign, pledge, encumber, charge, or otherwise in any manner alienate any benefit or other amount payable to him under the Plan or that there is any danger of any levy or attachment or other court process or encumbrance on the part of any creditor of such person entitled to payments under the Plan, against any benefit or other amounts payable to such person, the Plan Administrator may, at any time, in its discretion, direct the Trustee to

withhold any or all payments to such person under the Plan and apply the same for the benefit of such person in such manner and in such proportion as the Plan Administrator may deem proper.

(b) <u>Qualified Domestic Relations Order</u> - The Plan Administrator shall direct the Trustee to comply with a Qualified Domestic Relations Order. A Qualified Domestic Relations Order is a judgment, decree, or order (including approval of a property settlement agreement) made pursuant to a state domestic relations law (including community property law) that relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a Participant ("Alternate Payee") and which:

(1) Creates or recognizes the existence of an Alternate Payee's right to, or assigns to an Alternate Payee the right to, receive all or a portion of the benefits payable to a Participant under this Plan; and

(2) Specifies (i) the name and last known mailing address (if any) of the Participant and each Alternate Payee covered by the order, (ii) the amount or percentage of the Participant's Plan benefits to be paid to any Alternate Payee and the manner in which such amount or percentage is to be determined, and (iii) the number of payments or the period to which the order applies and each plan to which the order relates; and

(3) Does not require the Plan to:

(i) provide any type or form of benefit or any option not otherwise provided under this Plan;

(ii) pay any benefits to any Alternate Payee prior to the earlier of the affected Participant's termination of employment or the earlier of either (A) the earliest date benefits are payable under the Plan to a Participant, or (B) the later of the date the Participant attains age fifty (50), or the earliest date on which the Participant could obtain a distribution from the Plan if the Participant separated from employment;

(iii) provide increased benefits; or

(iv) pay benefits to an Alternate Payee that are required to be paid to another Alternate Payee under a prior Qualified Domestic Relations Order; and

(4) Otherwise complies with IRC Section 401(a)(13)(B).

For purposes of this Plan, an Alternate Payee who had been married to the Participant for at least one (1) year may be treated as a Spouse with respect to the portion of the Participant's benefit in which such Alternate Payee has an interest provided that the Qualified Domestic Relations Order provides for such treatment.  However, under no circumstances may the spouse of an Alternate Payee who is not a Participant hereunder be treated as a Spouse under the terms of the Plan or be entitled to any Joint and Survivor options available under the Plan.

Upon receipt of any judgment, decree, or order (including approval of a property settlement agreement) relating to a provision of payment by the Plan to an Alternate Payee pursuant to a state domestic relations law, the Plan Administrator shall promptly notify the affected Participant and any Alternate Payee of the receipt of such judgment, decree, or order, and, if requested, shall notify the affected Participant and any Alternate Payee of the

Plan Administrator's procedure for determining whether or not the judgment, decree, or order is a Qualified Domestic Relations Order.

The Plan Administrator shall establish a procedure to determine the status of a judgment, decree, or order as a Qualified Domestic Relations Order and to administer Plan distributions in accordance with Qualified Domestic Relations Orders. Such procedures shall be in writing, shall include a provision specifying the notification requirements enumerated in the preceding paragraph, shall permit an Alternate Payee to designate a representative for receipt of communications from the Plan Administrator and shall include such other provisions as the Plan Administrator shall determine, including provisions required under regulations promulgated by the Secretary of the Treasury.

12.07  <u>Merger of Plans</u> - In the event of the merger or consolidation of the Plan with another plan or transfer of assets or liabilities from the Plan to another plan, then each Participant shall not, as a result of such event, be entitled on the day following such merger, consolidation, or transfer under the termination of Plan provisions to a lesser benefit than the benefit he was entitled to on the date prior to the merger, consolidation, or transfer if the Plan had been terminated.

12.08  <u>Mistake of Fact</u> - All Contributions made by Employer are expressly conditioned upon the deductibility of such Contribution under Code Section 404. Notwithstanding anything herein to the contrary, upon the Employer's request, a Contribution which was made by a mistake of fact, or conditioned upon the deductibility of the Contribution under IRC Section 404 shall be returned to the Employer by the Trustee within one (1) year after the payment of the Contribution or the disallowance of the deduction (to the extent disallowed), whichever is applicable. The portion of any Contribution which is to be returned to the

Employer pursuant to this Section 12.08 must be reduced by its proportionate share of losses and expenses of the Fund, if any, but shall not be increased by any income or gains of the Fund, if any.

12.09  <u>Exclusive Benefit</u> - The Employer shall be entitled to no part of the assets or income of the Fund and no part thereof shall be used for or diverted to purposes other than for the exclusive benefit of Participants, Spouses, and Beneficiaries hereunder except as provided in Section 9.02 and in Section 12.08.

12.10  <u>Indemnification</u> - The Corporation shall indemnify and hold harmless each person or persons who may serve as Plan Administrator or in capacity of Plan Administrator Representative from any and all claims, losses, damages, expenses (including attorney's fees), and liabilities (including any amounts paid in settlement) arising from any act or omission of such member, except when the same is judicially determined to be due to the gross negligence or willful misconduct of such person.  No Plan assets may be used for any such indemnification.

12.11  <u>Counterparts</u> - The Plan and Trust may be executed in any number of counterparts, each of which shall constitute but one and the same instrument and may be sufficiently evidenced by any one counterpart.

12.12  <u>Rollovers</u>

(a) Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Plan, a distributee who is not subject to any of the two (2) limitations set forth in the following paragraph (b) may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an eligible rollover

distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b) The two (2) limitations on a distributee's direct rollover rights are as follows [1] a distributee may not divide an eligible rollover distribution into two (2) or more separate distributions to be paid in direct rollovers to two (2) or more eligible retirement plans; instead, an eligible rollover distribution that is distributed in a direct rollover may only be paid to one (1) eligible retirement plan selected by the distributee and [2] a distributee shall not be eligible to elect a direct rollover of an eligible rollover distribution unless the distributee makes such election within the time period established by the Plan Administrator.

(c) Eligible rollover distribution: An eligible rollover distribution is any distribution of all or any portion of the balance of the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated Beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); or any distribution on account of hardship.  A portion of a distribution shall not fail to be an eligible rollover distribution merely because the portion consists of after-tax employee contributions which are not includible in gross income; provided that such portion may be paid only to an individual retirement account or annuity described in Section 408(a) or (b) of the Code, or to a qualified defined contribution plan described in Section 401(a) or 403(a) of the Code that agrees to

separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible. Notwithstanding the foregoing, for distributions made on or after January 1, 2007, the portion consisting of after-tax employee contributions may also be transferred directly to a qualified defined benefit retirement plan, as defined in Code Section 414(j), or an annuity plan described in Code Section 403(b) that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

(d) Eligible retirement plan: An "eligible retirement plan" is an individual retirement account as described in Code Section 408 (a), an individual retirement annuity as described in Code Section 408 (b), an annuity contract as described in Code Section 403 (b), a qualified trust as described in Code Section 401 (a) that accepts the distributee's eligible rollover distribution, and an eligible plan under Code Section 457 (b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political sub-division of a state and which agrees to separately account for amounts transferred into such plan from this Plan.  The definition of eligible retirement plan shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414 (p) of the Code.  Notwithstanding the foregoing, effective for distributions made on or after January 1, 2008, an eligible retirement plan shall include a Roth IRA described in Code Section 408A(b), subject to any applicable eligibility restrictions imposed by law.

(e) Distributee: A distributee includes an Employee or former Employee.  In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code Section 414(p), are distributees with regard to the interest of the spouse or former spouse.

(f) Direct Rollover: A direct rollover is a payment by the Plan to the eligible retirement plan specified by the distributee.

(g) Notwithstanding anything herein to the contrary, a non-spouse Beneficiary may elect a direct trustee-to-trustee transfer of any portion of a distribution received on or after January 1, 2008, provided that the distribution satisfies all the requirements to be an Eligible Rollover Distribution, as defined above, other than the requirement that the distribution be made to the Distributee, as defined above; and further provided that such a direct transfer shall be treated as an Eligible Rollover Distribution solely for purposes of Code Section 402(c) (but effective on and after January 1, 2010, for all purposes under this Section 12.12 of the Plan). Such transfer must be made to an individual retirement plan described in Code Section 408(a) or (b) (an "IRA") that is established for the purpose of receiving the distribution on behalf of such beneficiary. Such IRA shall be treated as an inherited IRA within the meaning of Code Section 408(d)(3)(C) and the provisions of Code Section 401(a)(9)(B) (other than clause (iv) thereof) shall apply to such IRA, pursuant to the provisions of Code Section 402(c)(11).

12.13 Benefit Restrictions Under Code Section 436

Notwithstanding any provision of this Plan to the contrary, effective January 1, 2008, the following benefit restrictions shall apply based on the Plan's "Adjusted Funding Target

Attainment Percentage", as defined in Code Section 436(j) and herein referred to as the Plan's "AFTAP", for the Plan Year:

(a) <u>Amendment Restrictions</u>:  If the Plan's AFTAP for a Plan Year is less than eighty percent (80%) (or, if the AFTAP for the Plan Year is 80% or more but would be less than 80%, if benefits attributable to the amendment were taken into account in determining the Plan's AFTAP), no Plan amendment which has the effect of increasing the Plan's liabilities by reason of increases in benefits, establishment of new benefits, changing the rate of benefit accruals or changing the rate at which benefits become nonforfeitable shall take effect during such Plan Year.

Notwithstanding the foregoing, such amendment restrictions shall not apply to any amendment which provides for an increase in benefits under a formula which is not based on a Participant's compensation, but only if the rate of such increase is not in excess of the contemporaneous rate of increase in average wages of Participants covered by such amendment.

(b) <u>Accelerated Benefit Payment Restrictions</u>:  Subject to the provisions of paragraph (f), if the Plan's AFTAP for a Plan Year is less than eighty percent (80%), the following accelerated benefit payment restrictions shall apply:

(1)    <u>Partial Accelerated Payment Restrictions</u>:  If the Plan's AFTAP for a Plan Year is at least sixty percent (60%) but less than eighty percent (80%), no "prohibited payment" shall be made after the valuation date for such Plan Year to the extent the amount of the payment exceeds an amount equal to the lesser of:

(i)     fifty percent (50%) of the amount of the payment that could otherwise be made without regard to this benefit restriction; or

(ii)     the present value (determined under guidance prescribed by the Pension Benefit Guaranty Corporation, using the interest and mortality assumptions in Code Section 417(e)) of the maximum guarantee with respect to the Participant under Section 4022 of the Act; and

(iii)     further provided that:

(A)     only one "prohibited payment", meeting the requirements of subparagraphs (b)(1)(i) and (b)(1)(ii) above, may be made with respect to a Participant during any period of consecutive Plan Years when the benefit restrictions of either paragraph (b)(1) or (b)(2) apply; and

(B)     a Participant and any Beneficiary on his behalf (including an alternate payee, as defined in Code Section 414(p)(8)) shall be treated as one Participant; provided, however, that if the Participant's Accrued Benefit is allocated to such an alternate payee and one or more other persons, the unrestricted amount under paragraphs (b)(1)(i) and (b)(1)(ii) shall be allocated among such other persons in the same manner as the Accrued Benefit is allocated unless the qualified domestic relations order (as defined in Code Section 414(p)(1)(A)) with respect to the Participant or the alternate payee provides otherwise.

(2)    <u>Complete Accelerated Payment Restrictions</u>: The following complete accelerated benefit payment restrictions shall apply in accordance with the following rules:

(i)    <u>AFTAP Less Than 60%</u>:  If the Plan's AFTAP for a Plan Year is less than sixty percent (60%), no "prohibited payment" shall be paid after the valuation date for such Plan Year.

(ii)    <u>Bankruptcy</u>:  During any period in which the Plan Sponsor is a debtor in a case under Title 11, United States Code, or a similar Federal or State law, the Plan shall not pay any "prohibited payment" unless the actuary for the Plan certifies that the Plan's AFTAP is not less than one hundred percent (100%).

For purposes of this paragraph (b), a "prohibited payment" means (i) any payment in excess of the monthly amount paid under a life annuity (plus any social security supplements described in the last sentence of Code Section 411(a)(9)), to a Participant or Beneficiary whose annuity starting date (as defined in Code Section 417(f)(2)) occurs during any period a limitation under this paragraph (b) is in effect; (ii) any payment for the purchase of an irrevocable commitment from an insurer to pay benefits; and (iii) any other payment specified by the Secretary of the Treasury.  Such term shall not include the payment of a benefit which under Code Section 411(a)(11) may be immediately distributed without the consent of the Participant.

(c) <u>Benefit Accrual Restrictions</u>:  If the Plan's AFTAP for a Plan Year is less than sixty percent (60%), benefit accruals under the Plan shall cease as of the valuation date for such Plan Year; provided, however, that with respect to a Plan Year beginning on or

after October 1, 2008 and before October 1, 2009, the AFTAP used to determine whether benefit accruals shall cease shall be the AFTAP for the prior Plan Year, if greater.

(d) <u>UCEB Restrictions</u>:  If the Plan's AFTAP for a Plan Year is less than sixty percent (60%) (or, if the AFTAP for the Plan Year is 60% or more but would be less than 60% taking into account the occurrence of any "unpredictable contingent event" during the Plan Year), no "unpredictable contingent event benefit" ("UCEB"), as defined in Code Section 436(b)(3), shall be paid.

(e) <u>Current Year Contributions to Avoid or Terminate Benefit Limitations</u>:  The provisions of paragraphs (a), (c) and (d) shall cease to apply with respect to a Plan Year effective as of the first day of the Plan Year (or, in the case of paragraph (a), if later, the effective date of the amendment) upon payment by the Plan Sponsor of a contribution (in addition to any minimum required contribution under Code Section 430) equal to an amount determined under Code Section 436(b), 436(c) or 436(e), as applicable.

(f) <u>Exemption</u>:  A restriction under this Section shall not apply for a Plan Year (or shall cease to apply for a Plan Year) if the Plan Sponsor takes such action as provided in Code Section 436 and the final regulations promulgated thereunder in order to avoid application of the restriction.  Further,  the provisions of paragraph (b) shall not apply to the Plan, since under the terms of the Plan, as in effect for the period beginning on September 1, 2005, no further benefit accruals are provided with respect to any Participants; provided, however, that if the Plan provides for benefit accruals during any time after September 1, 2005 (treating benefit increases pursuant to a Plan amendment

as benefit accruals), this "frozen plan exemption" ceases to apply to the Plan as of the date any benefits accrue under the Plan (or the date the amendment takes effect).

(g) <u>Treatment of Plan as of Close of Prohibited or Cessation Period</u>:  Payments and benefit accruals, as applicable, shall resume effective as of the day following the close of the period for which any restriction of payment or accrual of benefits under paragraph (b) or (c), respectively, applies. Nothing in the preceding sentence, however, shall be construed as affecting the Plan's treatment of benefits which would have been paid or accrued but for this Section.

The limitations in this Section are intended to comply with the provisions of Code Section 436 and the final regulations promulgated thereunder.  If there is any discrepancy between the provisions of this Section and the provisions of Code Section 436 and the final regulations promulgated thereunder, such discrepancy shall be resolved in such a way as to give full effect to the provisions of the Code and such regulations. Further, this Section is intended to impose restrictions only to the extent required under Code Section 436 and shall be applied and interpreted accordingly. In the event any limitation of this Section is determined not to be required by Code Section 436 and the final regulations promulgated thereunder, such limitation shall not be applied.

ARTICLE XIII

ADOPTION OF PLAN AND TRUST

Anything herein to the contrary notwithstanding, this Plan is amended and maintained under the condition that it shall continue to be approved and qualified by the Internal Revenue Service under IRC Section 401(a) and that the Trust hereunder is exempt under IRC Section 501(a), or under any comparable Sections of any future legislation which amends, supplements, or supersedes such Sections.  In the event that it should be found by the Internal Revenue Service that the Plan as amended and restated hereby is not qualified, the Corporation may modify the Plan to meet Internal Revenue Service requirements or reinstate the Plan as in effect prior to such amendment and restatement.

As evidence of its adoption of the Plan, R. B. Pamplin Corporation has caused this instrument to be signed by its duly authorized officers this _____ day of _____, 20 _____.


ATTEST:                                              R. B. PAMPLIN CORPORATION


By: _____        By:_____
        Secretary                                                    President

ARTICLE XIII

ADOPTION OF PLAN AND TRUST

The Trustee, by joining in the execution of this Plan and Trust, hereby confirms his acceptance and approval of the terms hereof and agrees to carry out the provisions hereof in his part as Trustee.

TRUSTEE


_____         _____
  R. B. Pamplin, Jr.                                          Date

APPENDIX A

ACTUARIAL EQUIVALENT FACTORS

The term "Actuarial Equivalent" pursuant to Section 1.02 shall be based upon the following:

Interest:  Eight percent (8%)

Mortality:  UP-1984 Table of Mortality

Effective for annuity starting dates (ASDs) occurring on or after January 1, 2012, the term 'Actuarial Equivalent' pursuant to Section 1.02 shall be based on the following:

Interest: Six percent (6%)

Mortality: RP-2000 Mortality Combined Healthy Unisex Table 50/50 Blend of Male and Female Rates

Notwithstanding anything contained herein to the contrary, the Actuarial Equivalent of the Accrued Benefit on or after January 1, 1987, shall in no event be less than the Actuarial Equivalent of the Accrued Benefit on December 31, 1986, determined pursuant to the provisions of the Mount Vernon Hourly Plan, Mount Vernon Salaried Plan, Riegel Hourly Plan, or Riegel Salaried Plan, whichever shall be applicable, as in effect on December 31, 1986.

Notwithstanding anything contained herein to the contrary, the Actuarial Equivalent of the Accrued Benefit on or after January 1, 1992, for a Prior Pamplin Plan Participant (as defined in Appendix B) shall not be less than the actuarial equivalent of his Past Service Benefit (as defined in Appendix B), determined under the provisions of the Prior Pamplin Plan as in effect on December 31, 1991.

Notwithstanding the foregoing, solely for the purposes of determining (1) the Actuarially Equivalent reduced single-life benefit under the provisions of Sections 4.04 and 6.04 and (2) the

Actuarially Equivalent single-life benefit payable provided by a Participant's Profit Sharing Balance prior to Normal Retirement Age or Accumulated Contributions, if any, as provided under Appendix D, the Applicable Mortality Table and Applicable Interest Rate, as defined in Section 6.05, shall apply.

Notwithstanding the foregoing, the Actuarial Equivalent of the Accrued Benefit for ASDs occurring on and after January 1, 2012 shall not be less than the Actuarial Equivalent of the Accrued Benefit determined under the provisions of the Plan as in effect on December 31, 2011.

APPENDIX B

SPECIAL PROVISIONS APPLICABLE TO
PARTICIPANTS OF THE
PRIOR PAMPLIN PLAN

1.    <u>Definitions</u> - For purpose of this Appendix B, the following terms shall have the following meanings:

A.    <u>Prior Pamplin Plan Participant</u> - An Employee who as of December 31, 1991, was a participant in the Prior Pamplin Plan or became a Participant in this Plan pursuant to Section 2 of this Appendix B.

B.    <u>Vinton Employee</u> - An employee who was a participant in the Prior Pamplin Plan as of December 31, 1991, and who had been an employee of the Vinton Company Division.

2.    <u>Eligibility</u> - Notwithstanding the provisions of Section 2.01, if a person who becomes an Employee on or after January 1, 1992, and would have become a participant under the Prior Pamplin Plan as of any date during such period, such an Employee shall become a Participant in this Plan as of such date.

3.    <u>Normal Retirement Age</u> - Notwithstanding the provisions of Section 1.26, for a Prior Pamplin Plan participant, his Normal Retirement Age shall be the date he attains age sixty-five (65) and completes five (5) years of Vesting Service.

4.    <u>Past Service Benefit</u> - Notwithstanding the provisions of section 4.01(a), for a Prior Pamplin Plan Participant, his Past Service Benefit shall be his accrued benefit as of December 31, 1992, determined under the provisions of the Prior Pamplin Plan as in effect on December 31, 1991.

5.    <u>Future Service Benefit</u> - Notwithstanding the provisions of Section 4.01(b), for a Prior Pamplin Plan Participant, his future Service Benefit shall be determined for each year of Benefit Service commencing on and after January 1, 1993.

6.    <u>Normal Form of Payment</u> - Notwithstanding the provisions of Section 5.01, the normal form of payment for the Past Service Benefit shall be a three (3) year certain and life annuity.  A "three (3) year certain and life annuity" means the monthly benefit payable over the lifetime of the participant with thirty-six (36) monthly payments certain so that in the event of the death of the participant after benefit payments commence, but prior to the completion of thirty-six (36) monthly payments, the unpaid balance of such certain number of payments shall be continued to the Beneficiary designated by the Participant for the balance of the thirty-six (36) monthly payments.  If the Beneficiary should die before the total guaranteed number of payments have been made, the remaining payments will be made to the estate of such Beneficiary (or, if designated by the Participant, to a secondary Beneficiary), in an Actuarially Equivalent single sum.

7.    <u>Death Benefits</u> - If a Prior Pamplin Plan Participant dies while an Employee of the Employer and after the completion of at least five (5) years of Benefit Service, and has no Spouse as of date of death, his Beneficiary shall be paid beginning with the first day of the month after death, benefits of thirty-six (36) monthly payments equal to such Participant's Past Service Benefit unreduced for early commencement.

8.    <u>Vested Benefits</u> - Notwithstanding the provisions of Section 6.04, if a Vinton Employee, listed below, terminates employment with the Employer prior to retirement, other than by death, he shall be entitled to elect to receive a single lump-sum cash payment as shown below. This list has been revised to reflect those who are known to have died.

| Name | Lump-Sum Amount |
|------|-----------------|
| Bingham, Ted Keith | 4,955.14 |
| Fix, Fred J. | 6,460.84 |
| Grelle, Charles M. | 3,449.43 |

Such lump-sum payment shall be payable as soon as practicable following such Participant's termination of employment and shall be subject to the spousal consent provisions of Section 5.04 if the Actuarial Equivalent lump-sum value of the Participant's entire Accrued Benefit is greater than $3,500.00

If such a Participant elects the lump-sum payment pursuant to Section 6.05 of the Plan or is automatically cashed out pursuant to that Section, his lump-sum payment shall not be less than the lump-sum amount listed in this Section 8 of this Appendix B.

APPENDIX C

SPECIAL PROVISIONS APPLICABLE TO
PARTICIPANTS OF THE
MOUNT VERNON HOURLY PLAN
AS OF DECEMBER 31, 1986

1.    <u>Early Retirement Date and Benefit</u> - Notwithstanding the provisions of Section 3.03 and Section 4.03 to the contrary, a Participant of the Mount Vernon Hourly Plan who had not reached his Normal Retirement Date, but who had attained age fifty-five (55) and completed twenty (20) or more years of Benefit Service prior to January 12, 1983, may retire on the first day of any month prior to his Normal Retirement Date.  The amount of benefit payable to such a Participant shall be equal to the early retirement benefit that would have been payable to such Participant based on this Benefit Service as of December 31, 1982, and the provisions of the Mount Vernon Hourly Plan in effect on that date.

2.    <u>Additional Benefits for Participants of the Mount Vernon Hourly Plan who were Participants in the Cheney Bigelow, Inc. - Weaverville Pension Plan for Hourly Rated Employees</u> -

A. <u>Definitions</u> - For purposes of this Appendix C, the following terms shall have the following  meanings:

    (a)  <u>Cheney Bigelow</u> - Cheney Bigelow, Inc., a Delaware corporate, all of the issued and outstanding stock of which was acquired by a subsidiary of Mount Vernon Mills, Inc. as of January 22, 1980, and which was subsequently merged into Mount Vernon Mills, Inc.

    (b)  <u>Cheney Bigelow Plan</u> - the Cheney Bigelow, Inc.-Weaverville Pension Plan for Hourly Rated Employees (as adopted by Cheney Bigelow on September 26, 1975, and as amended from time to time after such date).

(c) <u>Cheney Bigelow Participant</u> - each hourly employee of Cheney Bigelow who, on January 22, 1980, was a participant in the Cheney Bigelow Plan and who became a Member of this Plan by reason of the adoption of this Plan by Cheney Bigelow.

B. <u>Increased and Minimum Benefit to Cheney Bigelow Participant</u> - In addition to the benefit to which he may be entitled upon his retirement or separation pursuant to any of the provisions of Section 4.01, 4.02, 4.03, 4.04 or Section 6.04 of this amended and restated Plan, each Cheney Bigelow Participant, upon his termination of employment due to his retirement pursuant to Sections 3.01, 3.02, 3.03, or 3.04 or his termination of employment pursuant to Section 6.04, shall receive a benefit not less than his accrued benefit in the Cheney Bigelow Plan as of December 31, 1979.

C. <u>Credit for Employment with Cheney Bigelow</u> - The employment of any person as an hourly employee of Cheney Bigelow prior to January 22, 1980, shall be credited for purposes of eligibility and Vesting Service.  Such employment shall not be credited for purposes of Benefit Service.

APPENDIX D

SPECIAL PROVISIONS APPLICABLE TO PARTICIPANTS
OF THE
MOUNT VERNON SALARIED PLAN
AS OF DECEMBER 31, 1986

1.    <u>Early Retirement Date and Benefit</u> - Notwithstanding the provisions of Section 3.03 and Section 4.03 to the contrary, a Participant of the Mount Vernon Salaried Plan who had not reached his Normal Retirement Date, but who had attained age fifty-five (55) and completed twenty (20) or more years of Benefit Service prior to January 1, 1983, may retire on the first day of any month prior to his Normal Retirement Date.  The amount of benefit payable to such a Participant shall be equal to the early retirement benefit that would have been payable to such Participant based on his "Average Final Effective Compensation" (as defined in the Mount Vernon Salaried Plan) and Benefit Service as of December 31, 1982, and the provisions of the Mount Vernon Hourly Plan in effect on that date.

2.    <u>Additional or Alternate Benefits for Participants of the Mount Vernon Salaried Plan who were Participants in the Turner Halsey Retirement Income Plan and the Turner Halsey Company Profit-Sharing Plan</u> - The provisions of this Section 2 of this Appendix D shall only apply to persons who became Participants of the Mount Vernon Salaried Plan as of January 1, 1962, as a result of the merger of the Turner Halsey Retirement Income Plan and the Turner Halsey Company Profit-Sharing Plan, as amended to conform to the Mount Vernon Salaried Plan as amended, the merger of the same into the Mount Vernon Salaried Plan, and the adoption of the Mount Vernon Salaried Plan by Turner Halsey Company Incorporated, including persons who, prior to January 1, 1962, had retired and were in

receipt of benefits payable under the Turner Halsey Retirement Income Plan and the Turner Halsey Company Profit-Sharing Plan.

A. <u>Definitions</u> - For purposes of this Appendix D, the following terms shall have the following meanings:

(a) <u>Old Turner Halsey</u> - Turner Halsey Company, which on November 9, 1961, was merged into Mount Vernon Mills, Inc.

(b) <u>New Turner Halsey</u> - Turner Halsey Company, Incorporated, which on November 9, 1961, acquired from Mount Vernon Mills, Inc. substantially all the assets of Old Turner Halsey acquired by Mount Vernon Mills, Inc. as a result of said merger of Old Turner Halsey into it.

(c) <u>Turner Halsey Retirement Income Plan</u> - The Turner Halsey Company Retirement Income Plan as adopted by Turner Halsey Company effective December 1, 1947, as amended October 24, 1950, February 12, 1954, May 22, 1957, and June 15, 1958.

(d) <u>Turner Halsey Profit-Sharing Plan</u> - The Turner Halsey Company Profit-Sharing Plan as adopted by Turner Halsey Company effective January 1, 1947, as amended on October 24, 1950, April 15, 1952, May 22, 1957, June 28, 1958, December 16, 1959, and June 16, 1960.

(e) <u>Turner Halsey Participant</u> - Each employee of New Turner Halsey who, immediately prior to January 1, 1962, was an active participant in the Turner Halsey Retirement Income Plan and the Turner Halsey Profit-Sharing Plan, and who became a member of this Plan effective January 1, 1962 by reason of the adoption of this Plan by New Turner Halsey.

(f)  <u>Retired Turner Halsey Participant</u> - A former employee of New Turner Halsey or of Old Turner Halsey who, immediately prior to January 1, 1962, was retired and in receipt of benefits payable under the Turner Halsey Retirement Income Plan and the Turner Halsey Profit-Sharing Plan.

(g)  <u>Turner Halsey Contingent Annuitant</u> - A person designated by a Turner Halsey Participant or a Retired Turner Halsey Participant to receive retirement income in certain cases after the death of a Turner Halsey Participant who hereafter retires or a Retired Turner Halsey Participant.

(h)  <u>Beneficiary</u> - A person designated by a Turner Halsey participant by written designation filed with the Plan Administrator to receive the sums to which such Turner Halsey Participant's Beneficiary may be entitled under this Appendix D in the event of his death.

(i)  <u>Turner Halsey Participant's Accumulated Contributions</u> - The aggregate amount of a Turner Halsey Participant's contributions to the Turner Halsey Retirement Income Plan immediately prior to January 1, 1962, including interest thereon to December 31, 1961 at the rate of two percent (2%) per annum compounded annually.

(j)  <u>Turner Halsey Participant's Profit-Sharing Balance</u> - The total amount standing to the credit of a Turner Halsey Participant as of December 31, 1961 in his Pre-retirement Account determined in accordance with Article IV of the Turner Halsey Profit-Sharing Plan.

B.  <u>Benefit for Retired Turner Halsey Participant</u> - The increased pensions provided for any Participants who are or were employees of Old Turner Halsey or New Turner Halsey by reason of the adoption of the Mount Vernon Salaried Plan, as amended by New Turner

Halsey, effective January 1, 1962, shall not apply or inure to the benefit of any Retired Turner Halsey Participant who had retired normally, or taken early retirement, or retired on a deferred pension, or retired by reason of disability prior to January 1, 1962.  Any Retired Turner Halsey Participant who immediately prior to January 1, 1962, was in receipt of benefits payable under the Turner Halsey Retirement Income Plan and the Turner Halsey Profit-Sharing Plan shall continue to receive from the Fund under this Plan the same benefits payable in the same manner and under the same terms and conditions to which he was entitled under the Turner Halsey Retirement Income Plan or the Turner Halsey Profit-Sharing Plan or both, to the same extent and with like effect as if neither of the said Turner Halsey Retirement Income Plan nor the said Turner Halsey Profit-Sharing Plan had been amended to conform to the Mount Vernon Salaried Plan or had been merged into the Mount Vernon Salaried Plan.  Similarly, any Beneficiary or Contingent Annuitant of such Retired Turner Halsey Participant shall have the same rights and be entitled to receive the same benefits as he would have been entitled to if neither the said Turner Halsey Retirement Income Plan nor the said Turner Halsey Profit-Sharing Plan had been amended to conform to the Mount Vernon Salaried Plan or had been merged into the Mount Vernon Salaried Plan.

C. Increased Benefit to Turner Halsey Participant - In addition to the benefit to which he may be entitled upon retiring or terminating pursuant to any of the provisions of Sections 4.01, 4.02, 4.03, 4.04, or 6.04 of this Plan, or the benefit to which he and/or his spouse may be entitled to receive under the provisions of Article V of this amended and restated Plan, a Participant who is a Turner Halsey Participant shall also be entitled to receive an additional full cash refund benefit which is the Actuarial

Equivalent value of the amount of his Turner Halsey Participant's Accumulated Contributions, with interest thereon at two percent (2%) per annum compounded annually from January 1, 1962 through December 3, 1965, and with interest thereon at the same rate used by the actuary for the Plan in computing the actuarial valuation of the Plan for the preceding Plan Year compounded annually from January 1, 1966 to the date of such retirement.

D. <u>Alternate Benefit for Turner Halsey Participant</u> - Each Turner Halsey Participant may, by written direction filed with the Plan Administrator at any time before payment of any retirement benefit to him under this amended and restated Plan, elect to receive in one lump sum in cash an amount equal to his Turner Halsey Participant's Profit-Sharing Balance, together with interest thereon compounded annually from January 1, 1962 to the date of his retirement. In the event such election is made, the Plan Administrator shall direct the Trustee to pay such Turner Halsey Participant upon his retirement or termination pursuant to Sections 3.01, 3.02, 3.03, 3.04, or 6.04 the amount of his Turner Halsey Participant's Profit-Sharing Balance with interest thereon as aforesaid in one lump sum in cash and in such event the benefit which would otherwise be payable to him under the provisions of Sections 4.01, 4.02, 4.03, 4.04, 6.04 or Article V shall be reduced by an amount of Actuarial Equivalent value to the amount so paid to him in cash.

E. <u>Minimum Benefit for Turner Halsey Participant</u> - Notwithstanding the provisions of Sections 4.01, 4.02, 4.03, 4.04, and 6.04, each Turner Halsey Participant, upon his retirement or termination pursuant to Sections 3.01, 3.02, 3.03, 3.04, or 6.04, shall be entitled to receive a benefit not less than the Actuarial Equivalent value of (1) his

accrued retirement income benefit under the Turner Halsey Retirement Income Plan as of December 31, 1961  and (2) his Profit Sharing Balance with interest on said Profit-Sharing Balance compounded annually from January 1, 1962 up to the date of such retirement, termination, or death.

F.  <u>Benefit upon Termination of Employment</u> - If the employment of any Turner Halsey Participant by an Employer shall be terminated prior to his Normal Retirement Date other than by death, or retirement, or termination pursuant to Sections 3.01, 3.02, 3.03, 3.04, or 6.04, whether such termination of employment is voluntary or involuntary, such Turner Halsey Participant shall, at the time his employment terminates, be entitled to receive in one lump sum in cash an amount equal to the sum of:

(1)  his Turner Halsey Participant's Accumulated Contributions with interest thereon at two percent (2%) per annum compounded annually from January 1, 1962 through December 31, 1965, and with interest thereon at the same rate used by the actuary for the Plan in computing the actuarial valuation of the Plan for the preceding year compounded annually from January 1, 1966 to the date such employment terminates, and

(2)  the vested portion of such Turner Halsey Participant's Profit-Sharing Balance with interest thereon compounded annually from January 1, 1962 to the date such employment terminates.  For the purposes of this subparagraph; each Turner Halsey Participant's Profit-Sharing Balance shall be deemed to have vested or vest at the rate of ten percent (10%) for each year of his Benefit Service prior to such termination of his employment, and in any event and regardless of the number of

years of his Benefit Service, shall be deemed to have fully vested or fully vest on the fifty-fifth (55th) anniversary of his birth.

G. <u>Death Benefit before Retirement</u> - If any Turner Halsey Participant shall die prior to is retirement or termination pursuant to any of the provisions of Sections 3.01, 3.02, 3.03, 3.04, or 6.04, and no spouse's benefit is payable pursuant to Sections 6.01 or 6.02, the surviving spouse (or the Beneficiary of such Turner Halsey Participant designated under Subsection 1 of Section 2 of this Appendix D) shall be entitled to receive in one lump sum in cash an amount equal to the sum of:

(1) his Turner Halsey Participant's Accumulated Contributions with interest thereon at two percent (2%) per annum compounded annually from January 1, 1962 through December 31, 1965, and with interest thereon at the same rate used by the actuary for the Plan in computing the actuarial valuation of the Plan for the preceding year compounded annually from January 1, 1966 to the date of his death, and

(2) his Turner Halsey Participant's Profit-Sharing Balance with interest thereon compounded annually from January 1, 1962 to the date of his death.

H. <u>Death Benefit after Retirement</u> - If at the time of the last to die of a retired Turner Halsey Participant and his Beneficiary, if any, the Turner Halsey Participant's Accumulated Contributions, with interest thereon at two percent (2%) per annum compounded annually from January 1, 1962 through December 31, 1965, and with interest thereon at the same rate used by the actuary for the Plan in computing the actuarial valuation of the Plan for the preceding Plan Year compounded annually from January 1, 1966 to the date of his retirement, exceed at the date of the death of the last to die of such retired Turner Halsey Participant and his Beneficiary, if any, (1) the total

aggregate amount of the benefits paid to him and to his Beneficiary, if any, prior to the death of the survivor of them, if he or such Beneficiary were in receipt of a minimum benefit under the provisions of Subsection E of       Section 2 of this Appendix D, or (2) the total aggregate amount of the portion of his benefit provided by his Accumulated Contributions with interest thereon at two percent (2%) per annum compounded annually from January 1, 1962 through December 31, 1965, and with interest thereon at the same rate used by the actuary for the Plan in computing the actuarial valuation of the Plan for the preceding Plan Year compounded annually from January 1, 1966 to the date of his retirement, if he or they were in receipt of a benefit other than the minimum benefit under the provisions of Subsection E or Section 2 of this Appendix D, then such excess shall be paid in one lump sum in cash to the estate of the last to die of such Turner Halsey Participant or his Beneficiary, if any.

I.    <u>Designation of Beneficiary</u> - Any benefit which is payable to a Turner Halsey Participant under the provisions of this Appendix D shall be paid in the form designated by such Participant in accordance with the provisions of Article V.  Such election may be made at such time and in such form, and shall be subject to revocation or change by such Turner Halsey Participant in accordance with the provisions of Section 5.02 in such manner as is described by Section 5.02.

For purposes of Subsection G of Section 2 of this Appendix D, each Turner Halsey Participant shall designate a Beneficiary if he is not married at any time, or if it is such Participant's election that any amounts which may be payable under Subsection G of Section 2 of this Appendix D shall be distributed to a Beneficiary other than his Spouse. Such designation shall be made on a form supplied by, and filed with, the Plan

Administrator, and may be changed or revoked at any time by a Turner Halsey Participant prior to his retirement without the consent of such Beneficiary by executing and filing a similar form. If a Beneficiary designated by a Turner Halsey Participant is not his Spouse, then the Spouse's consent shall be required for such designation to become effective and such consent shall be witnessed by a representative of the Plan Administrator or a notary public. The Plan Administrator may accept an election other than that provided hereunder without the consent of the Spouse if there is no Spouse, the Spouse cannot be located, or such other circumstances as may be prescribed by regulations. Any spousal consent shall only be applicable to the Spouse granting such consent.

For purposes of Subsection G of Section 2 of this Appendix D, (i) if a retired Turner Halsey participant had not elected out of the Joint and Survivor benefit under Section 5.04, his Spouse shall be deemed to be his designated Beneficiary, (ii) if a retired Turner Halsey Participant elected the optional form of payment provided in Section 5.02, the Beneficiary designated in such option shall be deemed to be his designated Beneficiary, and (iii) if a retired Turner Halsey Participant will receive benefits in accordance with the normal form provided in Section 5.01, his Beneficiary shall be such person as such Participant may have elected at the time of his retirement.

If a Turner Halsey Participant shall not have a Beneficiary, as determined in accordance with this Section I, or if the Beneficiary (as determined under this Section I) of a Turner Halsey Participant shall have predeceased such Participant, any amounts which are payable under this Appendix D shall be paid to the estate of such Turner Halsey Participant.

J. <u>Determinations by Plan Administrator (or Formerly the Retirement Board under the Mount Vernon Salaried Plan)</u> - As soon as practicable after January 1, 1962, the Retirement Board under the Mount Vernon Salaried Plan determined (1) the amount of each Turner Halsey Participant's Accumulated Contributions, (2) the amount of each Turner Halsey Participant's Profit-Sharing Balance and (3) the amount of each Turner Halsey Participant's accrued retirement income benefit under the Turner Halsey Retirement Income Plan as of December 31, 1961.  The Retirement Board, under the Mount Vernon Salaried Plan, and thereafter the Plan Administrator established pursuant to this amended and restated Plan, annually shall declare a rate of interest to be used in determining the amount of increase to be added each year to each Turner Halsey Participant's Profit-Sharing Balance and, in fixing such rate of interest, the Retirement Board under the Mount Vernon Salaried Plan, and thereafter the Plan Administrator established pursuant to this amended and restated Plan, shall take into consideration the income or rate of return earned by the Fund during each year and also, to the extent deemed appropriate by the Retirement Board under the Mount Vernon Salaried Plan, and thereafter the Plan Administrator established pursuant to this amended and restated Plan, the realized capital gains and losses and the unrealized appreciation and depreciation in value during such year of the securities comprising the Trust Fund.  In the event of the termination of employment, death before retirement, or retirement of a Turner Halsey Participant, the Retirement Board under the Mount Vernon Salaried Plan, and thereafter the Plan Administrator established pursuant to this amended and restated Plan, shall also declare the rate of interest to be used in determining the amount of interest to be added to such Turner Halsey

participant's Profit-Sharing Balance for the Plan Year in which such termination of employment, death, or retirement occurs and, in fixing such rate of interest, the Retirement Board under the Mount Vernon Salaried Plan, and thereafter the Plan Administrator established pursuant to this amended and restated Plan, shall, to the extent feasible, take into consideration the same factors above provided to be considered by it in determining annually the rate of interest to be used.

3.  <u>Additional Benefits for Participants of the Mount Vernon Salaried Plan who were Participants in the National-Standard Company Retirement Plan for Salaried Employees</u> -

A.  <u>Definitions</u> - For purposes of this Section 3 of this Appendix D, the following terms shall have the following meaning:

(a)  <u>National-Standard</u> - National-Standard Company, a Delaware corporation, the principal office of which is located in Niles, Michigan.

(b)  <u>Cheney Bigelow</u> - Cheney Bigelow, Inc., a Delaware corporation, all of the issued and outstanding stock of which was acquired by a subsidiary of Mount Vernon Mills, Inc., from national-Standard.

(c)  <u>National-Standard Plan</u> - the National-Standard Retirement Plan for Salaried Employees (as Amended and Restated Effective as of January 1, 1976) as adopted by National-Standard on March 1, 1976 and amended on May 19, 1978, June 25, 1979, and January 14, 1980).

(d)  <u>Cheney Bigelow Participant</u> - Each salaried employee of Cheney Bigelow who on December 31, 1979, was a participant in the National-Standard Plan and who became a participant of this Plan as of January 1, 1980, by reason of the adoption of this Plan by Cheney Bigelow.

(e) <u>National-Standard Plan Benefit</u> - The accrued benefit of a Cheney Bigelow participant in the National-Standard Plan as of December 31, 1979, as determined in accordance with subparagraph (b) of Subsection A-7 to Supplement A of the National-Standard Plan.

B. <u>Increased and Minimum Benefit to Cheney Bigelow Participant</u> - In addition to the benefit to which he may be entitled upon his retirement or termination pursuant to any of the provisions of Sections 3.01, 3.02, 3.03, 3.04, or 6.04 of this amended and restated Plan, a Participant who is a Cheney Bigelow Participant shall also be entitled to receive an additional amount equal to his National-Standard Plan Benefit. Notwithstanding the provisions of Section 6.04 of this amended and restated Plan, each Cheney Bigelow Participant, upon his termination pursuant to Section 6.04 shall receive a benefit not less than his National-Standard Benefit.

C. <u>Credit for Employment with Cheney Bigelow</u> - The employment of any person as a salaried employee of Cheney Bigelow prior to January 1, 1980, shall be credited for purposes of eligibility and Vesting Service.  Such employment shall not be credited for purposes of Benefit Service.

APPENDIX E

SPECIAL PROVISIONS APPLICABLE TO PARTICIPANTS
OF THE RIEGEL HOURLY PLAN
AS OF DECEMBER 31, 1986

1.    <u>Early Retirement Date and Benefit</u> - Notwithstanding the provisions of Section 3.03 and Section 4.03 to the contrary, a Participant of the Riegel Hourly Plan on December 31, 1986, may retire on the first day of any month coinciding with or next following his attainment of age fifty-five (55) or more.  Subject to the conditions on the commencement of such benefit pursuant to Section 4.03, if the benefit commences at the Participant's Early Retirement Date, the amount of such monthly retirement benefit shall be equal to the Participant's Past Service Benefit as of December 31, 1986 under Section 4.01(a) as of his Early Retirement date reduced by one-fourth (1/4) of one percent (1%) for each full month by which his Early Retirement Date precedes his Normal Retirement Date, plus one-sixth (1/6) of one percent (1%) for each full month by which his Early Retirement Date precedes his sixtieth (60th) birthday.  If the benefit commences at the Participant's Normal Retirement Date, the benefit shall be equal to the Participant's Past Service Benefit as of December 31, 1986 under Section 4.01(a) as of his Normal Retirement Date.

In addition, for purposes of Section 6.04, a Participant covered hereunder who terminates employment after completing at least ten (10) years of Benefit Service may elect to commence the above benefit with appropriate reductions on the first day of any month after attaining the age of fifty-five (55).

2.    <u>Special Definitions Applicable to this Appendix E</u> -

(a) <u>Dallas/Mason Profit-Sharing Account</u> means the amount held by New York Life Insurance Company as of June 30, 1980 under Group Annuity Contract GA-1010 as a

profit-sharing account for the benefit of a Participant who was an Employee of either Dallas Sports Knitting Company, Inc. or Mason Athletic Company, Inc. under the terms of the Dallas Sports Knitting Company Pension Plan as in effect on such date for the Employees of Dallas Sports Knitting Company, Inc. and Mason Athletic Company, Inc. plus interest thereon from and after July 1, 1980, at the rate at which earnings were credited on the investments of the Fund until the earlier of such Participant's Normal Retirement Date, Early Retirement Date, Disability Retirement Date, or such other date on which such amount is distributed to the Participant or his Beneficiary.

(b) Profit-Sharing Plan shall mean the Profit-Sharing Retirement Plan of Riegel Textile Corporation for its Non-Salaried Employees as amended through the Eleventh Amendment as constituted and in effect on December 31, 1978.  Effective January 1, 1979, the Profit-Sharing Plan was amended and restated and the provisions of the Plan as set forth in the Riegel Hourly Plan became applicable with respect to benefits based on the fully vested shares of former members in the Profit-Sharing Plan who retire or whose employment terminates on and after January 1, 1979.  The terms and provisions of the Profit-Sharing Plan as in effect from time to time prior to January 1, 1979, governed the payment of benefits to members of the Profit-Sharing Plan who retired or whose employment was terminated prior to January 1, 1979.

(c) Profit-Sharing Account shall mean the separate account established and maintained by the Plan Administrator in the name of an individual pursuant to the provisions of Article XI of the Riegel Hourly Plan and Section 12 of this Appendix E.

(d) Profit-Sharing vesting Percentage of a Participant shall mean the percentage of the balance credited to such Participant's account as a member of the Profit-Sharing Plan

to which such member would have been entitled following his retirement after age fifty-five (55) or "Termination of Service" (as defined in such Profit-Sharing Plan) determined under the provisions of the Profit-Sharing Plan as of the date of the Participant's Termination of Employment as if such Profit-Sharing Plan had not been amended to such date.

(e) <u>Suspended Participant</u> shall mean an individual whose status as a member of the Profit-Sharing Plan remained suspended on December 31, 1978, in accordance with Sections 2.08 and 2.09 of the Profit-Sharing Plan, and to whom the provisions of Article XVIII of the Riegel Hourly Plan applied and which are provided for in Section 13 of this Appendix E.

(f) <u>Past Service Benefit</u> as of any date shall mean the greater of (1) the amount determined by multiplying two dollars ($2.00) by the number of such Participant's "Years of Past Service," or (2) the amount of monthly retirement benefit payable to the Participant solely during his life with five (5) years of payments guaranteed commencing on his Normal Retirement Date which may be provided by the amount credited to such Participant's Profit-Sharing Account as of January 1, 1979.

(g) <u>Years of Past Service</u> shall mean the aggregate number of years (including fractions thereof) of a Participant's continuous service (i) as an Employee of a company which was a Participating Company in the Profit-Sharing Plan on January 1, 1965, and (ii) as an Employee of a company during such time as it was an Affiliated Company (as defined in the Profit-Sharing Plan), commencing on the January 1, or July 1 such employee had either completed three (3) "Years of Service," as defined in the Profit-Sharing Plan, or had attained the age of twenty-five (25) and completed one (1) Year of

Service, and ending on December 31, 1978. "Years of Past Service" shall also mean the aggregate number of twelve (12) consecutive month periods ending on or before December 31, 1978, during which a Participant was a Salaried Employee of a company which during such periods was a Participating Company in the Profit-Sharing Plan, and for whom no benefit was accrued under a Defined Benefit Plan, if any, maintained by such Participating Company with respect to such periods of such individual's employment by such Participating Company.

3.  Special Provisions Applicable to a Participant of the Riegel Hourly Plan to Withdraw his Profit-Sharing Account at Retirement - A Participant who retires pursuant to the provisions of Sections 3.01, 3.02, 3.03, or 3.04 of the amended and restated Plan may elect, in a writing delivered to the Plan Administrator, to receive a distribution, to be paid as soon as practicable after the date the Participant retires pursuant to the provisions of Sections 3.01, 3.02, 3.03, or 3.04, of the dollar amount credited to his Profit-Sharing Account as of such date.  In the event the Participant makes the election described in this Section 3 of this Appendix E, his monthly retirement benefit payable at his Normal Retirement Date, Delayed Retirement Date, Early Retirement Date, or Disability Retirement Date, and any other monthly retirement benefit payable to the Participant or any other person under the Plan which is determined by reference to such Participant's normal, delayed, early, or disability retirement benefit shall be calculated (i) by eliminating therefrom any Past Service Benefit, as of December 31, 1986, pursuant to Subsection (f) of Section 2 of this Appendix E, of the Participant, (ii) by eliminating from the Past Service Benefit, as of December 31, 1986, pursuant to Section 4.01(a) of this amended and restated Plan, the amount attributable to his Profit-Sharing Account, and (iii) by increasing the amount so

determined by the excess, if any, of (a) the amount determined by multiplying two dollars ($2.00) by the number of the Participant's Years of Past Service, over (b) the amount of monthly retirement benefit payable to the Participant solely during his life with payments guaranteed for five (5) years commencing on his Normal Retirement Date which could have been provided by the Participant's Profit-Sharing Account as of January 1, 1979.  In the event a Participant who retires pursuant to the provisions of Section 3.01 makes the election described in this Section 3, the amount of his normal monthly retirement benefit determined as of December 31, 1986 under Section 4.01(a) of this Plan shall be reduced by the amount of such Accrued Benefit which could have been provided by the Participant's Profit-Sharing Account.

4.  <u>Special Provision Applicable to a Participant of the Riegel Hourly Plan to Withdraw his Dallas/Mason Profit-Sharing Account at Retirement</u> - A Participant who retires pursuant to the provisions of Sections 3.01, 3.02, 3.03, or 3.04 of the Plan may elect, in a writing delivered to the Plan Administrator, to receive a distribution, to be paid as soon as practicable after the date the Participant retires pursuant to the provisions of Sections 3.01, 3.02, 3.03, or 3.04, of the dollar amount credited to his Dallas/Mason Profit-Sharing Account as of such date.  In the event the Participant makes the election described in this Section 4, his monthly retirement benefit payable at his Normal Retirement Date, Delayed Retirement Date, Early Retirement Date, or Disability Retirement Date, or any other monthly retirement benefit payable to the Participant or any other person under the Plan which is determined by reference to such Participant's normal, delayed, early, or disability retirement benefit, shall be calculated by eliminating therefrom, the portion of such benefit which could have been purchased with such Participant's Dallas/Mason Profit-Sharing

Account as of the date of such retirement.  In the event a Participant who retires pursuant to the provisions of Section 3.01 makes the election described in this Section 4, the amount of his monthly retirement benefit determined as of December 31, 1986 under Section 4.01(a) of the amended and restated Plan, shall be reduced by the amount of monthly retirement benefit which could have been provided by the Participant's Dallas/Mason Profit-Sharing Account.

5.    <u>Special Provision Applicable to a Participant of the Riegel Hourly Plan to Request the Distribution of his Dallas/Mason Profit-Sharing Account</u> - A Participant who was an Employee of either Dallas Sports Knitting Company, Inc. or Mason Athletic Company, Inc. on June 30, 1980, may at any time request, in a writing delivered to the Plan Administrator, a distribution to him of the dollar amount then credited to his Dallas/Mason Profit-Sharing Account.  The Plan Administrator shall have the sole and absolute discretion either to grant or deny such request, exercised in a uniform and nondiscriminatory manner.  In the event the Plan Administrator grants such a request, such Participant's monthly retirement benefit payable at his Normal Retirement Date, Delayed Retirement Date, Early Retirement Date, or Disability Retirement Date, or any other monthly retirement benefit payable to the Participant or any other person under the Plan which is determined by reference to such Participant's normal, delayed, early, or disability retirement benefit shall be calculated by eliminating therefrom the portion of such benefit which could have been purchased with such Participant's Dallas/Mason Profit-Sharing Account.

6.    <u>Special Provisions Applicable to Participant of the Riegel Hourly Plan to Request a Lump-Sum Payment of his Profit-Sharing Account at his Disability Retirement Date</u> - A

Participant who is retired in accordance with Section 3.04 shall be entitled to elect, in a writing delivered to the Plan Administrator, to receive a distribution of cash in a lump sum of the dollar amount credited to his Profit-Sharing Account as of his Disability Retirement Date. Such election may be made at any time prior to the first payment to the Participant of his disability retirement benefit. In the event the Participant makes the election provided herein, the amount of his Past Service Benefit as of December 31, 1986 shall be deemed to be the excess, if any, of (a) the amount determined by multiplying two dollars ($2.00) by his Years of Past Service, over (b) the amount of monthly retirement benefit which could have been provided by his Profit-Sharing Account.

7.  <u>Special Provision Applicable to a Participant of the Riegel Hourly Plan to Request a Lump-Sum Payment of his Dallas/Mason Profit-Sharing Account at his Disability Retirement Date</u> - A Participant who is retired in accordance with the provisions of Section 3.04 shall be entitled to elect, in a writing delivered to the Plan Administrator, to receive a distribution in a lump sum in cash equal to the dollar amount credited to his Dallas/Mason Profit-Sharing Account as of his Disability Retirement Date. Such election may be made at any time prior to the first payment to the Participant of his disability retirement benefit. In the event the Participant makes the election described in this Section 7, the amount of his disability retirement benefit computed under Section 4.04 shall be reduced by the amount of disability retirement benefit that could have been purchased with the dollar amount credited to his Dallas/Mason Profit-Sharing Account of his Disability Retirement Date.

8.  <u>Special Provision Applicable on Termination of Employment for a Participant of the Riegel Hourly Plan to Withdraw his Profit-Sharing Account</u> - A terminated Participant who is also a member of the Profit-Sharing Plan may elect at any time prior to his termination of

employment to receive a distribution in cash in a lump sum payable as soon as practicable after his termination of employment the amount determined by multiplying the Participant's Profit-Sharing Vesting Percentage by the amount credited to his Profit-Sharing Account as of the date of such Participant's termination of employment.  Unless such Participant repays to the Fund the dollar amount distributed to him pursuant to his Section 8 prior to the time he incurs a period of five (5) consecutive One Year Breaks in Service, such Participant's Past Service Benefit as of December 31, 1986 shall be limited to the amount of monthly retirement benefit which may be provided by the amount remaining credited to his Profit-Sharing Account as of the date his Past-Service Benefit as of December 31, 1986, is to be determined, plus the excess, if any, of (i) the amount determined by multiplying two dollars ($2.00) by the number of his Years of Past Service over (ii) the amount of monthly retirement income which could have been provided by his Profit-Sharing Account.

The amount remaining credited to the Profit-Sharing Account of a terminated Participant following the distribution, if any, made to the Participant pursuant to the provisions of this Section 8 shall continue to be maintained in such Profit-Sharing Account subject to the continuing adjustments made pursuant to Article XI of the Riegel Hourly Plan and Section 12 of this Appendix E until the earlier to occur of  (a) the Participant's death, (b) the first day of the month next following the date the Participant makes an election described in Section 6.04, or (c) the Participant's Normal Retirement Date.

If the Participant shall die prior to having made an election described in Section 6.04 and prior to his Normal Retirement Date, the Participant's surviving spouse or (if the Participant has designated another Beneficiary to receive his Profit-Sharing Account of if

the Participant shall leave no surviving spouse) his Beneficiary shall have the right to elect to receive a distribution in a lump sum in cash of the dollar amount remaining credited to such Participant's Profit-Sharing Account as of the date of his death.

At any time prior to the earlier to occur of (a) the Participant's Normal Retirement Date or (b) the date upon which payments to the Participant of the monthly retirement benefit provided for in Section 6.04 are to commence pursuant to an election made by the Participant pursuant to Section 6.04, the Participant may elect to receive as soon as practicable after the earlier to occur of such dates a distribution in a lump sum in cash of the dollar amount remaining credited to his Profit-Sharing Account on the earlier to occur of such dates. In such case, the monthly retirement benefit described in Section 6.04 shall be computed in the manner therein prescribed, but by limiting any Past Service Benefit as of December 31, 1986, of the Participant to the excess, if any, of the amount determined by multiplying two dollars ($2.00) by the number of his Years of Past Service, over the amount of monthly retirement income which could have been provided by his Profit-Sharing Account.

9. <u>Special Provision Applicable on Termination of Employment for a Participant of the Riegel Hourly Plan to Withdraw his Dallas/Mason Profit-Sharing Account</u> - A Participant described in Section 6.04 may elect at any time prior to his termination of employment to receive a distribution in cash in a lump sum payable as soon as practicable after his termination of employment of the dollar amount credited to his Dallas/Mason Profit-Sharing Account as of the date of his termination of employment. In such event, the amount of the Participant's monthly retirement benefit determined pursuant to Section 6.04 shall be reduced by the amount of monthly retirement income which could have been purchased

with his Dallas/Mason Profit-Sharing Account as of the date of his termination of employment.

10.  Special Provision Applicable to the Spouse of a Participant of the Riegel Hourly Plan Entitled to a Benefit Pursuant to Section 5.04, 6.01, or 6.02 to Elect a Lump-Sum Payment of the Participant's Profit-Sharing Account or Dallas/Mason Profit-Sharing Account - In the event of the death of a Participant who leaves a Spouse surviving him who is entitled to a monthly retirement benefit pursuant to the provisions of Section 5.04, 6.01, or 6.02, his surviving Spouse shall be entitled to elect, in a writing delivered to the Plan Administrator, at any time prior to the expiration of ninety (90) days following receipt by such Spouse from the Plan Administrator of an explanation written in non-technical language of the availability of the practical dollar effect of such election to receive a distribution of cash in one lump sum, payable as soon as practicable after such election is made, of the dollar amount credited to the Participant's Profit-Sharing Account or Dallas/Mason Profit-Sharing Account as of the date of the Participant's death.

If a surviving Spouse of a Participant elects to receive a distribution of cash in one lump sum of the dollar amount credited to the Participant's Profit-Sharing Account as of the date of the Participant's death pursuant to the provisions of this Section 10, the monthly retirement benefit payable to such surviving Spouse pursuant to the provisions of Section 5.04, 6.01, or 6.02 shall be calculated by eliminating therefrom any Past Service Benefit as of December 31, 1986 of the Participant, and by increasing the amount so determined by the excess, if any, of (a) the amount determined by multiplying two dollars ($2.00) by the number of the Participant's Years of Past Service, over (b) the amount of monthly retirement benefit payable to the Participant solely during his life commencing on

the date of the Participant's death which could have been provided by the amount credited to the Participant's Profit-Sharing Account as of January 1, 1979.

If a surviving Spouse of a Participant elects to receive a distribution in cash in one lump sum of the dollar amount credited to the Participant's Dallas/Mason Profit-Sharing Account as of the date of the Participant's death pursuant to the provisions of this Section 10, the monthly retirement benefit payable to such surviving Spouse pursuant to the provisions of Sections 5.04, 6.01, or 6.02 of the Plan shall be reduced by the amount of such benefit which could have been provided by such Participant's Dallas/Mason Profit-Sharing Account as of the date of such Participant's death.

11. <u>Special Provision Related to Death Benefits for Participants of the Riegel Hourly Plan with a Profit-Sharing Account or a Dallas/Mason Profit-Sharing Account</u> - If a Participant dies prior to his sixty-fifth (65th) birthday and prior to his termination of employment or retirement pursuant to the provisions of Sections 3.01 or 3.02 of the Plan, and if he does not leave a surviving Spouse who is entitled to a monthly retirement benefit pursuant to the provisions of Sections 6.01 or 6.02, there shall be distributed to the Participant's Beneficiary, as soon as practicable following receipt by the Plan Administrator of proof satisfactory to it of the Participant's death, in cash in one lump sum the dollar amount credited to the Participant's Profit-Sharing Account or Dallas/Mason Profit-Sharing Account as of the date of the Participant's death.

Upon the death of the survivor of the Participant and his surviving Spouse or his Beneficiary, as the case may be, after payments of a monthly retirement benefit have commenced pursuant to the provisions of the Plan, there shall be distributed to the estate

of such survivor in cash in a lump sum the balance then credited to the Participant's Profit-Sharing Account or Dallas/Mason Profit-Sharing Account.

If a Participant dies after his sixty-fifth (65th) birthday but prior to his termination of employment or retirement pursuant to the provisions of Sections 301 or 3.02 and if he does not leave a surviving Spouse who is entitled to a monthly retirement benefit pursuant to the provisions of the Plan, or a Beneficiary who is entitled to a monthly retirement benefit pursuant to election of an optional form of benefit payment pursuant to the provisions of Section 5.02 of the Plan, there shall be distributed to the Participant's Beneficiary in cash in one lump sum the balance then credited to the Participant's Profit-Sharing Account or Dallas/Mason Profit-Sharing Account.

A Participant may designate a Beneficiary to receive any or all of his benefits under this Section 11 or under any other provision of the Plan which calls for payments to be made to the Participant's Beneficiary.  Notwithstanding the foregoing, for purposes of this Section 11, the Beneficiary of a Participant shall be the person previously designated by a Participant as a Member of the Profit-Sharing Plan unless and until he revokes or changes such designation in writing on a form furnished by the Plan Administrator.  If a married Participant designates a Beneficiary other than his Spouse, such Spouse must consent to such designation in the manner provided in IRC Section 417(a)(2) and consistent with regulations issued by the Secretary of the Treasury.  If a deceased Participant shall have failed to designate a Beneficiary, or if the designated Beneficiary fails to survive the Participant, the Participant's Spouse shall be the Beneficiary or, if there is no Spouse, the Participant's estate shall be the Beneficiary.

If a Participant dies after his Early Retirement Date and (a) does not have in effect an optional form of payment as described in Section 5.02, (or in the Appendix), and (b) does not leave a surviving Spouse who is entitled to a monthly retirement benefit pursuant to the provisions of Section 6.01 of the Plan, there shall be distributed to the Participant's Beneficiary, as soon as practicable following receipt by the Plan Administrator of proof satisfactory to it of the Participant's death, in cash in one lump sum the dollar amount credited to the Participant's Profit-Sharing Account or Dallas/Mason Profit-Sharing Account.

12.   <u>Special Provisions Applicable to Funds Held for Profit-Sharing Accounts and Dallas/Mason Profit-Sharing Accounts</u> - All assets of the Fund held by the Trustee under the Profit-Sharing Plan on December 31, 1978, thereafter constituted a part of the Fund of the Riegel Hourly Plan.

The Plan Administrator, under the Riegel Hourly Plan, established and maintained separate accounts ("Profit-Sharing Accounts") for and in the name of (a) each Member of the Profit-Sharing Plan who became a Participant in the Plan on January 1, 1979, pursuant to the provisions of Section 2.01 of the Riegel Hourly Plan in effect on such date, (b) each Employee who becomes a Participant on January 1, 1979, pursuant to Section 2.02 of the Riegel Hourly Plan in effect on such date, (c) each individual entitled to receive on or after January 1, 1979, the benefits described in Section 5.01(b)(2) of the Profit-Sharing Plan, (d) each member of the Profit-Sharing Plan who becomes a Suspended Participant on January 1, 1979, pursuant to the provisions of Article XVIII of the Riegel Hourly Plan and Section 13 of this Appendix E, and (e) each individual (a "Former Member') who was a member of the Profit-Sharing Plan whose "Termination of Service"

(as defined in the Profit-Sharing Plan) occurred on or before December 31, 1978, and for whom an account in the Fund of the Profit-Sharing Plan would have continued to be maintained on and after January 1, 1979, pursuant to the provisions of Section 5.02(d) of the Profit-Sharing Plan.

Each Profit-Sharing Account established pursuant to the provisions in this Section 12 shall be credited as of January 1, 1979, with the amount which would have remained credited to such individual's account under the Profit-Sharing Plan as of January 1, 1979, pursuant to the terms thereof as constituted on December 31, 1978, so that the total of the amounts credited to the Profit-Sharing Accounts shall equal the aggregate amounts which would have remained credited to the accounts which would have been maintained on January 1, 1979, under the terms of the Profit-Sharing Plan.

The aggregate amounts credited to all Profit-Sharing Accounts on January 1, 1979, shall equal the net worth of the Fund on that date.

The amounts of contributions made to the Fund on or after January 1, 1979, in satisfaction of the liability of the Participating Companies to make the contributions required by Article III of the Profit-Sharing Plan for the fiscal year ended September 30, 1978, shall be held and invested as part of the assets of the Fund under the Riegel Hourly Plan.

The amount of any payments made to the Fund by former members on or after January 1, 1979, pursuant to the provisions of Section 5.02(d) of the Profit-Sharing Plan, shall be held and invested as part of the assets of the Fund under the Riegel Hourly Plan, and shall be credited to the Profit-Sharing Account of the former member making the payment as of the date such payment is made to the Fund.

The amount credited to the Fund on or after January 1, 1979, hereunder shall be credited to the Profit-Sharing Accounts at the time and in the manner described in Section 4.02 of the Profit-Sharing Plan, determined as if the Profit-Sharing Plan as constituted on December 31, 1978 remained unchanged.

Each Profit-Sharing Account shall be credited from time to time with interest at the rate of six percent (6%) per annum from the date amounts are credited to such Profit-Sharing Account pursuant to the other provisions of this Section 12.

Payments of benefits described in Sections 5.01(b)(2) and 5.02(d) of the Profit-Sharing Plan shall be charged against the Profit-Sharing Account of the individual with respect to whom such benefits are required to be paid pursuant to such provisions of the Profit-Sharing Plan.

Payments of any cash distribution in a lump sum of the amount of any Profit-Sharing Account or Dallas/Mason Profit-Sharing Account to a Participant, Beneficiary, surviving Spouse of a Participant, Beneficiary, estate of any of the foregoing, or any other person entitled to receive a lump-sum distribution of a Profit-Sharing Account or Dallas/Mason Profit-Sharing Account pursuant to the provisions of the Plan, shall be charged against the Profit-Sharing Account or Dallas/Mason Profit-Sharing Account involved.

Each monthly payment of any monthly retirement benefit attributable to a Participant's Profit-Sharing Account or Dallas/Mason Profit-Sharing Account that is paid to a Participant, surviving Spouse, Beneficiary, or the estate of any of the foregoing, pursuant to the provisions of the Plan shall be charged against the Profit-Sharing Account or Dallas/Mason Profit-Sharing Account of the Participant involved.

All contributions to the Fund made by the Participating Companies hereunder shall be held and invested as part of the Fund.

The Fund shall be increased by any profits or income thereon, and decreased by any losses incurred, and any payments made therefrom under the Plan or in satisfaction of benefits described in Section 5.01(b)(2) and 5.01(d) of the Profit-Sharing Plan.

The Plan Administrator shall establish and maintain separate accounts ("Dallas/Mason Profit-Sharing Accounts") for and in the name of each Participant who was an Employee of either Dallas Sports Knitting Company, Inc. or Mason Athletic Company, Inc. on July 1, 1980 and for whose benefit funds attributable to such Participant's participation in the profit-sharing plan formerly maintained by Dallas Sports Knitting Company, Inc. and Mason Athletic Company, Inc. were held by New York Life Insurance Company.  The Dallas/Mason Profit-Sharing Accounts so established shall be (a) credited as of the date of each transfer with the amount transferred to the Plan by New York Life Insurance Company for each such Participant and (b) maintained and administered in accordance with this Section 12.  The Dallas/Mason Profit-Sharing Account so established shall be (a) credited as of the date of each transfer with the amount transferred to the Plan by New York Life Insurance Company for each such Participant; (b) maintained and administered in accordance with the provisions of this Section 12; and (c) distributed in accordance with the procedures of the Plan.  Amounts transferred from New York Life Insurance Company pursuant to this Section 12 shall be held by the Trustee and constitute part of the Fund of the Plan.

13.    Special Provisions Applicable to Suspended Participants of the Riegel Hourly Plan - An individual whose status as a Member of the Profit-Sharing Plan remains suspended on

December 31, 1978, pursuant to Sections 2.08 or 2.09 of the Profit-Sharing Plan shall not become a Participant in the Plan on January 1, 1979. Except and to the extent it is otherwise provided in this Section 13 until such Suspended Participant becomes a Participant in the Riegel Hourly Plan or this Plan pursuant to the provisions of Article II of the Riegel Hourly Plan or this Plan, he shall not be regarded as a Participant in the Plan for any purpose other than Article XI and Section 17.09 of the Riegel Hourly Plan, and the special provisions of this Section 13 shall govern such Suspended Participant's rights under the Plan and any rights he may have under the Profit-Sharing Plan.

An individual's status as a Suspended Participant shall cease upon his becoming a Participant in the Plan pursuant to Article II of the Plan, and thereafter all of the provisions of the Plan other than this Section 13 shall apply to him.

As soon as practicable following receipt by the Plan Administrator of proof satisfactory to it of the death of a Suspended Participant prior to his termination of employment or retirement, there shall be distributed to the Suspended Participant's surviving Beneficiary in cash in one lump sum the dollar amount credited to the Suspended Participant's Profit-Sharing Account as of the date of his death. If no Beneficiary is named or if none survives, the cash distribution shall be made to the Suspended Participant's estate.

Except as otherwise provided in this Section 13, in the event a Suspended Participant shall retire or otherwise terminate his employment with the Affiliated Companies, such Participant shall be entitled to receive, as soon as practicable after he submits a claim therefor, a distribution in cash in one lump sum of the dollar amount credited to the Suspended Participant's Profit-Sharing Account as of the date of his retirement or other termination of employment.

A Suspended Participant who is a Salaried Employee of a Participating Company on January 1, 1979, and who retires on or after his Normal Retirement Date and prior to his Termination of Employment, shall be deemed to be a Participant in the Plan for purposes of the Past Service Benefit and Years of Past Service of the Riegel Hourly Plan.  Upon his retirement from the employ of a Employer on or after his Normal Retirement Date, he shall, unless he elects to file the claim as described in the preceding paragraph of this Section 13 prior to the date of his retirement, receive his Past Service Benefit as of December 31, 1986, as his normal retirement benefit in the manner, at the times and with the elections set forth in Article IV and Article V of this amended and restated Plan.  Upon the death of the Suspended Participant after payments to the Suspended Participant have begun, or upon the death of the survivor of the Suspended Participant and his surviving Spouse after payments to the Suspended Participant or his surviving Spouse have begun, the excess, if any, then remaining credited to the Suspended Participant's Profit-Sharing Account shall be distributed to the estate of the Participant or his surviving Spouse, whichever is applicable.

Following any cash distribution made pursuant to this Section 13, the Participant, his estate, his Beneficiary, his surviving Spouse, or any other person claiming through him, shall have no further rights under the Plan or Profit-Sharing Plan or to any assets constituting a part of the Funds of either of such Plans.

APPENDIX F

SPECIAL PROVISIONS APPLICABLE TO PARTICIPANTS
OF THE RIEGEL SALARIED PLAN
AS OF DECEMBER 31, 1986

1.    <u>Early Retirement Date and Benefit</u> - Notwithstanding the provisions of Section 3.03 and Section 4.03 to the contrary, a Participant of the Riegel Salaried Plan on December 31, 1986, may retire on the first day of any month coinciding with or next following his attainment of age fifty-five (55) or more.  Subject to the conditions on the commencement of such benefit pursuant to Section 4.03, if the benefit commences at the Participant's Early Retirement Date, the amount of such monthly retirement benefit shall be equal to the Participant's Past Service Benefit as of December 31, 1986, under Section 4.01(a) as of his Early Retirement Date reduced by .25% for each of the first sixty (60) months and .4167% for each of the next sixty (60) months by which the Participant's Early Retirement Date precedes his Normal Retirement Date.  If the benefit commences at the Participant's Normal Retirement Date, the benefit shall be equal to the Participant's Past Service Benefit as of December 31, 1986, under Section 4.01(a) as of his Normal Retirement date.

In addition, for purposes of Section 6.04, a Participant covered hereunder who terminates employment after completing at least ten (10) years of Benefit Service may elect to commence the above benefit with appropriate reductions on the first day of any month after attaining the age of fifty-five (55).

2.    <u>Definitions Applicable to this Appendix F</u> - For purposes of this Appendix F, the following definitions shall be applicable.

(a) <u>1971 Accrued Annuity</u> - The aggregate amount of retirement benefit, expressed as an annuity for the life of the Participant only, which was accrued as of December 30, 1971

under Group Annuity Contract GR-153 issued by Connecticut General Life Insurance Company to Riegel Textile Corporation effective December 30, 1941, as amended, such benefit being further adjusted as provided under the terms of the Prior Plan.

(b) <u>Prior Plan</u> - The qualified retirement income plan as maintained for salaried employees with respect to periods of time before July 1, 1985.

(c) <u>Credited Interest</u> - Interest credited on mandatory contributions made to the Prior Plan by a Participant at the rate applicable under the terms of the Prior Plan for periods of time before December 31, 1976, and at the rate of six percent (6%) per annum for periods of time thereafter or such greater rate as shall be provided in regulations of the Secretary of Treasury pursuant to IRC Section 411(c)(2)(D) and interest credited on a Participant's Dallas/Mason Profit-Sharing Account from and after July 1, 1980, at the rate at which earnings were credited on the investments of the Trust Fund.

(d) <u>Dallas/Mason Profit-Sharing Account</u> - The account maintained by the Plan Administrator under the terms of the Prior Plan to which is credited the amount attributable to a Participant's participation in the profit-sharing plan formerly maintained by Dallas Sports Knitting Company, Inc., and Mason Athletic Company, Inc., together with Credited Interest on such amount.

3.  <u>Special Provision for Participants of the Riegel Salaried Plan to Elect to Withdraw Participant Contributions Plus Credited Interest</u> - Notwithstanding anything contained herein to the contrary, a Participant may elect in writing at any time after his or her termination of employment and before the date his or her retirement benefits commence pursuant to the provisions of the Plan to receive a lump-sum distribution equal to the amount of such Participant's mandatory contributions to the Prior Plan, if any, plus

Credited Interest.  If the Participant is married on the date on which he or she makes the withdrawal provided by this Section 3 of this Appendix F, such Participant's election shall not be effective unless his Spouse consents to such withdrawal in writing in the manner required by IRC Section 417(a)(2) and the regulations issued pursuant thereto, unless such Spouse cannot be located or such Spouse's consent is otherwise determined to be unnecessary for reasons consistent with IRC Section 417(a)(2) and the regulations issued pursuant thereto.  If a Participant makes the election provided by this Section 3, his vested benefits payable under the provisions of the Plan shall be determined by reducing his Accrued Benefit by the portion of such Participant's 1971 Accrued Annuity attributable to the Participant's mandatory contribution to the Prior Plan, determined by using the actuarial assumptions specified in Appendix A to the Plan.

4.  <u>Special Provision for Participants of the Riegel Salaried Plan to Elect to Withdraw Dallas/Mason Profit-Sharing Account</u> - Notwithstanding anything to the contrary in the Plan, a Participant may, within sixty (60) days after his termination of employment for any reason other than death, elect to receive a distribution of a lump sum in cash equal to the dollar amount then credited to his Dallas/Mason Profit-Sharing Account.  If the Participant is married on the date on which he makes the election provided by this Section 4 of this Appendix F, such Participant's election shall not be effective unless his Spouse consents to the distribution in writing in the manner required by IRC Section 417(a)(2) and the regulations issued pursuant thereto, unless such Spouse cannot be located or such Spouse's consent is otherwise determined to be unnecessary for reasons consistent with IRC Section 417(a)(2) and the regulations issued pursuant thereto.   In the event a Participant makes the election described herein, the retirement benefit otherwise payable

to him shall be reduced by the amount of annual benefit which can be purchased with such Participant's Dallas/Mason Profit-Sharing Account, using the actuarial assumptions specified in Appendix A.

5.     <u>Special Provisions Applicable Upon the Death of a Participant in the Riegel Salaried Plan</u> -

    A.   <u>Election by Spouse Regarding Dallas/Mason Profit-Sharing Account</u> - A Participant's Spouse who becomes entitled to receive benefit payments under Sections 5.04, 6.01, or 6.02 may, within sixty (60) days after the Participant's death, elect to receive a distribution of a lump sum in cash equal to the dollar amount credited to such Participant's Dallas/Mason Profit-Sharing Account, if any. In the event the Participant's Spouse makes the election provided by this Subsection A, the benefits otherwise payable to such Spouse under Sections 5.04, 6.01, or 6.02, whichever is applicable, shall be reduced by the portion of the benefit attributable to such Participant's Dallas/Mason Profit-Sharing Account.

    B.   <u>Death of an Unmarried Participant</u> - If a Participant dies before beginning to receive benefits hereunder and is not married at the date of his death, his Beneficiary shall be entitled to receive the amount of the Participant's mandatory contributions made to the Prior Plan, if any, plus Credited Interest and the amount of the Participant's Dallas/Mason Profit-Sharing Account, if any. If such Participant has not made any such contributions and does not have a Dallas/Mason Profit-Sharing Account, no death benefits shall be payable under the Plan with respect to such Participant.

    C.   <u>Special Provisions Applicable at Death of a Spouse in Receipt of Benefits</u> - Upon the death of a Spouse of a Participant who is receiving a death benefit pursuant to Sections 5.04, 6.01, or 6.02, such Participant's Beneficiary shall be entitled to receive a

lump-sum payment equal to the difference, if any, between (x) the sum of the Participant's mandatory contributions to the Prior Plan, if any, plus Credited Interest and the Participant's Dallas/Mason Profit-Sharing Account, and (y) the total amount of retirement benefit payments actually made to such Spouse pursuant to Sections 5.04, 6.01, or 6.02.

D. <u>Special Post-Retirement Death Benefit</u> - On the death of a Participant and his Spouse or Beneficiary after benefits have commended hereunder, such Participant's Beneficiary determined pursuant to Subsection E following shall be entitled to receive a lump-sum payment equal to the difference, if any, between (x) the sum of the Participant's mandatory contributions to the Prior Plan, if any, plus Credited Interest and the Participant's Dallas/Mason Profit-Sharing Account, and (y) the total amount  of retirement benefit payments received by the Participant and his Spouse or Beneficiary under the form of benefit payment actually used.

E. <u>Designation of Beneficiary for Purposes of this Appendix F</u> - Each Participant shall designate a Beneficiary to receive the death benefits, if any, which may be due under the terms of Section 5 of this Appendix F following the death of a Participant and, if applicable, his Spouse or Beneficiary.  The Beneficiary of a Participant may be any person or legal entity designated in writing by the Participant at the time and in the manner provided by the Plan Administrator pursuant to uniform rules; provided, however, that if a Participant is married at the date of his death such Participant's Beneficiary shall be his Spouse unless such Spouse consents in writing to the designation of another Beneficiary in the manner provided by IRC Section 417(a)(2) and the regulations issued pursuant thereto, except that such consent shall not be

required if such Spouse cannot be located or such consent is otherwise determined to be unnecessary under guidelines consistent with IRC Section 417(a)(2).    Any designation, once made, may be revoked by the Participant and new designation made following the procedures of this Subsection E.    If a Participant designates no Beneficiary pursuant to the procedures outlined above or if no designated Beneficiary survives, such Participant's Spouse, if surviving, shall be the Beneficiary, and, if not, his estate shall be the Beneficiary.

APPENDIX G
SPECIAL PROVISIONS APPLICABLE TO WEST COAST EMPLOYEES
AS OF JANUARY 1, 1998

1. <u>Employer</u>.  With respect to this Appendix G, these provisions apply to the following Employers:

Pamplin Communications Corporation (PCC); Christian Supply Center, Inc.; Pamplin Entertainment Corporation; Pamplin Music Corporation; Pamplin Foundation; The Pastor Of Christ Community Church And His Successors, A Corporation Sole (the Pastor); Columbia Empire Farms, Inc. (CEF); Pamplin Broadcasting-Oregon, Inc.; Pamplin Broadcasting-Washington, Inc.; United Tile Corp.; United Tile Co., Inc.; and Sonoma Tilemakers, Inc.

2. <u>Employees</u>. The following employees shall be credited with Years of Service for eligibility, vesting, Benefit Service, and benefit accruals effective from their initial date of employment with the respective Employers as noted above subject to the eligibility and participation rules of Article II of the Plan:

Arthur North, PCC/CEF

Thomas Rogers, CEF

Leverett Miller, CEF

All employees of the Pamplin Foundation at January 1, 1998

The Pastor at January 1, 1998.

All remaining employees of the Employers listed in Section 1 above will be credited with eligibility, vesting and benefit service from their initial employment date subject to the eligibility and participation rules of Article II of the Plan with benefit accruals effective beginning January 1, 1998.

# ARTICLE XIII

## ADOPTION OF PLAN AND TRUST

Anything herein to the contrary notwithstanding, this Plan is amended and maintained under the condition that it shall continue to be approved and qualified by the Internal Revenue Service under IRC Section 401(a) and that the Trust hereunder is exempt under IRC Section 501(a), or under any comparable Sections of any future legislation which amends, supplements or supersedes such Sections. In the event that it should be found by the Internal Revenue Service that the Plan as amended and restated hereby is not qualified, the Corporation may modify the Plan to meet Internal Revenue Service requirements or reinstate the Plan as in effect prior to such amendment and restatement.

As evidence of its adoption of the Plan, R.B. Pamplin Corporation has caused this instrument to be signed by its duly authorized officers on this _28th_ day of _November_, _2011_.

Attest: _Marilyn C Steward_

R.B. PAMPLIN CORPORATION

_Robert B Pamplin_

The Trustee of the Plan, by joining in the execution of this Plan and Trust, hereby confirms his acceptance and approval of the terms hereof and agrees to carry out the provisions hereof in his capacity as Trustee.

Date: _11/18/12_

_Robert B. Pamplin_
Trustee

# Exhibit 5

Executable Version

### INDEPENDENT FIDUCIARY ENGAGEMENT AGREEMENT BETWEEN R.B. PAMPLIN CORPORATION AND GALLAGHER FIDUCIARY ADVISORS, LLC

This document, when executed by R.B. Pamplin Corporation and Subsidiaries, a Delaware corporation ("Company"), in its corporate capacity and as named fiduciary of the R.B. Pamplin Corporation and Subsidiaries Pension Plan (the "Plan") and the Plan Fiduciary Selection Committee as named fiduciary (the "Plan Committee") with the authority to appoint an independent fiduciary, and Gallagher Fiduciary Advisors, LLC ("Gallagher"), a Delaware limited liability company, shall constitute an agreement ("Agreement") as to the matters set forth herein.

1.    **Background**

The Company represents as follows.

The Company is the named fiduciary of the Plan. The Plan is a qualified pension plan under section 401(a) of the Internal Revenue Code of 1986, as amended, and a defined benefit pension plan under section 3(35) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Company has recently disclosed a prohibited transactions on its Form 5500 filings, noting that the plan sponsor contributed, and sold to the Plan, real property far in excess of the ERISA Section 407 exemption limitation equal to 10 percent of total Plan assets for qualifying employer securities and real property. Upon audit, the U. S. Department of Labor has demanded that an independent fiduciary be engaged to prudently manage the Plan's assets in accordance with the Plan's investment policy, as amended.

The Company, acting in its capacity as named fiduciary of the Plan, and the Plan Committee wish to retain and appoint Gallagher to serve as an independent fiduciary and investment manager of the Plan for the limited purposes described above and set forth in Section 2 below.

2.    **Scope and Limits of Engagement**

(a)    Gallagher shall act as an independent fiduciary and investment manager of the Plan and shall be charged on behalf of the Plan as the fiduciary with the exclusive responsibility to carry out with respect to the transaction the functions set forth on Exhibit A.

(b)    Gallagher shall have the exclusive responsibility on behalf of the Plan to make the determinations and undertake the actions as specifically and expressly set forth on Exhibit A or any other exhibits. The Company shall have no duties with respect to the undertakings on Exhibit A.

(c)    Gallagher shall have no fiduciary responsibilities or duties to the Plan except as specifically and expressly set forth on Exhibit A. In addition to the limitations on Gallagher's authority and responsibility set forth on Exhibit A or any other exhibits, the Company does not authorize Gallagher to participate in, exercise or perform,

and Gallagher shall not be responsible for nor participate in, exercise or perform, evaluate or make recommendations regarding any of the following matters, duties or powers:

(1) Paying benefits, administering the Plan, amending the Plan, filing reports with any governmental authority regarding the Plan, or participating in other matters outside (although possibly related to) the matters covered by Exhibit A;

(2) The functions performed by or responsibilities of any person, entity, association or partnership (including, without limitation, the Company or an affiliate or employee of the Company) who or which provides services to or on behalf of the Plan (each, a "Service Provider"), including rendition of legal, auditing, actuarial, custodial, administrative, recordkeeping and accounting services and advice;

(d) In performing its responsibilities as set forth on Exhibit A, Gallagher shall undertake such efforts as are necessary and required of a fiduciary, under the prevailing circumstances, acting in accordance with ERISA and other requirements of applicable law. Gallagher shall retain full discretion and judgment in determining whether, when and in what manner to use and apply its personnel and other resources.

(e) Gallagher and the Company recognize and agree:

(1) That in rendering its services hereunder Gallagher may use its discretion to request supportive documentation and ask questions to ensure the accuracy of information supplied by the Company, the Plan, or Service Providers;

(2) That Gallagher is not rendering legal advice or any other legal services to the Plan, the Plan's fiduciaries or the Company; and

(3) That in performing its services pursuant to this Agreement, Gallagher may coordinate with and utilize the services of any Service Provider and that the Company and/or the Plan as described in section 6 and Exhibit A, and not Gallagher, shall pay all reasonable fees and expenses charged by all such Service Providers for services rendered in connection with the Plan.

(4) In addition to or as an alternative to using the services of a Service Provider, Gallagher may engage the services of outside counsel and other professional services, such as real estate brokers and property engineers, (the "Gallagher Professionals") to assist Gallagher in the performances of its duties, the reasonable fees and expenses of whom shall be paid by the Company and/or the Plan as described in section 6 and Exhibit A.

(f) Gallagher shall not serve as an expert consultant in regard to any civil or criminal judicial proceedings related to its services hereunder or as an expert witness in any

Executable Version

such regard, except as the Company, the Plan Committee and Gallagher may subsequently agree in writing.

**3.**    **Warranties and Representations**

    **(a)**    Gallagher warrants that:

        **(1)**    It is lawfully empowered to enter into this Agreement and perform or provide the services which, pursuant to this Agreement, it has agreed to perform or provide;

        **(2)**    The person executing this Agreement on behalf of Gallagher is authorized to do so; and

        **(3)**    In performing services described in this Agreement, it will comply with all applicable laws including ERISA.

    **(b)**    The Company, in its corporate capacity and on behalf of the Plan, and the Plan Committee warrant that:

        **(1)**    They promptly will provide, and will instruct the Service Providers to provide, Gallagher with the information, resources, cooperation and other assistance reasonably necessary to enable Gallagher to perform its services hereunder and that such information as the Company and the Plan provide to Gallagher shall be accurate;

        **(2)**    They are legally authorized to enter into this Agreement; and

        **(3)**    The persons executing this Agreement on their behalf are authorized to do so.

    **(c)**    In performing its responsibilities as set forth on Exhibit A, Gallagher shall undertake such efforts as are necessary and required of a fiduciary, under the prevailing circumstances, acting in accordance with ERISA and other requirements of applicable law.

**4.**    **Cooperation of Other Parties to Agreement**

The Company, on behalf of the Plan and itself in its corporate capacity, and Plan Committee agree to reasonably cooperate with Gallagher so that it may timely perform its responsibilities as set forth in this Agreement. The Company and Plan Committee shall undertake best efforts to timely respond to requests from Gallagher for information and shall provide or shall direct the Service Providers to provide Gallagher responses to such requests. Gallagher may use its discretion to request supportive documentation and ask questions to ensure the accuracy of the information, both oral and written, provided to it by the Company, the Plan Committee, their counsel and the Service Providers. To the extent that the Company, or Dr. R.B. Pamplin, Jr. retains a portion of the ownership of the real estate properties held by the Plan, the Company, Plan

Executable Version

Committee and Dr. R.B. Pamplin, Jr. agree to concede to, participate in, and execute the sale of the real estate properties to third parties pursuant to Gallagher's direction.

5.  **Limitation of Liability**

Except insofar as may be the result of a violation of ERISA by Gallagher, Gallagher shall not be liable for liabilities, losses, claims, fees or expenses incurred by the Plan, or any of its participants or beneficiaries, or the Company, resulting from or relating to any of the following:

(a)  Matters as to which Gallagher does not have responsibility or authority pursuant to this Agreement, including matters that are within the exclusive responsibility or authority of the Company, the Plan Committee or other Service Providers and as to which Gallagher is not obligated to provide advice or recommendations pursuant to this Agreement;

(b)  Circumstances which occurred prior to the effective date of this Agreement;

(c)  The failure of the Company, the Plan Committee or any Service Provider (i) properly to adopt or implement the decision(s) made by Gallagher, (ii) properly to perform its or their duties, or (iii) adequately to provide Gallagher accurate, timely, necessary or reliable information, cooperation, or services;

(d)  Any employee benefit plan other than the Plan; and

(e)  Fraud, concealment, bad faith, or criminal acts or omissions of others which Gallagher did not discover or which Gallagher would not have discovered with exercise of reasonable care in performing its duties pursuant to Exhibit A of this Agreement.

6.  **Fees and Expenses**

(a)  Gallagher shall be paid by the Company for its services under Service Level 1 as set forth on Exhibit A in the amount of $550 per hour, not to exceed $125,000.00, plus reasonable out-of-pocket expenses that it may incur in connection with this engagement. Gallagher shall invoice for its services rendered on a quarterly basis.

(b)  Gallagher shall be paid by the Plan in the amount of $85,000.00 per annum, payable quarterly in arrears, for the services set forth in Service Level 2 on Exhibit A. As of the first anniversary of this Agreement and each anniversary thereafter, the annual fee shall be adjusted by a percentage (but not less than zero percent) equal to the annual percentage change in the CPI for the prior twelve month period. The CPI will be based on the Consumer Price Index for All Urban Consumers (CPI-U) – Not Seasonally Adjusted, U.S. City Average, All Items ("Base Period 1982-84=100") according to the U.S. Department of Labor's Bureau of Labor Statistics ("BLS").

Executable Version

(c)     On an annual basis, Gallagher shall disclose to the Plan Committee any compensation received as a result of Gallagher's role as independent fiduciary of the Plan, including compensation received from other sources, whether directly or indirectly.

(d)     Reasonable out-of-pocket expenses shall be documented and shall include but not be limited to, reasonable travel, lodging and meal expenses, duplicating charges, long-distance telephone calls, and computer charges that may be incurred by Gallagher in connection with the engagement. Gallagher shall in addition be reimbursed for reasonable and documented fees and expenses of any Gallagher Professional that Gallagher may choose to retain in connection with the engagement pursuant to Section 2(e)(4) unless Gallagher requests that the Plan and/or the Company pay such fees and expenses directly to the Gallagher Professional. Reasonable out-of-pocket expenses shall be paid within thirty (30) days of the Company's receipt of an invoice with appropriate documentation.

(e)     All fees and expenses to be paid pursuant to this Section 6 shall be paid by the Plan and/or the Company, as noted above and discussed in Exhibit A. Neither Gallagher nor its counsel shall have any right to seek payment of fees from Company members or executives personally. Except Gallagher may seek said compensation from Dr. Robert B Pamplin Jr. where the Company is obligated to pay as described in Exhibit A and the Company fails to do so.

(f)     Gallagher shall send invoices for fees and expenses to the Vice President of Human Resources, Mount Vernon Mills, 503 Main Street, Mauldin, SC 29662, currently Gary Williams.

7.   **Acknowledgement of Fiduciary Status**

Gallagher represents that it is registered as an investment advisor under the Investment Advisers Act of 1940. It acknowledges that by agreeing to undertake the engagement set forth in Section 2, above, it shall be a "fiduciary" and "investment manager" with respect to the Plan, as those terms are defined in ERISA, with respect to such engagement.

8.   **Indemnification from the Company**

(a)     If Gallagher or any Gallagher employee, Gallagher Professional, officer, director, parent, affiliate or shareholder (each a "Gallagher Indemnified Person") becomes involved in any capacity in any legal or administrative action, suit, claim, proceeding, investigation, arbitration, or inquiry, directly or indirectly related to the Plan or the services and decisions that are the subject of this Agreement (a "Proceeding"), the Company alone shall indemnify and hold harmless each Gallagher Indemnified Person against any and all losses, claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses) ("Liabilities") for which such Gallagher Indemnified Person may become liable in connection with any such matter as such Liabilities arise. The indemnification obligations hereunder shall not apply to any Liabilities that are finally judicially determined to have been caused primarily by such Gallagher Indemnified Person's

negligence, bad faith, willful misfeasance, or by such Gallagher Indemnified Person's breach of any fiduciary duty owed to the Plan under ERISA. In the event of such a determination, the Company shall be entitled to recover from the Gallagher Indemnified Person the costs and expenses paid on behalf of such person pursuant to this indemnification obligation.

**(b)**     The Gallagher Indemnified Persons shall notify the Company in writing of any Proceeding, or any Liabilities assessed or to be assessed against them for which indemnification is sought and will provide such notification after the Gallagher Indemnified Person has actual knowledge of such Proceeding or Liabilities. The Company shall provide a defense to the Gallagher Indemnified Persons in any Proceeding through an attorney reasonably acceptable to the Gallagher Indemnified Person, except that an Gallagher Indemnified Persons may engage separate counsel, whose reasonable fees and expenses shall be paid by the Company, if that Gallagher Indemnified Person reasonably concludes that a conflict of interest renders it inappropriate for counsel for other Gallagher Indemnified Persons to represent that Gallagher Indemnified Person. The Gallagher Indemnified Persons will cooperate in the defense of any proceeding in respect of which such Gallagher Indemnified Persons are being provided with indemnification hereunder, and to assist in the conduct of suits and in enforcing any right of contribution, indemnity, or other liability against any person or organization that may be liable to the Gallagher Indemnified Persons. The Gallagher Indemnified Persons shall not settle, compromise, or discharge any such Proceeding without the written prior consent of the Company, which will not be unreasonably withheld. The Company agrees that it will not settle, compromise, or discharge any Proceeding to which any Gallagher Indemnified Person may reasonably be expected to be a party, without the written prior consent of the Gallagher Indemnified Person, which will not be unreasonably withheld provided that the Company has obtained a written agreement executed by such party to such proposed settlement, compromise or discharge, releasing each of the Gallagher Indemnified Persons from any and all liability and such written agreement and any other instrument associated with the settlement, compromise or discharge contains no provision finding or admitting that Gallagher has violated ERISA or any other law.

**(c)**     The parties acknowledge that Gallagher Indemnified Persons may receive subpoenas and other requests for information, documents or testimony by virtue of the fact that Gallagher is providing services pursuant to this Agreement. Accordingly, and without limiting the generality of the indemnity obligation set forth above, the Company shall pay the expenses, including all time spent (at Gallagher's then current hourly rate) and reasonable attorneys' fees, incurred by any Gallagher Indemnified Persons in testifying, responding to, objecting to or moving to quash or for a protective order, concerning any subpoena, governmental investigation or other legally enforceable request for information, documents or testimony directed to any Gallagher Indemnified Person, arising out of or related to the operation of the Plan or the investment, management or administration of its assets including, without limitation, the assets as to which Gallagher is providing services pursuant to this Agreement.

Executable Version

(d)    The federal securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore nothing herein shall in any way constitute a waiver or limitation of any rights which the Company may have under any federal securities laws.

(e)    If the Company should fail to perform its obligations under this Section 8, Dr. Robert B. Pamplin Jr. shall be liable therefore. If both the Company and Dr. Robert B. Pamplin Jr. should fail to perform their obligations under this Section 8, the Plan shall be liable therefore, except to the extent that performance by the Plan of such obligations is barred by ERISA.

(f)    The provisions of this Section 8 shall be enforceable by each Gallagher Indemnified Person and such person's heirs, representatives and successors and shall survive the expiration or termination of this Agreement.

## 9.   Other Issues

(a)    Any notice required or permitted pursuant to this Agreement shall be in writing and served upon the other Party by first-class mail. Any notice to the Plan shall be addressed as follows: Vice President of Human Resources, Mount Vernon Mills, 503 Main Street, Mauldin, SC 29662, currently Gary Williams. Any notice to the Company shall be addressed as follows: Vice President of Human Resources, Mount Vernon Mills, 503 Main Street, Mauldin, SC 29662, currently Gary Williams. Any notice to Gallagher shall be addressed as follows: Gallagher Fiduciary Advisors, LLC, 1667 K Street, N.W., Suite 1270, Washington, D.C., 20006, Attention: Michael W. Johnson, with a copy to Gallagher Fiduciary Advisors, LLC, 300 Madison Avenue, 28th Fl., New York, NY 10017.

(b)    The Plan Committee or Gallagher shall be entitled to terminate this Agreement at any time, subject only to thirty (30) days' prior written notice. Said notice should simultaneously also be provided to the United States, Department of Labor Employee Benefits Security Administration San Francisco Regional Director. The Company and/or Plan shall pay Gallagher for all services performed and expenses incurred through the effective date of termination, provided, however, that if the Agreement is terminated before the end of the first year of its service hereunder, Gallagher shall be paid its fees as set forth herein on a pro rata basis based on the percentage of the year that has been completed.

(c)    This Agreement states the entire agreement of the Parties and supersedes all previous agreements or understandings, whether written or oral; is intended as the complete and exclusive statement of their agreement; and may not be modified or amended except by a writing duly executed by the Parties. Gallagher shall render services in addition to the services set forth on Exhibit A above only pursuant to either a separate written agreement or a written modification to this agreement. The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect pursuant to the terms hereof.

Executable Version

(d)    The Plan and the Company acknowledge that the services being provided and obligations undertaken hereunder are being provided and undertaken by Gallagher as an entity and not by any individual officer, director, employee, or shareholder (each a "Gallagher Individual"). Neither the Plan nor any fiduciary of the Plan has entered into any agreement to the effect that (i) one or more Gallagher Individuals, as opposed to Gallagher, is providing services to the Plan or its fiduciaries, or (ii) the work performed for or advice communicated to the Plan by any one or more Gallagher Individuals is the work or advice of such Gallagher Individual(s), as opposed to the work or advice of Gallagher. Gallagher represents and the Plan and the Company acknowledge that Gallagher will not delegate to any Gallagher Individual Gallagher's fiduciary obligations and responsibilities owed to the Plan.

(e)    This Agreement shall be governed by the laws of the District of Columbia (without giving effect to its provisions on the conflict of laws) only to the extent not preempted by ERISA or other federal law.

(f)    This Agreement shall be for the benefit of, and shall be binding upon only (a) the Plan and its successors, (b) the Company and its successors, and (c) Gallagher and its successors.

(g)    This Agreement cannot be assigned by any Party without the consent of the other Parties.

(h)    This Agreement may be executed in counterpart copies, each of which shall be deemed an original, but all of which shall be considered the same instrument.

(i)    This Agreement shall be effective upon execution of this Agreement by all parties, except that Gallagher shall have no obligation to perform the services set forth on Exhibit A unless and until the Plan's governing instruments, including, without limitation, its trust agreement, provide in terms reasonably acceptable to Gallagher for the granting to Gallagher of the authority to do so.

In witness whereof, the Parties have executed this Agreement on the dates set forth below.

SIGNATURE BLOCKS FOR GALLAGHER, THE COMPANY and THE COMMITTEE

_____          _____
Gallagher Fiduciary Advisors, LLC          Dr. R.B. Pamplin, Jr.

Executable Version

10/02/2023
Date

10/2/2023
Date


Plan Committee
GARY R. WILLIAMS

10/2/2023
Date

Plan Committee
WILLIAM H. ROGERS

10/2/2023
Date

# EXHIBIT A

Upon execution of this Agreement by all parties, Gallagher shall perform the following functions as an independent fiduciary and investment manager for the Plan:

## Service Level 1

1) Determine whether, when and on what terms to seek prudently to sell one or more of the Properties in accordance with the provisions of the applicable transaction instruments in order to reduce the real estate holdings of the Plan at or close to 10% of total Plan assets.

2) Engage the services of a qualified appraiser, engineers and brokers to prepare each of the targeted Properties for sale.

3) Work with the broker to find a ready, willing and able buyer for each of the targeted Properties.

4) With the assistance of outside legal counsel, negotiate the terms and conditions of, and consummate the sale or disposition of the Properties selected for sale on behalf of the Plan and with the respective buyer(s).

5) Review the current lease arrangements involving each of the Properties, amend such leases as deemed necessary, ensure timely payment of rents related to the leases and collect any penalties for any late payments of rents on leases.

## Service Level 2

1) Gallagher agrees to assist the Trustee on an ongoing basis by providing the following services regarding the Assets, subject to the other provisions of this Agreement:

   (a) Developing for discussion with the Plan Committee an investment policy statement or review and recommend revisions, as appropriate, in the existing investment policy statement for the Plan.

   (b) Selecting a range of suitable asset allocations for the Plan, based on, review of documents supplied to Gallagher by or on behalf of the Trustee and Service Providers in response to Gallagher's request therefore, quantitative analysis of the historical risks and returns of various combinations of asset classes, the experience of Gallagher with the financial markets and the particular financial situation of the Plan as appears from documents supplied by the Trustee to Gallagher. In developing its asset allocations, Gallagher shall consider diversification, expected return and risk and other relevant considerations both across asset classes and within each recommended asset class.

(c)     Evaluating and deciding which, if any, of the Plan's current Investment Managers (each, a "Manager") is appropriate to manage which, if any, portion of the Plan's assets, consistent with the investment policy statement and asset allocation developed pursuant to subsection (a), above and replacing any Manager where appropriate.

(d)     Identifying, evaluating and selecting a roster of additional or different Investment Managers, consistent with the Plan's investment policy statement and asset allocation.   Prior to selecting any Manager, Gallagher shall have personally interviewed one or more suitable representatives of the Manager with whom it shall have discussed the particular needs of the Plan and the investment discipline Manager would utilize in managing a portion of the Assets.

(e)     Periodically rebalancing the Plan's asset allocation.

(f)     Selecting suitable strategies for, and assisting in monitoring, the transfer of assets among Investment Managers in the event of the termination or addition of an Investment Manager or a reallocation of the assets.

(g)     Providing assistance reasonably required by the Plan to respond to audits or examinations conducted by governmental agencies relating to the investment of the assets.

(h)     Drafting and modifying, as necessary, written investment guidelines and objectives for each specific Investment Manager, tailored to each Manager's specific investment discipline, including appropriate investment performance benchmarks and limitations on risk.   Gallagher shall draft (and modify, as necessary) such guidelines and objectives for each Manager regardless of whether such Manager currently is retained by the Plan or is retained after the effective date of this Agreement.

(i)     Negotiating and advising the Trustee regarding fee arrangements with each Investment Manager, provided that such negotiation and advice shall not involve rendering legal advice, and the Plan's legal counsel shall be responsible for drafting all investment management agreements.

(j)     Measuring and evaluating on a quarterly basis the performance of the Plan as a whole and each Investment Manager.  This includes providing to the Trustee a quarterly, written evaluation report and up to four personal meetings per year with the Trustee.  Each report shall set forth separately the performance of the Plan as a whole, of the Plan's entire portfolio within each asset class (e.g., equities, fixed income, real estate, alternative investments), plus performance regarding the portion of the Assets delegated to each Investment Manager taken as a whole (an "Account"), the portion of each Account invested in securities and the portion invested in cash.  Each report shall include an evaluation of the returns achieved on each Account and the portion invested in securities against suitable benchmarks for performance and risk.

(k)     Reviewing as appropriate each Investment Manager's adherence to the applicable written investment guidelines and objectives and deciding upon corrective action as needed.

(l)     Periodically evaluating whether and on what terms to continue to retain the Plan's bank custodian and identifying, a suitable replacement, when and to the extent appropriate, provided that such evaluation shall not involve rendering legal advice, and the Plan's legal counsel shall be responsible for drafting all custodial agreements and providing legal advice concerning the amendment, enforcement and termination of such agreements.

(m)    Periodically evaluating the reasonableness of the fees paid to the Plan's third-party service providers specifically from the Plan's assets, including actuarial services, audit services, PBGC premiums and printing and mailing services.  It is noted that should Gallagher determine the need to obtain a market benchmark for any of these fees/expenses in order to make its determination, the Company will pay for all such benchmarking services so requested by Gallagher.

(n)     Voting proxies on all shares of stock held in the Plan, or the tendering of such shares or otherwise exercising rights associated with such shares with respect to a merger, corporate restructuring, proxy contest, tender offer, rights offering, sale or disposition, or similar transaction involving control of the underlying stock.

2)   In addition to the foregoing, the Gallagher shall also:

(a)     Attend regularly scheduled Trustee meetings (generally quarterly) and any Plan Committee meetings.

(b)     Advise the Trustee during these meetings on the investment impact of plan amendments that may be considered, subject to receipt of reasonable advance notice of proposed amendments and sufficient additional input from the Trustees and appropriate Service Providers.

# Exhibit 6

AMENDMENT NO. 1 TO INDEPENDENT FIDUCIARY ENGAGEMENT AGREEMENT
· BETWEEN R.B.PAMPLIN CORPORATION AND
GALLAGHER FIDUCIARY ADVISORS, LLC

WHEREAS, R.B. Pamplin Corporation and Subsidiaries (the "Company"), in its corporate capacity and as named fiduciary of the R. B. Pamplin Corporation and Subsidiaries Pension Plan (the "Plan"), the Plan Fiduciary Selection Committee, as named fiduciary of the Plan (the "Plan Committee") and Gallagher Fiduciary Advisors, LLC ("Gallagher") entered into an Independent Fiduciary Engagement Agreement dated October 2, 2023 (the "Agreement");

WHEREAS, the Company, the Plan Committee and Gallagher wish to amend the Agreement to provide that the Plan may pay Gallagher's fees and expenses under Service Level 1 in Exhibit A to the Agreement, and Gallagher may collect reimbursements for the Plan from the Company and Dr. Robert B. Pamplin Jr.;

WHEREAS, Section 9 (c) of the Agreement requires that any amendment to the Agreement be in writing signed by all the parties to the Agreement;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties to the Agreement agree that the Agreement, effective upon execution of this Amendment No. 1, shall be amended as follows:

1.  Section 6 (a) shall be replaced by the following provision: "Gallagher shall be paid by the Company for its services under Service Level 1 as set forth on Exhibit A in the amount of $550 per hour plus reasonable expenses that it may incur in connection with this engagement. Reasonable expenses include Service Providers retained by Gallagher in connection with Service Level 1 services as defined in Exhibit A. Gallagher shall invoice the Company for its services rendered and reasonable expenses on a quarterly basis. If the Company fails to pay Gallager for its services and/or reasonable expenses under Service Level 1 within 30 days of the date the payment is due, the Plan may instead pay Gallagher. The amounts to be paid by the Plan include any invoices currently delinquent. The Company and Dr. Robert B. Pamplin Jr. have responsibility for the payment of Service Level 1 services that are initially paid by the Plan. Gallagher has the authority to collect from the Company and Dr. Robert B. Pamplin Jr. reimbursement to the Plan for any amounts paid by the Plan."

2.  Section 6 is amended to add Section 6(g), which shall read "Gallagher shall be required to submit a report every 90 days that itemizes any fees and reasonable expenses charged by Gallagher to the Company for its services under Service Level 1, including but not limited to hourly rates of pay, dates and hours of work, and a description of the work performed by Gallagher and/or Service Provider hired by Gallagher. The report shall be submitted to Department of Labor, Office of the Solicitor, Attn: Adriana Ahumada, 90 Seventh Street, Suite 3-700, San Francisco, CA 94013 and to the Vice President of Human Resources, Mount Vernon Mills, 503 Main Street, Mauldin, SC 29662. The Vice President of Human Resources, Mount Vernon Mills is currently Gary Williams. This fee report shall be deemed approved unless the

Department of Labor and/or the Company objects, within fifteen business days, to any fee or expense charged."

All other terms and provisions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment No. 1 to be effective as noted above.

GALLAGHER FIDUCIARY ADVISORS, LLC

DR. R. B. PAMPLIN, JR.

PLAN COMMITTEE

PLAN COMMITTEE

# Exhibit 7

**Side Letter**

**to the**

**Independent Fiduciary Engagement Agreement**

**between**

**R.B. Corporation and Gallagher Fiduciary Advisors, LLC**

This side letter ("Side Letter") to the Independent Fiduciary Engagement Agreement between R.B. Pamplin Corporation (the "Company") and Gallagher Fiduciary Advisors, LLC ("Gallagher") dated October 2, 2023 (the "IF Agreement"), is effective _____, 2023. Capitalized terms not defined herein have the meanings ascribed to them in the IF Agreement.

The Company has appointed Newport Trust Company, LLC ("Newport Trust") as directed trustee of the R.B. Pamplin Corporation and Subsidiaries Pension Plan and Trust (the "Trust"), pursuant to a trust agreement dated _____, 2023 (the "Trust Agreement"). This Side Letter is to clarify the respective responsibilities of Newport Trust and Gallagher with respect to annual valuation of trust assets.

Notwithstanding any ambiguity that may exist in the IF Agreement, Gallagher and the Company agree that Gallagher will be responsible in accordance with its responsibilities under Service Level 2, Section 1(j) for engaging a qualified appraiser to establish values for all Properties held in the Trust on an annual basis. These values will be reported to Newport Trust and used for year-end valuation purposes, in accordance with Section 9.3 of the Trust Agreement.

Further, upon the execution of the Trust Agreement with Newport Trust, the first sentence of Item (1) of Service Level 2 on Exhibit A shall be revised to delete the reference to "trustee" and replace it with a reference to the "Plan Administrator," and paragraph (l) of Item (1) dealing with the Plan's custodian shall be deleted and items (m) and (n) redesignated as (l) and (m).

**R.B. PAMPLIN CORPORATION**

By:  _Dr. Robert B. Pamplin Jr._
Name:  Dr. Robert B. Pamplin, Jr.
Title:  Chairman, President, CEO

**GALLAGHER FIDUCIARY ADVISORS, LLC**

By:  _____
Name:  Michael W Johnson
Title:  Area President

# Exhibit 8

**Pamplin Ranchland Properties**

| Tax Account ID Numbers | Parcel Identification Numbers | County in State of Oregon |
|---|---|---|
| 231 | 10140000 00800 | Jefferson |
| 269 | 09142700 00801 | Jefferson |
| 289 | 09143300 00701 | Jefferson |
| 290 | 09143300 00800 | Jefferson |
| 292 | 09143400 00200 | Jefferson |
| 293 | 09143400 00201 | Jefferson |
| 294 | 09143400 00290 | Jefferson |
| 298 | 09143400 00401 | Jefferson |
| 348 | 10140400 00100 | Jefferson |
| 350 | 10140400 00300 | Jefferson |
| 564 | 09140000 02402 | Jefferson |
| 586 | 09150000 00300 | Jefferson |
| 593 | 09150000 00500 | Jefferson |
| 594 | 09150000 00600 | Jefferson |
| 595 | 09150000 00700 | Jefferson |
| 596 | 09150000 00800 | Jefferson |
| 597 | 09150000 00801 | Jefferson |
| 598 | 09150000 00900 | Jefferson |
| 599 | 09150000 00901 | Jefferson |
| 600 | 09150000 00902 | Jefferson |
| 604 | 09150000 01300 | Jefferson |
| 605 | 09150000 01400 | Jefferson |
| 607 | 09150000 01600 | Jefferson |
| 611 | 09150000 02000 | Jefferson |
| 612 | 09150000 02100 | Jefferson |
| 627 | 09150300 00500 | Jefferson |
| 8607 | 09150000 00300 | Jefferson |

| 8617 | 09160000 01200 | Jefferson |
| 8778 | 10160000 01500 | Jefferson |
| 12786 | 09150000 00802 | Jefferson |
| 11722 | 08S15 E00 04400 00 | Wasco |
| 11711 | 08S15 E00 02000 00 | Wasco |
| 11714 | 08S15 E00 03000 00 | Wasco |
| 12902 | 08S15 E00 03000 00 | Wasco |
| 11723 | 08S15 E00 04500 00 | Wasco |
| 11726 | 08S15 E00 05000 00 | Wasco |
| 12898 | 08S15 E00 02000 00 | Wasco |
| 12899 | 08S15 E00 02100 00 | Wasco |
| 12886 | 08S15 E00 00500 00 | Wasco |

# Exhibit 9

# TRUST DEED

---

**Grantor:**

**Beneficiary:**

**Tax Parcel No.:**

**Abbreviated Legal:**

**Address:**

---

This Trust Deed, made this ___day of _____, 202_, between Grantor, _____, whose address is _____, Trustee, _____, whose address is _____, and Beneficiary, _____, whose address is in care of: _____.

# WITNESSETH

Grantor hereby bargains, sells, and conveys to Trustee in Trust, with power of sale, the following described real property in _____ County, Oregon:

See Exhibit A attached hereto

which real property is used principally for _____ purposes, together with all the tenements, and appurtenances now or hereafter thereunto belonging or in any wise appertaining, and the rents, issues and profits thereof.

This deed is for the purpose of securing the performance of the obligations in the Consent Judgment ordered by the Court in the matter *Acting Secretary of Labor, United States Department of Labor v. Robert B. Pamplin, Jr., et. al.,* 3:24-cv-01548 in the United States District Court, District of Oregon ("Consent Judgment").

To protect the security of this Trust Deed, Grantor covenants and agrees:

1.      To keep the property in good condition and repair; to permit no waste thereof; to complete any building, structure or improvement thereon which may be damaged or destroyed; and to comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the property.

2.      To pay all lawful taxes and assessments upon the property; to keep the property free and clear of all other charges, liens or encumbrances impairing the security of this Trust Deed.

3.      To keep the property and all buildings now or hereafter erected on the property described herein continuously insured against loss by fire or other hazards in an amount not less than the replacement cost of the property.  All policies shall be held by the Beneficiary and be in such companies as the Beneficiary may approve and have loss payable first to the Beneficiary, as its interest may appear, and then to the Grantor.  The amount collected under any insurance policy may be applied upon any indebtedness hereby secured in such order as the Beneficiary shall determine.  Such application by the Beneficiary shall not cause discontinuance of any proceedings to foreclose this Trust Deed. In the event of foreclosure, all rights of the Grantor in insurance policies then in force shall pass to the purchaser at the foreclosure sale.

4.      To defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee, and to pay all costs and expenses, including cost of title search and attorney's fees in a reasonable amount, in any such action or proceeding, and in any suit brought by Beneficiary to foreclose this Trust Deed.

5.      To pay all costs, fees, and expenses in connection with this Trust Deed, including the expenses of the Trustee incurred in enforcing the obligation secured hereby and Trustee's and attorney's fees actually incurred, as provided by statute.

6.      Should Grantor fail to pay when due any taxes, assessments, insurance premiums, liens, encumbrances or other charges against the property hereinabove described, Beneficiary may pay the same, and the amount so paid, with interest at the rate set forth in the Consent Judgment secured hereby, shall be added to and become a part of the debt secured in this Trust Deed.

7.      Without prior written consent of Beneficiary, Grantor shall not transfer or sell or agree to transfer or sell all or any part of Property or any interest in the Property, with the exception of a transfer to the Beneficiary.  For the purpose of this Section the occurrence of any of the following events, without limitation, or any agreement to do any of the following, without limitation, shall be deemed to be a transfer of the Property: Any sale, conveyance, assignment or other transfer of, or grant of a mortgage, trust deed, other lien, or other security interest in, all or any part of the legal or equitable title to Property. If any of the aforementioned or any combination thereof occurs, Beneficiary, at Beneficiary's option, may declare all of the sums secured by this Trust Deed to be immediately due and payable, and may invoke any of the remedies permitted by this Trust Deed.

8.      Unless required by applicable law or unless Beneficiary has otherwise agreed in writing, Grantor shall not allow changes in the use for which all or any part of the Property was intended at the time this Trust Deed was executed.  Grantor shall not initiate or acquiesce in a change in the zoning classification of the Property without Beneficiary's prior written consent.

DEED OF TRUST 2

IT IS MUTUALLY AGREED THAT:

1.      In the event any portion of the property is taken or damaged in an eminent domain proceeding, the entire amount of the award or such portion as may be necessary to fully satisfy the obligation secured hereby, shall be paid to Beneficiary to be applied to said obligation.

2.      By accepting payment of any sum secured hereby after its due date, Beneficiary does not waive its right to require prompt payment when due of all other sums so secured or to declare default for failure to so pay.

3.      The Trustee shall reconvey all or any part of the property covered by this Trust Deed to the person entitled thereto, on written request of the Grantor and the Beneficiary, or upon satisfaction of the obligation secured and written request for reconveyance made by the Beneficiary or the person entitled thereto.

4.      Upon default by Grantor in the payment of any indebtedness secured hereby or in the performance of any agreement contained herein, all sums secured hereby shall immediately become due and payable at the option of the Beneficiary.  In such event and upon written request of Beneficiary, Trustee shall sell the trust property, in accordance with the Oregon Trust Deed Act and/or other applicable laws, at public auction to the highest bidder.  Any person except Trustee may bid at Trustee's sale.  Trustee shall apply the proceeds of the sale as follows: (1) to the expense of the sale, including a reasonable Trustee's fee and attorney's fee; (2) to the obligation secured by this Trust Deed; (3) the surplus, if any, shall be distributed to the persons entitled thereto.

5.      Trustee shall deliver to the purchaser at the sale its deed, without warranty, which shall convey to the purchaser the interest in the property which Grantor had or had the power to convey at the time of his execution of this Trust Deed, and such as he may have acquired thereafter. Trustee's deed shall recite the facts showing that the sale was conducted in compliance with all the requirements of law and of this Trust Deed, which recital shall be prima facie evidence of such compliance and conclusive evidence thereof in favor of bona fide purchaser and encumbrancers for value.

6.      The power of sale conferred by this Trust Deed and by the Oregon Trust Deed Act and/or other applicable laws is not an exclusive remedy; Beneficiary may cause this Trust Deed to be foreclosed as a mortgage, which shall mean a judicial foreclosure.

7.      In the event of the death, incapacity, disability or resignation of Trustee, Beneficiary may appoint in writing a successor trustee, and upon the recording of such appointment in the mortgage records of the county in which this Trust Deed is recorded, the successor trustee shall be vested with all powers of the original trustee.  The trustee is not obligated to notify any party hereto of pending sale under any other Trust Deed or of any action or proceeding in which Grantor, Trustee or Beneficiary shall be a party unless such action or proceeding is brought by the Trustee.

8.      This Trust Deed applies to, inures to the benefit of, and is binding not only on the parties hereto, but on their heirs, devisees, legatees, administrators, executors and assigns.

9.      As additional security under this Trust Deed, Grantor hereby assigns to Beneficiary the leases, rents or agreements concerning the Property now existing or in the future arising, provided that unless there is an event of default, Grantor shall have the right to collect and retain such rents as they become due and payable. Upon Beneficiary's request, Grantor shall execute any additional

DEED OF TRUST 3

documents requested by Beneficiary to assign to Beneficiary any leases and all security and other deposits concerning Property. This assignment is not a delegation or assignment to Beneficiary of Grantor's duties or obligations under or in connection with the Property. Beneficiary's acceptance of this assignment does not constitute a promise by it nor does it in any way obligate it to perform any of Grantor's duties or obligations under or in connection with the leases, rents or agreements. Grantor hereby agrees to indemnify Beneficiary against and hold it harmless from any and all liability, loss or damage which it may or might incur under the leases, rents or agreements or under or by reason of this assignment and of and from any and all claims and demands whatsoever which may be asserted against it by any reason of any alleged obligation or undertaking on Beneficiary's or Grantor's part to perform or discharge any of the terms of the leases, rents or agreements.

10.    The following shall be considered a default: Grantor's failure to satisfy any monetary obligation in the Consent Judgment, which includes Grantor's obligation to transfer Settlement Assets to the Pension Plan, pay independent fiduciary costs, restore plan losses, and pay 502(l) penalties, after the U.S. Department of Labor has notified Grantor of such failure and after a 14-day period to cure such failure has passed.

11.    Upon the occurrence of any event of default and at any time thereafter, Trustee or Beneficiary may exercise any one or more of the following rights and remedies:

a.    Beneficiary may declare all sums secured by this Trust Deed immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

b.    The Trustee shall have the right to foreclose by notice and sale, or Beneficiary shall have the right to foreclose by judicial foreclosure, in either case in accordance with applicable law.

c.    Beneficiary shall have the right to take possession of the Property and collect all the rents and revenues of the Property in accordance with this Trust Deed and/or in any other assignment of rents.

d.    Beneficiary shall have the right to have a receiver appointed to take possession of any or all of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, to collect all the rents and revenues from the Property and apply the proceeds, over and above cost of the receivership, against the sums due under this Trust Deed. The receiver may serve without bond if permitted by law. Beneficiary's right to the appointment of a receiver shall exist whether or not apparent value of the Property exceeds the sums due under this Trust Deed by a substantial amount. Employment by Beneficiary shall not disqualify a person from serving as a receiver.

e.    Trustee and Beneficiary shall have any other right or remedy provided in this Trust Deed or available at law, in equity or otherwise.

12.    Upon taking possession of all or any part of the Property, the receiver or Beneficiary may:

a.    Use, operate, manage, control and conduct business on the Property and make expenditures for all maintenance and improvements as in its judgment are proper;

b.    Collect the income from the Property including any past due, and apply such sums to the expenses of use, operation and management including but not limited to receivers fees, premiums on receivers bonds, and reasonable attorneys' fees and to the sums secured by

DEED OF TRUST 4

this Trust Deed in any order as Beneficiary shall determine in Beneficiary's sole discretion;

c.   At Beneficiary's option, complete any construction in progress on the Property, and in that connection pay bills, borrow funds, employ contractors and make any changes in plans or specifications as Beneficiary deems appropriate.

d.   Beneficiary or the receiver shall be liable to account only for those rents actually received. If the revenues produced by the Property are insufficient to pay expenses, the receiver may borrow from Beneficiary (if Beneficiary, in its sole discretion, agrees to lend) or otherwise, or Beneficiary may borrow or advance, such sums as the receiver or Beneficiary may deem necessary for purposes stated in this paragraph. Such sums shall become a part of the indebtedness secured by this Trust Deed and shall be payable by Grantor on demand.

13.     This Trust Deed is intended to be a security agreement pursuant to the Uniform Commercial Code of Oregon for any of the items specified above as part of the Property which, under applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code of Oregon, and Grantor hereby grants Beneficiary a security interest in said items. Grantor agrees that Beneficiary may file this Trust Deed, or a reproduction of it, in the real estate records, office of the Oregon Secretary of State, or other appropriate filing index, as a financing statement for any of the items specified above as part of the Property. Any reproduction of this Trust Deed or of any other security agreement or financing statement shall be sufficient as a financing statement. In addition, Grantor agrees to execute and deliver to Beneficiary, upon Beneficiary's request, any financing statements, as well as extensions, renewals and amendments of them, and reproductions of this Trust Deed in such form as Beneficiary may require to perfect a security interest with respect to said items. Grantor shall pay all costs of filing such financing statements and any extensions, renewals, amendments and releases of them, and shall pay all costs and expenses of any record searches for financing statements Beneficiary may require. Without the prior written consent of Beneficiary, Grantor shall not create or suffer to be created pursuant to the Uniform Commercial Code of Oregon any other security interest in those items, including replacements, substitutions and additions to them. Upon Grantor's breach of any covenant or agreement of Grantor contained in this Trust Deed, including the covenants to pay when due all sums secured by this Trust Deed, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code of Oregon and, at Beneficiary's option, may also invoke the remedies provided in this Trust Deed as to such items. In exercising any of said remedies, Beneficiary may proceed against the items of real property and any items of personal specified above as part of the Property separately or together and in any order whatsoever, whether by nonjudicial sale or otherwise, without in any way affecting the availability of Beneficiary's remedies under the Uniform Commercial Code of Oregon or the remedies provided in this Trust Deed.

14.     Grantor agrees and acknowledges that it has been advised of the right and need to, and has had the opportunity to, consult with its own legal and tax counsel.

BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.  THIS INSTRUMENT DOES NOT ALLOW USE OF THE PROPERTY DESCRIBED IN THIS INSTRUMENT IN VIOLATION OF APPLICABLE LAND USE LAWS AND REGULATIONS.  BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF

DEED OF TRUST 5

LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO DETERMINE ANY LIMITS ON LAWSUITS AGAINST FARMING OR FOREST PRACTICES, AS DEFINED IN ORS 30.930, AND TO INQUIRE ABOUT THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009 AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

IN WITNESS WHEREOF, Grantor has executed this Trust Deed on this _____, 202___.

**GRANTOR:**

_____

By: _____

STATE OF OREGON                    )
                                   ) ss.
County of _____    )

     This instrument was acknowledged before me on _____, 202___, by _____ as authorized signatory on behalf of _____, with all necessary authority to bind the Grantor.

_____
Notary Public – State of Oregon

DEED OF TRUST 6

**EXHIBIT A**
**Legal Description of Property**

TRUST DEED - EXHIBIT A

# Exhibit 10

**Proposed Settlement Assets**

| **Property Address** | **Parcel Number** |
| --- | --- |
| 31875 Northeast Bell Road<br>Sherwood, Yamhill County, OR 97140 | Parcel R3203 03200 |
| 31461 Northeast Bell Road<br>Sherwood, Yamhill County, OR 97140 | Parcel R3203 03202 |
| 31875 Northeast Bell Road<br>Sherwood, Yamhill County, OR 97140 | Parcel R3203 03300 |
| 16850 Northeast Leander Drive<br>Sherwood, Yamhill County, OR 97140 | Parcel R3203 03409 |
| 16850 Northeast Leander Drive<br>Sherwood, Yamhill County, OR 97140 | Parcel R3203 03410 |
| 31235 Northeast Bell Road<br>Sherwood, Yamhill County, OR 97140 | Parcel R3203 03100 |
| 16850 Northeast Leander Drive<br>Sherwood, Yamhill County, OR 97140 | Parcel R3203 03401 |
| 16850 Northeast Leander Drive<br>Sherwood, Yamhill County, OR 97140 | Parcel R3203 03400 |